# MOTION SEEKING PERMISSION

1  JOSEPH MIZZONI #68549

2  HIGH DESERT STATE PRISON

3  PO BOX 650

4  INDIAN SPRINGS, NV. 89070

✓ FILED
— ENTERED
COUNSEL/PARTIES OF RECORD

RECEIVED
— SERVED ON

AUG 0 8 2017

CLERK US DISTRICT COURT
DISTRICT OF NEVADA

BY: _____ DEPUTY

6  UNITED STATES DISTRICT COURT

7  DISTRICT OF NEVADA

9  JOSEPH MIZZONI

10         Plaintiff

12  VS.

14  STATE OF NEVADA etal

15        Defendants

CASE #: 3:15-CV-00499-MMD-WGC

"MOTION RESPONDING TO 7-24-17 HEARING"/AND

"MOTION SEEKING PERMISSION TO FILE A SPOLIATION/DESTRUCTION OF VIDEO TAPE EVIDENCE AGAINST DEFENDANTS"

"FOR RELIEF"

17  COMES NOW, the plaintiff Joseph Mizzoni #68549 PRO-SE
18  Respectfully request to file the above Motion on Defendant's
19  for Destroying, Loss, or Destructing Video Tape evidence on his
20  §1983 Civil Rights Case Pursuant to USC 42 §1983.

22  See; Haines v. Kerner. 404 U.S. 519 (1972)(Allegations of a pro-se complaint are
23  held to less standards than formal pleadings drafted by lawyers).

26  EXHIBITS A,B,C,D,E,F IS ATTACHED

-1-

I.

STATEMENT OF FACTS IN SUPPORT I

1  (FACT 1.) Plaintiff filed his First Amended Complaint on the 20th day of
2  March, 2016.

3

4  (FACT 2.) On this First Amend Complaint plaintiff requested vidio on
5  (PAGE 3 B: Nature of the Case to Page 3 C) through out, and at
6  the Disciplenary Hearing on 5-1-15 as stated in the 81983 Complaint.
7  And Plaintiff (Attached Exhibits), one being a INMATE REQUEST FORM
8  dated the 5th day of April, 2015 to Warden Ms. Walsh. I asked for
9  the Vidio and Witness for my Lawyer, Court and my 5-1-15 Disciplenary.
10 She responds: "ADHERE TO THE PROCESS". See; EXHIBIT-A.

11

12 (FACT 4.) This Courts Order filed 9-2-16 (Doc # 10) On (Page 4 Line 6-12); (PAGE 4
13 Line 19-20); (Page 5 Line 13-20); (Page 6 Line 25), all in which show this
14 Court reconized the Evidence, Witnesses and Vidio.

15

16 (FACT 7.) On 2-9-17 (Doc # 31) this Court Ordered a "SCHEDULING ORDER
17 FOR CIVIL RIGHTS ACTION FILED BY INCARCERATED PROSE
18 PLAINTIFFS, ordering Discovery by May 24, 2017.

19

20 (FACT 8.) On March 9, 2017 Defendant Bronson admits on Interrogatories
21 Question 5, that there Vidio working in Units 5, 4, 7, and 8 on 3-28-15.
22 Also Interrogatories 6 same question is there Vidio, yes there is. He also admits
23 in the 3-31-2017 Admissions there Vidio.

24

25 (FACT 9.) Plaintiff did file his " REQUEST TO DEFENTS FOR DISCOVERY
26 CONFERENCE UNDER FRCP ● 37(a)(1) LETTER dated March 21, 2017, and on
27 (Page 2 Line 16-27) Plaintiff requested any/all Vidio evidence, and I specified Units
28 5, 4, 7, 8 at NNCC Prison 3-28-15.        -2-

STATEMENT OF FACTS IN SUPPORT I                    (Contoned)

1  (FACT 10.) On a Courts Order dated 4-17-17 (Doc #47) on (page 4

2  Bottom of page) it states : "The Court is not pre-judging this issues but

3  on first "blush" it appears that the "vidio evidence" which plaintiff

4  claims "has been admitted" to exist" is central to this case, and plaintiff

5  should be permitted to review that evidence in a manner which

6  alaviates any safty and security concerns espoused in Bramons objections.

7

8  (FACT 11.) Defendants were ordered on June 15, 2017 MINUTES OF PROCEEDINGS

9  (Doc #78) on (page 4) to this: Defendants "shall" submit the Vidio and

10  pictures to Court no later than Friday 6-23-17.

11

12  (FACT 12.) ~~Defendants file "MOTION FOR ENLARGEMENT OF TIME TO REPLY~~

13  ~~TO PLAINTIFFS "MOTION TO RESPOND TO NOTICE AVAILABILITY OF~~  Old

14  ~~VIDIO MARCH 28, 2015 AND OPPOSE~~

15

16  (FACT 12.) Defendants file " NOTICE AVAILABILITY OF VIDEO

17  MARCH 28, 2015. On (page 1 Line 27-28) states: Defendants Motion For

18  Summary Judgment in Case No. 3:15-CV-00313, Inmate Mizzoni raised the

19  issues of Vidio tape footage. In there reply to Mizzonis opposition, Defendants

20  appered this, (page 2 Line 4-5) contowed), Court ord Inmate Mizzoni that the

21  incident on March 28, 2015 occurred in the rotunda of housing unit 5, an area

22  that does not have Vidio coverage; therefore, no vidio fotage of the incident

23  exists. (ECF No. 62 in 3:15-cv-00313-MMD-VPC at 5-6). The opposition also

24  outlined that an investigation was conducted and no Vidio fotage from

25  any part of Northern Nevada Correctional Center ("NNCC") capturing any

26  portion of the subject incident exists. (Id.)

27       This is Isolation of evidence of Vidio which is on (page 2 Line 6-21). And

28  it states: In preparation

                                    -3-

I.

STATEMENT OF FACTS IN SUPPORT I                    (continued)

1  for the June 15, 2012 hearing in this matter on Inmate Mizzoni's Motion
2  Seek Permission to Obtain by Court Order Vidio Tape (EEF No. 50), the
3  undersigned requested her clients double check their files regarding the
4  existence of Vidio footage on the March 28, 2015 incident. The
5  Vidio footage taken and available on March 28, 2015 of housing units
6  4, 5, 7, and 8 at NNCC for the time frame of 8:00 PM and 9:30 pm does not
7  depict the incident involving Inmate Mizzoni. (Exh A).
8       Further, the video taken by the camras in housing units 4, 5, 7, and 8
9  is on a recording loop; therefore, the vidio recording is not indefinitely
10 retained by the NDOC. (Id.) The only time a video recording from a
11 camra in housing units 4, 5, 7, and 8 is indefinitely kept by the NDOC
12 is if there is an incident (ie., riot, assalt against a correctional officer,
13 assault against inmate) that occurred and the incident was recorded on Video.
14 (Id.) If that occurres, the NDOC "will" make a copy of the video recording
15 and retain the recording for its records. (Id.) Since the March 28, 2015
16 incident occurred in area where there is no Video Camra coverage, and there
17 is no recorded vidio caverage of an incident from March 28, 2015 involving
18 Inmate Mizzoni, there is no video footage available to provide Mizzoni.
19 "The vidio footage from that date has been recorded over" as the
20 Video footage is on a recording loop and is not indefinitely retained
21 by NDOC or NNCC.
22
23            \              II PLAINTIFFS ARGUMENT
24      On the above Defendants Motion it says that Defendants on the ajacent
25 Case # 3:15-CV-00313-MMD-VPC filed a response on (Doc# 62) at 5-6 there
26 is no Vidio tape epidence on Unit 4, 5, 7 and 8. The Judge brought this up 7-24-17
27 and stated plaintiff did not oppose or respond. Plaintiff has not had a chance
28 to oppose the (Doc# 62)                    -4-

## PLAINTIFF'S ARGUMENT                    (continued)

1. Declaration of Ronald Schreckengost EXEZONI 3:13: DEF EXHL:001.
2. The reason plaintiff didn't oppose or respond to this because this was
3. a "Reply in Support of Defendants Motion For Summary Judment
4. dated the 6 day of December, 2016, and it was the final response to
5. the Summary Judgment. After this motion the Court made a decission
6. on the Summary Judgment # 3:15-CV-00513-MMD-VPC on a "REPORT AND
7. RECOMMENDATION OF U.S. MAGISTRATE JUDGE dated 3-7-17 (Doc# 71).
8. Then the Defendants filed a "DEFENDANTS PARTIAL OBJECTION TO REPORT
9. AND RECOMMENDATION OF US MAGISTRATE JUDGE date the 21, day of
10. March 2017. To this day the Magistrate Judge has not made a
11. final decission to any of this, so therefore it is delaying plaintiffs
12. Spoliation Motion for this case to of Destruction of evidence, and
13. therefore the Judge Cobb should not use this Declaration as a reason
14. to not make the Defendants produce the Crusial Vidro Evidence by
15. Court order not the AG Ms. Albrights version see; Exhibit-E See; EXHIBIT A-B-
16.      Plaintiff points out that on (page 2 Line 6-20) of Defendants "Notice
17. AVAILABILITY OF VIDEO MARCH 28, 2015, dated the 20, day of June, 2017,
18. that on (Line 12-16) it says: NDOC keeps vidio indefinitely if the following
19. happens ( i.e., riot, assault against a correctional officer, assault against an inmate)
20.      Plaintiffs points out on 3-28-15 spontaneus Force/Force was used in
21. Unit 5 to assist C/O C.Smith. then plaintiff was cuffed on his legs" his
22. hands were already cuffed," then all C/O' state on there C/O Reports' that
23. they used force to escort plaintiff from Unit 5 to Unit 8 to Unit 7.
SEE:> 24. Per (NDOC) AR USE OF FORCE AR405 B(a) pg 6 of 18 a/so (b) and (c) and page 7
EX-B 25. of 18 (d) If the use of force is still occurring when Staff Vidro recorder arrives
Attached 26. the incidents "shall" be recorded to conserve the unfolding events while waiting
27. for a response team, even if through windows, fences, bars, or even if far
28. away etc...)                        -5-  (AR 405 IS FOR ANY AND ALL FORCE, NOT JUST
                                              CELL EXTRACTIONS)

PLAINTIFFS ARGUMENT                    (continued)

1  This is Spontaneous Use of Force. See; EX-B AR 405 pg 6 of 18 (9);
2  Where force was used spontaneously, regardless of injuries reported
3  contemporaneous with the event, the area supervisors/incident commander
4  "shall" immediatly review, if available any Unit Video Survallance that may
5  have captured the Use of force.
6      (b.) If the Use of force was captured on Video, from "Any Angle" on camra
7  the area Supervisor/incident commander "shall" be responble for preserving
8  that recording in a manner and location that is easily retreivable in the
9  event review is needed. The Video "Must" be maintained for no less than
10 (3) Three Years from the date force was used.
11     (c.) If no camras were operational in that Unit or no cameras captured
12 the Use of force, the area supervisor/insident commander "shall" make a
13 notice of same in the Use of Force Ireedent Report.
14 AR405 (d.) In addition to and apart from "any" Survallance footage from
   pg 7&15
15 Stationary Camras that may exist, Video footage "SHALL" also be recorded
16 Via a HandHeld Camras follows :
17     • As soon as the shift supervisor becomes aware that force is
18 "being used or has been used", a staff member "SHALL" be directed to
19 immeatley obtain a Hand Held Vidio Camra and "SHALL" be ordered to the
20 Scene where force has been used. See; MEZZONI 313 DEF EXHA-005 Ms J. Roberson.
                                          (Didn't Follow AR405)
21     • Immediately upon arrival to the scene, the staff vidio recorder
22 "SHALL" begin recording, noting the time and date the recording begans and
23 identify himself/herself as video recorder. The staff video recorder "SHALL"
24 conteeve to take footage until area supervisor/incident commander decides
25 the incident is over and instructions the staff video recorder to cease
26 recording. See; MEZZONI 313:DEF EX A-005 Ms J. Roberson Shif Sorgent. She
27 didnt follow (NDOC) AR 405." Where the HandHeld Vidio from Unit 5 to Unit 8
28 on Use of force escort by (4) Officers?" -6- ( The insident didnt end until plaintiff was secure in)
                                                UNIT 7.

## PLAINTIFFS ARGUMENT (Continued)

1. She, Ms. Robertson said she had to go to operations for a new camra,
2. and she was a part of the escort from Unit 5 to Unit 8 to Unit 7. She
3. says she had a camra "wheres the Video Camra Tape?"; the AR 405 says a
4. Video Camra is to be used not a regular camra. This a spoltation/
5. destruction of evidence or not gatering the evidence at all. When she
6. came in to Unit 5 she was on one knee pointing the camra/vidio camra
7. directly at me when I saw her and the C10's were pounding and
8. grinding my head and body on the concret ground while I was cuffed
9. and C10's holded me down. Wheres that Video? I have a right to hand
10. held video by AR405/NRS LAWS (NDOC). Also; Responding Sgt. Steven Chowder, John Hill
11. senior C10; Shift Sergeant John Henley all never followed NDOC AR 405 for
12. Hand Held Video Camra evidence. See; MEZZONI 313 DEF EXH A-003; 005.
13. Staff Involvement. And see; MEZZONI 313: DEF EXH A-001 FRANK SHERMAN
14. LT. Shift command. He states he didn't see any of the incident "in Unit 5 only."
15. Where is the rest of the stationary camra footage from Units 5 outside, Unit 4
16. outside, Unit 8 inside/out, and Unit 7 outside/in?", for the contenued use of
17. force from one Unit to another?" Plaintiff was hand cuffed by C. Smith then
18. leg shackled by Officer Joel Hightower inwhich Hightower and Grider say they
19. used more force to escort plaintiff to infermory "(this force was excessive)." Once
20. plaintiff was brought to his feet Officers Hill, Grider, Henley, Hightower,
21. Crowder, C. Smith, Garnica, Ardinger, Highline, Samsel, and more C10's draged plaintiff
22. backwords from Unit 5 to Unit 8 (with use of Force) so there is sposed to
23. be Hand Held and Stationary Camra Vidio per AR 405, and is to be saved (3)
24. years to view "just like this Case"; Where is it?. NDOC Destroyed, loss it, and
25. never even took Vidio 'required by there own Admenstration Regulations
26. AR 405. This is spoltation of Vidio evidence See; MEZZONI 313: DEF EXH A-
27. 001-010 C10's reports, See; EXHIBET-C.   See; AR 405 (NDOC) EXHIBET B.
28. See; NDOC Rules, EXHIBET-A.

<u>PLAINTIFF'S ARGUMENT/CASE LAWS</u>   (continued)

1. Because of those events of use of force the whole incident from start
2. to finish is to be Video taped. See; <u>Marguez v. Mann</u>, 192 A.D. 2d. 100,
3. 600 N.Y.S 2d 285 (3d Dept. 1993)(Failure of hearing officer to allow inmate to
4. review Video Tape of incident in question at disciplinary hearing denied inmate his
5. Constitutional right to answer the evidence therefore, the record of the
6. incident should be exspunged.) See; <u>Wolff v. McDonell</u>, 418 U.S. 539, 94 S.
7. Ct 2963, 41 L.Ed 2d 935 (1974.) See; <u>Muhammed v. Butler</u>, 655 F. Supp 1470,
8. 1472 (D.N.J. 1987)(Hearing officers refusal to allow the inmate to hear
9. taped telephone recording-or even to see transcript of the call inmate made
10. did not pass Constitutional muster, and that the inmates right to present a
11. defense was clearly abridged by his inability to review these statements.)
12. See; <u>Young v. Lynch</u>, 846 F.2d 960, 963 (4th Cir 1988)(Due process may require
13. production of evidence when it is dispositive item of proof; it is critical to
14. the inmates defense; it is in the custody of prison officials and it could be
15. produced without impairing institutional concerns") See; <u>Little v. Armontrout,</u>
16. 835 F.2d 1240 (8th Cir. 1987)(Destruction of tapes violate due process
17. if they had exculpatatory value which was apparent before there
18. destruction.) The destruction of Video Tapes or none took at all is
19. a Violation of plaintiffs Due Process Rights in its self. See; <u>Northen</u>
20. <u>Nevada Association of Injured Workers v. Nevada State Indus. Insurance</u>
21. <u>System</u> (Nev. 1991) 807 P.2d 728, 107 Nev. 108, says; "State Agencies "MUST"
22. follow their own Rules. Failure to follow a Non-Discretinary Rule Constitutes a
23. Non-Discretionary Act." (See; <u>NRS 41.031, NRS 41.032, and NRS 616.50057</u>.)
24. Where Nevada Dept. Of Corrections Administration Regulations, OP's, and
25. IP's say that something has to be done, ie "Forced movements" and/or
26. Extractions must be Video Taped, The absence of a Video, (Because one wasn't
27. taken or because it was lost): (1) Violates a non-discretionary Policy; (2)
28. It Constitutes a

PLAINTIFFS ARGUMENT / CASE LAWS          (continued)

1  NON-Discretionary Act; <3> It Constitutes Destruction of Evidence, (ITS Spollation).

2  See; Kimberly Bass Davis V. Katus Davis (Nev. 2006) 134 P. 3d 103 122

3  Nev. 442; says: "Destruction of Evidence that is not willfull still evidence

4  would have been unfavorable to the Destroyer "Destruction Evidence that

5  is willfull warrants Jury Instructions for Presumption that destroyed evidence

6  would have been unfavorable to the Destroyer." The difference between and

7  inference and presumption is that while the Jury "MUST" accept a

8  Presumption as true", it does not have to accept an inference as true!"

9    Where the destroyer destruction of evidence violates a written policy; said

10  Destruction is deemed wilful." NRS 41.031 says that: "The State of Nevada;

11  its Agencies; and their employees wave there immunity from being sued in

12  State Court for Non-Discretionary acts". (Also see; NRS. 037) Where law

13  suit is against NDOC Employee, destruction of evidence by "any" other

14  NDOC Employee is still held against law suit party under law ⬛⬛⬛

15  of Agency." See; Plaintiffs Grievance # 2006-29-98671 EXHIBIT E VIDEO

16  EVIDENCE dated 4-15-15 Only 18 Days After 3-28-15 insident. See; MIZZONI 313: DEF

17  EXH C-002 Responding Medical Nurse Stefanie Andrews plaintiffs intind injuries.

18  ⬛⬛⬛⬛                    IV CONCLUSION

19     Wherefore Plaintiff shows "Points and Authorities" and good cause to why

20  the 3-28-15 Video by Hand Held and Stasnary Video for Units 4, 5, 7, 8 at

21  (NNCC) Prison is crusal to plaintiff's due process rights and evidence to show and

22  prove his facts of case as said in his §1983 Complaint; And that the Defendants

23  and there administration destroyed, loss, or none at all, pre-Ae 4o5 NDOC, on purpose

24  to withhold evidence of Excessive Force Used and Force Used to violate the plaintiffs

25  Due Process Rights under the 14th Amd USCA before a Due process hearing, and destroying

26  Video Evidence that could be used against them NDOC Employees to avoid prosecution of

27  plaintiffs case. Plaintiff ask for all his relief on this case #3: 15-cv-oo499-MMD-WGC, or proper

28  Jury instructions to defalt Defendants.         -9- (Plaintiff did as ordered on 7-24-17)

## IV CONCLUSION                    (continued)

1  And the Vidio that the 3-28-15 Shift Commander Lt. Frank Sherman
2  Viewed as he stated in his C/O Reports is crusal to this case # 3:15-cv-
3  00499-MMD-WGC to show witnesses that were in the rotunda.
4  Mr Frank Sherman is sposed to preserve that Vidio to. It Shows Unit 5
5  A wing, B wing, and C wings, with a ▓▓▓▓ Cmra at ▓▓▓▓ each wing
6  Coming and going from Rotunda to the Wings or "vrs versA", and
7  with that Vrideo it will show all the inmates that Defendant
8  C. Smith said on his Disciplenary Report in the Rotunda, comin and
9  going to the Rotund or leaving the Rotund at 8pm or before, and
10 Plaintiff has a Constitutional Right to Confront those Inmate
11 Witnesses in person or by Affidavit to get their version of events
12 that took place that night, and so the Video will show the
13 Inmates comin from the rotunda when the responding Officer came
14 in the Unit 5 and said Lock Down. Also (NDOC) or (IG) Investigators
15 should have that Vidio and witness statements or Interviews to
16 what took place that night, Where is all this evidence? Once
17 again with out it or the Video this is clearly destruction of evidence
18 and Failure to investigate which is Spolation. See; <u>AR 405</u>   See; <u>MIZIONI</u>
19 <u>313: DEF EXH A-001 Shift Commander Frank Sherman ▓▓▓▓▓▓▓▓▓▓</u>
20    Also if the Court looks at the C/O's reports the Vrdio will show in
21 Unit 5 - Wings the two inmates sitting on the floor and restrained them
22 when they went back to there cells from the Rotunda Floor. Wheres the
23 Video and the statements/names of those witness inmates that Officer
24 Heidi DierHKA states on her Officer report as a witness. See; <u>MIZIONI</u>
25 <u>313: DEF EXH A-009.</u> Once again Spolation/Destruction Evidence and failure
26 to Investigate. Plaintiff still ask for relief of damages or Jury instructions of destruction
27 of evidence on case at trial. Plaintiff ask to reverse the 7-24-17 Decision and demand
28 Any/All Videos by Court Order.        9-A  See; <u>Hart v. Gomez, 174 F.3d 1067, 1070 (9th Cir 1999)</u>

AFFIDAVIT OF PLAINTIFF JOSEPH MEZZONE #68549 IN-PRO-SE

STATE OF NEVADA.)

                              :SS JOSEPH MEZZONI

COUNTY OF CLARK)


(1.) Plaintiff Sworn in support of the Motion duly and says;


(2.) Plaintiff in Pro-se Joseph Mizzoni #68549 in support of the affidavit here for a " MOTION RESPONDING TO 7-24-17 HEARING"/AND "MOTION SEEKING PERMISSION TO FILE A SPOLIATION/DESTRUCTION OF VIDEO TAPE EVIDENCE AGAINST DEFENDANTS" FOR RELIEF" on hrs §1983 IN THE UNITED STATES DISTRICT COURT DISTRICT OF NEVADA and does so in the truth under penalty of perjury USC§1746/NRS LAWS.


                                        RESPECTFULLY SUBMITTED
                                        this 31 day of July 2017

                                        BY: Joseph Mizzoni

                                        Joseph Mizzoni
                                        #68549

## CERTFICATE OF SERVICE BY MAILING

I, _JOSEPH MEZZONE #68549_, hereby certify, pursuant to NRCP 5(b), that on this _31_

day of _July_, 20_17_, I mailed a true and correct copy of the foregoing, "_MOTION RESPONDING_

_TO 7-24-17 HEARING "/AND "MOTION SEEKING PERMISSION TO FILE A SPOLIATION /_ "

_DESTRUCTION OF ~~EVIDENCE~~ VIDEO TAPE EVIDENCE AGAINST DEFENDANTS FOR RELIEF_
by depositing it in the High Desert State Prison, Legal Library, First-Class Postage, fully prepaid,

addressed as follows:


1) _CLERK, US DISTRICT COURT_          2) _Office of Attorney Gen. / Nev_
   _DISTRICT OF NEVADA_                   _MS. ALBRIGHT_
   _400 S. VIRGENIA Street_               _100 N. Carson Street_
   _Room # 301_                           _Carson City, Nev._
   _Reno, Nev. 89501_                           _89701-4717_


3) _Address Plantiff_
   _High Desert State Prison_
   _PO Box 650_
   _Indian Springs, Nev. 89070_


CC:FILE


**DATED:** this _31_ day of _July_, 20_17_.




                                    _Joseph Mezzone_          _#68549_
                                          /In Propria Personam
                                    Post Office box 650 [HDSP]
                                    Indian Springs, Nevada 89018
                                    **IN FORMA PAUPERIS:**

EXHIBITS-A

EXHIBITS-A

**INMATE REQUEST FORM**

| 1.) INMATE NAME | DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Joseph Mizzou | 68549 | 7-B-62 | 4-5-15 |

**4.) REQUEST FORM TO: (CHECK BOX)**

___ CASEWORKER    ___ MEDICAL    ___ MENTAL HEALTH    ___ CANTEEN

___ EDUCATION    ___ VISITING    ___ LAW LIBRARY    ___ DENTAL

___ LAUNDRY    ___ PROPERTY ROOM    ___ SHIFT COMMAND

✓ OTHER *WARDEN [MS. WALSH]*
*FOR MY lawyer and Court*

**5.) NAME OF INDIVIDUAL TO CONTACT:** MS WALSH (Please Retain all video/still pictures)

**6.) REQUEST: (PRINT BELOW)** MAM, I am in 7-B-62 I went to a Hearing on 4-4-15 and Received my Notice of Charges and was read everything in C/O Smith's Versing Unit 5 on 3-28-15 he said he made, I asked to lock it up and they did; then he said he ordered "several" "Inmates" to get back because his rotunda was full of other inmates. AT the hearing I requested those inmates in the rotunda and account myself and C/O Smith Names on Affidavits to or any other Inmates version of events to be at my disciplinary Also, please request all video/still pictures from inside Unit 5 to 7-A-38 on 3-28-15 in order to Confront witness and evidence with Charges against me mam. Thank You

**7.) INMATE SIGNATURE** Joseph Mizz    DOC # 68549

**8.) RECEIVING STAFF SIGNATURE** _____ DATE _____

**9.) RESPONSE TO INMATE**

Adhere to the process

**10.) RESPONDING STAFF SIGNATURE** RW    DATE 4/17

DOC – 3012 (REV. 7/01)

EXHIBITS — B

EXHIBITS-B

*Ex B*

*Joseph*
*Mizan*
*1468590*

# ADMINISTRATIVE REGULATION
# 405

## USE OF FORCE

**Supersedes:**     AR 405 (Temporary 6/23/11) AR 405 (Temporary, 03/03/16)
                    AR 405 (Temporary 5/25/16) AR 405 8/16/16,
                    AR 405 (Temporary 11/3/16)
**Effective Date:**  11/16/16

**AUTHORITY:** NRS 209.131, 209.161, 212.090 and 212.190

## RESPONSIBILITY

1. The Warden/Division Head is responsible for the overall execution of this regulation.
   Direct supervision of this regulation is the responsibility of the Shift Supervisor
   (institutions/facilities) and/or the Transportation Lieutenant/Sergeant in regards to
   Central Transportation Division. The Inspector General in regards to the Inspector
   General's Office.

2. The Warden at each institution, Central Transportation Lieutenant, the Inspector
   General; shall ensure that all assigned staff is trained and have signed an
   acknowledgement statement that they have read, know and understand this regulation.
   A copy of their acknowledgement shall be maintained in each staff member's training
   file.

3. It is the responsibility of all employees who may be required to use force as part of
   their duties to understand and comply with the Use of Force policy, related
   procedures, use of equipment and attend and understand relevant use of force
   training.

## DEFINITIONS

<u>Authorized Personnel</u> – A person who has received the prescribed NDOC training in the
application of Use of Force equipment or tactics, and whose qualifications are up-to-date.
Any person who volunteers, is contracted by or is employed by the NDOC is authorized
to defend themselves or others from attack. A Correctional Officer Trainee or
Correctional Officer who has not completed the Basic Academy and has not passed the
Peace Officers Standards and Training (POST) certification exam are authorized to
defend themselves and others from attack.  Only certified Peace Officers who are current
on their qualifications shall be authorized to utilize force tactics, tools, devices, weapons
or other methods authorized by the Department Director.

<u>Lethal Force</u> –

*All CO's
Blows to
head*

* **Great Bodily Injury -** Great bodily injury is any bodily injury that creates a substantial risk of death, such as but not limited to, stab wounds that cause substantial bleeding strike vital organs or repeated blows to the head with kicks or with a blunt instrument.

## 405.01 USE OF FORCE GENERAL PROVISIONS

The NDOC shall operate under this use of force policy that defines staff responsibilities and limitations concerning the use of force while still allowing discretion in the appropriate application of force. The policy provides staff with the appropriate guidance on the permissible Use of Force. It ensures discipline is imposed for violations of the Use of Force policy, procedures or training.

It is the policy of the NDOC to authorize the use of physical force when and only to the extent that is reasonably believed to be necessary as specified in these rules. Staff is authorized to use that amount of force that is objectively reasonable to overcome a threat thereby minimizing the risk of injury to the officer, the threat and the public.

✳ At no time are staff permitted to use force for punishment, retaliation, or discipline. ✳

*All CO
No Excessive
Force Used*

*Dragging
me across
yards?*

✳ Force shall be used only when reasonably necessary to subdue an attacker, overcome resistance, affect custody, or to gain compliance with a lawful order. It is the policy of the NDOC to accomplish the educational, treatment and supervision functions with minimal reliance on the use of force. Staff may use reasonable force as required in the performance of their duties, but unnecessary or excessive force shall not be used. If staff, at any point, determines the situation can be resolved without any further use of force, staff shall terminate the use of force.

All the facility Operational Procedures must conform to the provisions in this Administrative Regulation.

## 405.02 STAFF TRAINING INVOLVING USE OF FORCE

*Physical
restraints
is Force*

1.  All personnel shall receive training and be qualified prior to being assigned to a position involving possible Use of Force and being authorized to use any force related equipment such as physical restraints, firearms, projectile launchers, chemical agents (CS/OC), taser or similar technology or batons. A staff member employed in positions that are authorized to use force-related equipment shall receive annual refresher and semi-annual firearms qualification training in the correct use of all equipment to maintain their established proficiency levels.

*No
Choke Holds*

2.  The application of force when using any authorized equipment must be consistent with training. (For example; intentional strikes to the head or neck are not consistent with training for the side handle baton.) Shots to the head with 40 mm launcher are not consistent with training. (The use of carotid or choke holds is not authorized.)

3.  Training shall include:

*(handwritten margin notes: "O/C", "Handheld batons", "Lasers(?)", "Cuffs", "No choke holds")*

- **Physical Force** – includes the use of physical strength and holds (strikes i.e. Hand, elbow, knee and locks i.e. Wrist locks) except that choke holds and other types of physical holds that prevent the person from breathing, swallowing or cutting off blood supply to the brain are not authorized.) *(handwritten: "Hand cuffs see par")*
- **Chemical Agents** – use of departmentally authorized chemical agents
- **Hand-held Batons** – departmentally approved batons.
- **Less-lethal weapons** – departmentally approved projectile launchers that are not likely to cause death.
- **Lethal weapons** – firearms capable of firing lethal rounds/projectiles.

10. Levels of Force:

A. Planned use of force can be used at any level in the use of force continuum.
  Planned use of force incidents (must be videotaped) as outlined in this AR. (Healthcare staff shall be consulted to determine if there are any contra-indicating factors such as but not limited to the use of O/C for asthmatics or tasers on inmates with other health problems or heart pacemakers prior to the planned use of force and documented.) Staff involved in these incidents shall utilize protective equipment. An example of planned use of force is a cell extraction. Staff are to be reminded to use universal precautions equipment such as latex gloves in addition to their other equipment.

*(handwritten margin notes: "medical", "Cell extraction", "video")*

  a. In a planned use of force, the Incident Commander in charge shall assign a staff member to be in (charge of recording the entire planned use of force.) If time permits and a second camera is available, one staff member shall video-record the inmate at the cell front during staff's attempts to gain the inmate's compliance through verbal persuasion efforts and the other video-recording is taping the planned use of force team introductions and plan by the incident commander.

*(handwritten margin notes: "O/C (again)", "Equipment of", "Camera / Audio")*

  b. The staff member assigned to recording shall ensure, prior to the start of the use of force, that the recording equipment has sufficient batteries and sufficient blank recording space, such that technical issues with recording shall be minimized once recording begins. The recorder shall begin all video recording stating his/her name, date, time, location and inmate name.
     - The incident commander shall describe the nature of the incident that requires the planned use of force and the attempts to resolve the issue without the use of force.
     - Prior to the use of force, healthcare staff shall be contacted to determine if there are is medical or mental health condition that would preclude the use of any chemical agent or taser. Record on video the comments by healthcare staff, stating his/her name. If unavailable for video, Incident Commander shall identify name of healthcare staff and the comment made by the healthcare staff member on the recording.

*(handwritten: SHALL BE SEEN) (handwritten: video)*

d. In addition to and apart from any surveillance footage from stationary cameras that may exist, video footage shall also be recorded via a hand-held camera, as follows:

*(handwritten margin: Planning UR of Force)*

*(handwritten: Hand Held Video Camera)*

- As soon as the shift supervisor becomes aware that force is being used or has been used, a staff member shall be directed to immediately obtain a handheld video camera and shall be ordered to the scene where force has been used.

- Immediately upon arrival to the scene, the staff video recorder shall begin recording, noting the time and date the recording begins and identify himself/herself as video recorder. The staff video recorder shall continue to take footage until the area supervisor/incident commander decides the incident is over and instructs the staff video recorder to cease recording.

- For any breaks in recording, the recording staff member must sign back on with the date, time and reason for the break in recording.

*(handwritten margin: Video)*

If the Use of Force is still occurring when the staff video recorder arrives, the incidents shall be recorded to capture the unfolding events while waiting for a response team, even if through windows, fences, bars, or even if far away, etc. Staff shall not place themselves in any danger to capture the events.

*(handwritten margin: Wardens Adhere to Video to Wardens)*

C. The Warden/Division head shall ensure that Use of Force Operational Procedures are specific on the process for the recording of Use of Force incidents and storage of the video recordings.

## 405.04 AUTHORIZATION FOR THE USE OF LESS LETHAL FORCE

"Less lethal force" may be used in the following situations:

1. Self-defense;

2. Defense of others;

3. Prevention of self-injurious behavior;

4. Maintaining order and control in a facility, including prevention of damage to state property;

5. Prevention of escape from any security level;

6. Prevention of the commission of a felony by an inmate;

## 405.05   LESS LETHAL FORCE

F.  Pepperball or FN 303 less lethal launcher using compressed air to launch direct impact or chemical agents to temporarily incapacitate a threat. These Launchers may only be deployed by trained and qualified Authorized Personnel.

Decontamination - If chemical agents are utilized in a planned use of force or spontaneous use of force, the inmate shall be decontaminated as soon as the inmate is in restraints and the decontamination can be conducted in a safe manner. Inmate(s) affected shall also be seen by medical personnel as soon as practicable upon containment of incident. The decontamination and medical evaluation shall be documented in the Incident Report by Supervisor handling the planned use of force.

Choke
Holds (Choke or carotid holds is not authorized use of force techniques.) A head lock is not considered a choke or carotid hold.

*  3.  **Wardens shall ensure through Operational Procedures where and how these tools shall be utilized throughout the institution.**

A loud and clear verbal warning or order shall be given.  Verbal warnings shall be issued before and repeated while less lethal munitions or chemical agents are being deployed.

If the verbal warnings or orders fail to stop the prohibited activity, the Officer may then deploy less lethal force tools to prevent further harm of another person or property. Verbal warnings shall be repeated continuously while less lethal munitions or chemical agents are being deployed. Force shall cease immediately upon gaining compliance.

The use of less than lethal force are never to be used to stop verbal abuse or other non-threatening behavior

## 405.06  AUTHORIZATION FOR USE OF LETHAL FORCE

Staff has the obligation and responsibility to exercise discipline, caution, restraint and good judgment when using potentially lethal force. Lethal force may be used upon the reasonable belief that staff life or safety, or the life or safety of another, is in imminent jeopardy of death or substantial bodily harm given the totality of the circumstances known to the officer at the time of his/her action. Staff must keep in mind that the use of potentially lethal force presents a danger to the subject and to innocent parties. Only trained and qualified staff are authorized to use lethal force, and only as a last resort. Officers shall consider other reasonable means of control before resorting to the use of deadly force as time and circumstances safely permit.

Lethal force is any force which carries a substantial risk that it may result in death or serious or great bodily injury. Lethal force may be used only when imminent jeopardy exists regarding the following situations:

## 405.08  EMERGENCY RESPONSE

The Nevada Department of Correction shall utilize a "plain English" notification system. This statewide universal approach shall initiate first responders. Followed by the secondary responders, based on initial reports. Some examples for each level are as following:

1. Level 1,  mutual combat between two inmates, isolated and contained physical plant failure or compromise, or a single disruptive inmate

2. Level 2, multiple inmate fight, weapons present, staff assault, evidence of escape, or larger scale physical plant failure or compromise

3. Level 3, Escape, homicide, officer-involved lethal force or complete physical plant failure or compromise.

The Warden at each institution shall ensure the development of an Operational Procedure that shall identify responders/position, the systematic lockdown, and equipment deployed for each level. This Operational Procedure shall also include response to rural camps and Transitional Housing facilities.

## 405.09  ESCAPE FROM SECURED PERIMETER

1. If possible, prior to using firearms, an alert to the institution shall be broadcast by radio, attempts shall be made to apprehend or physically restrain an escapee or an attempted escapee.

2. If an officer observes an inmate located within the "No Man's Land," an immediate alarm shall be sounded to initiate a response then the following command in a loud and firm voice, shall be given, "Stop or I will shoot." A second alert to the institution shall be broadcast by radio, time permitting, to alert responding staff of the possible discharge of the weapon. If the inmate fails to stop and no other means of stopping the inmate is available, then the officer may fire a warning shot as outlined in this procedure.

3. If the inmate continues toward the inner perimeter fence, after verbal warnings and a warning shot has been discharged, additional warning shots may be discharged near the escaping inmate in an effort to gain compliance. The officer must exercise care to prevent a possible ricochet of the warning shots. (Wardens shall designate in operational procedures where warning shots will be discharged.)

4. Once an inmate has begun going over, under, or through the inner perimeter fence, (that is, feet have left the ground or crawling under or through), the following shall be done:

area, such as within a building, it would be inappropriate to use warning shots. Verbal commands shall be substituted.

3. Transportation Officers shall be armed with both lethal and less lethal tools in the event of the physical surroundings and the proximity of civilians would prevent the use of lethal tools.

4. Officers are required to cooperate with local law enforcement officials in any unusual or emergency situation involving inmates under the custody of the Department of Corrections.

## 405.11   MEDICAL CARE AFTER USE OF FORCE

1. Medical care which includes medical treatment and examinations shall be conducted by institutional medical staff when a Use of Force incident has occurred.  When order has been restored, the inmate(s) who has been subjected to any Use of Force shall be examined by medical staff and provided medical care proportionate to the individual's injuries sustained. This examination shall be documented utilizing the Unusual Occurrence Report form DOC 2514.  Inmates cannot refuse to be assessed, but can refuse treatment of any injuries sustained. All refusals of medical treatment shall be documented and included in the Use of Force incident files utilizing the Refusal of Medical Treatment form DOC 2523. Decontamination from chemical agents shall also be completed as soon as practical after the use of force. Refusal for decontamination shall be documented on NDOC form 2523 – Refusal of Medical Treatment. Photographs of the Inmate shall be completed on all Inmates who had force used upon them regardless of injuries. Copies of these photos shall be uploaded into NOTIS and placed in the Use of Force Incident File.

2. Any staff member involved in the Use of Force sustaining injuries shall be examined by NDOC medical staff and shall provide emergency medical care proportionate to the individual's injuries prior to transport to an appropriate healthcare facility.  This examination shall be documented utilizing the Unusual Occurrence Report form DOC 2514.

## 405.12   REPORTING OF USE OF FORCE

In all cases the reporting of Uses of Force MUST be accomplished as soon as practical after the incident and before leaving the institution or going off duty.  Any Use of Force shall be reported to the shift supervisors who shall ensure, once order has been restored and the involved inmate(s) are placed in secure housing, that written reports from all staff involved are completed.  This includes custody officers, institutional staff, medical staff, volunteers or any persons that witnessed the Use of Force.

1. These reports shall be entered into the Nevada Offender Tracking Information System (NOTIS) for review by the appropriate supervisors.

5. The review panel shall review the actions of all staff members and inmate(s) involved in the Use of Force incident, including those actions leading up to the Use of Force, taking into account any NOTIS incident reports surrounding the time frame of the Use of Force, especially involving the staff member that used the force and the inmate that had the force used upon their person.

6. The review panel shall conduct in person, recorded interviews of all staff and inmate(s) involved in the Use of Force. Should the panel, as part of the review, desire to question/interview an employee involved in the use of force, the panel shall conduct all interviews in accordance with department procedures, as well as relevant provisions of NRS chapter 284 and 289. The panel does not have the authority to recommend discipline.

7. The review panel shall evaluate the Use of Force incident and prepare a written report on its evaluation and determination to the Warden, the Deputy Director of Operations and Inspector General within ten (10) days from commencement of the Use of Force review, to include:

   A. Was the Use of Force justified;

   B. Was the Use of Force within policy, procedures and training of the Department;

   C. Could the Use of Force have been prevented;

   D. Could this type of Use of Force be prevented in the future;

   E. Any referral for investigation for possible disciplinary action for staff member(s) involved in the Use of Force.

   F. Any recommended corrective action for staff member(s) involved in the use of force.

   G. Any recommendation for any staff member that acted with distinction in the Use of Force; and

   H. Any recommended changes or enhancements to policy, procedure, or training related to this Use of Force.

   I. Any recommended changes or enhancements to the physical structure of the area related to this use of force

## 405.13 SERIOUS USE OF FORCE INCIDENT REVIEWS

1. Any Use of Force suspected to be excessive or unnecessary shall be immediately referred to and assigned to the Inspector General for investigation. In these circumstances the Use of Force Incident Review will not be completed.

7. The review panel shall evaluate the Use of Force incident and prepare a written report on its evaluation and determination to the Director and the Deputy Director of Operations within thirty (30) days from commencement of the Use of Force review, to include:

   A. Was the Use of Force justified;

   B. Was the Use of Force within policy, procedures and training of the Department;

   C. Could the Use of Force have been prevented;

   D. Could this type of Use of Force be prevented in the future;

   E. Any referral for investigation for possible disciplinary action for staff member(s) involved in the Use of Force.

   F. Any referral for investigation for possible corrective action for staff member(s) involved in the Use of Force.

   G. Any recommendation for any staff member that acted with distinction in the Use of Force; and

   H. Any recommended changes or enhancements to policy, procedure, or training related to this Use of Force.

   I. Any recommended changes or enhancements to the physical structure of the area related to this use of force.

8. Any recommended corrective action being applied to a staff member shall be reported to the appointing authority via a memorandum that outlines the reason for the corrective action. A corrective action is not deemed a discipline.

9. Any findings that recommend disciplinary action be taken against a staff member shall be referred to the Inspector General and Director for their review and appropriate response; response may include, but not be limited to official assignment for Administrative Investigation.

10. Any findings that recommend a change or enhancement to a policy, procedure, or training shall be sent to the Director and Deputy Director of Operations.

11. Any findings that identifies that a staff member acted with distinction in the Use of Force shall be sent to the Director and Deputy Director of Operations.

12. The review panel report and its contents are confidential and not subject to dissemination except by order of the Director, Inspector General, or lawful court order.

EXHIBITS- C

EXHIBITS-C





# State of Nevada
# Department of Corrections

*Investigation Detail Report*
*For: AG Office*

## Investigation

| | | | |
|---|---|---|---|
| **Investigator:** | | **IR Number:** | IR-2015-NNCC-000575 |
| **Assigned Date:** | | **Occurrence Date:** | 03/28/2015 |
| **Report Due Date:** | | **IA Number:** | IA- |
| **Disposition Date:** | | **Institution:** | NNCC |

## Narrative

On March 28, 2015 at approximately 2034, Correctional Officer C.Smith, Unit 5 officer, requested Via radio backup assistance for a disruptive inmate. Sgt. Roberson and Search and Escort responded to unit. Inmate had struck the officer in the face. Inmate was checked by medical and placed into Adminstrative Segregation. Unit officer and one responding officer completed C-1 paperwork. Both were seen by Institutional Medical. Photos were taken of inmate and officers. No officer released at this time. Warden Baca was advised. Message left for AW Schreckengost. Reports to follow from officers. ...[MSMITH, 03/29/2015 09:14:54] The inmate involved in this incident is inmate Joseph Mizzoni #68549 (5B-29A). Inmate Mizzoni was served with a notice of classification hearing and housed in 7A-38A. Inmate Mizzoni is on the communicable disease list. Officer Smith, C. was treated at CTRMC for a possible blood exposure and checked for injuries as a result of the incident. Officers Samsel and Grider were treated at CTRMC for possible blood exposure.

## Offender Involvment

| NDOC ID | Offender Name | Participation |
|---|---|---|
| 68549 | MIZZONI, JOSEPH | Suspect |
| Comments: | | |

## Staff Involvment

| Staff Name | Participation |
|---|---|
| SHERMAN, FRANK | Witness |
| Comment: Shift command reporting 019 | |

● *Reports*

| Report Type | Report Detail |
|---|---|
| INC028 | On March 28, 2015, I, Sergeant Frank Sherman, was arriving at Northern Nevada Correctional Center to work C-Graveyard Shift as the Acting Shift Lieutenant. At approximately 2035 hours, a radio call for back-up at Unit 5 was received from Correctional officer Christopher Smith. Sergeant Roberson, RMF Sergeant, and Sergeant John Henley, C-Graveyard Shift Sergeant, responded from Operations. I remained at operations to monitor the shift change for C-Graveyard Shift and the phones. I began checking the institutional cameras to check Unit 5 for any information. I was not able to see any of the incident on camera. I began checking the playback of the unit for any possible information. Nothing was seen. Inmates were seen mingling in the wings. At this time, Sgt. Crowder responded to the unit to assist. At approximately 2046 hours, Sgt. Henley advised that the institution would remain locked down for the evening and the incident was code 4. The inmate, later identified as Mizzoni, 68549, Unit 5 B 29 A, was being escorted to the Infirmary for further evaluation. After the evaluation and photos taken, Inmate Mizzoni was moved to Unit 7 A 38 A pending reclassification and disciplinary. The Institutional Count was delayed to complete this move. At approximately 2050 hours, Sgt. Henley returned to operations with Sgt. Roberson and briefed me on the incident. Search and Escort were in Unit 5 completing some random cell searches and one cell that was searched was Unit 5 B 29 where Inmate Mizzoni, 68549, resides. Unit 5 officer, Correctional Officer Christopher Smith, was monitoring the Unit rotunda. Inmate Mizzoni was becoming irate and disruptive and Officer C. Smith, went to calm the inmate. As the inmate became more irate, Officer Smith requested assistance by radio. C/O Smith was attempting to |

MIZZONI 313: DEF EXH C - 001



# State of Nevada
# Department of Corrections

*Investigation Detail Report*
*For: AG Office*



---

## Investigation

| | |
|---|---|
| **Investigator:** | **IR Number:** IR-2015-NNCC-000575 |
| **Assigned Date:** | **Occurrence Date:** 03/28/2015 |
| **Report Due Date:** | **IA Number:** IA- |
| **Disposition Date:** | **Institution:** NNCC |

---

## Staff Involvment

● *Reports*

**Report Type**      **Report Detail**

place Inmate Mizzoni into restraints and had ordered the inmate to move to the wall. Inmate Mizzoni appeared he was going to comply but moved in an aggressive mannner toward Officer Smith. C/O Smith used hands on force to attempt to control Inmate Mizzoni. C/O Smith radioed for Back up at this time. Inmate Mizzoni was able to get loose from Officer Smith and used a closed fist to swing at the officer. Inmate Mizzoni¿s closed hand struck Officer Smith on the right cheek. As officers arrived to assist at the incident the unit was secured. With Inmate Mizzoni restrained, C/O Grider, C/O Samsel and C/O Allison escorted the inmate to the infirmary for further evaluation.

At this time, Sgt. Henley had to leave the institution due to a family emergency. Sgt. Roberson remained on post as the second supervisor and assisted with reports. Sgt. Roberson did assist with completing the C-1 Paperwork for staff from this incident.  C/O Smith was moved to Unit 2 to complete his paperwork and C-1 paperwork for possible injury from the incident. An initial evaluation was giving by the institutional Medical Nurse, Stephanie Andrews. Photographs were taken of the injuries of the officer at this time.

Warden Baca was advised on the situation at approximately 2055 hours. A message was left on the cell phone for AW Ron Schreckengost. At approximately 0015 hours, it was discovered that Inmate Mizzoni had bled during the incident and he was screaming he was Hep C positive. I found that two other officers with C/O Smith may have been exposed to blood borne pathogens. I checked the Communicable list and did find Inmate Mizzoni was on it. At this time, Sgt. Roberson contacted C/O Smith and advised him he would be leaving as soon as we were able to get C-1 completed for him to take to the Carson Tahoe Regional Medical Center. The other officers were identified at C/O Lee Grider and C/O Paul Samsel. To release the officers as soon as possible, I had the institution below minimum security staffing. C/O Smith was release at approximately 0100 hours. C/O Grider and C/O Samsel were released at approximately 0330 hours to complete a blood draw. I had spoken with the Medical Department and it was unknown as to why Inmate Mizzoni was on the List. I was also advised that Inmate Mizzoni would have a blood draw for testing of Hep C on Monday, March 30, 2015.

---

| Staff Name | Participation |
|---|---|
| ANDREWS, STEFANIE | Witness |

Comment: Responding Medical Nurse

● *Reports*

**Report Type**      **Report Detail**

USEOF          On 3/28/2015 at approx 2100, Inmate Mizzoni was brought to medical for evaluation. I/m sustained a 1cm laceration above the Lt eye which required cleansing and steristrip. Dime sized abrasion to both knees were treated with bandaids. Small abrasion from handcuff noted to wrist, no treatment needed. Vital signs were stable and I/M was released back to unit with custody. At approx 2110 C/O Smith was brought to medical for evaluation. Vital signs were stable. Reddened area noted to Rt cheek and temple area. No broken skin noted. No other injuries noted. No complaints of vertigo , blurred vision or headache. Instructed C/O Smith to follow up per exposure protocol and work comp protocol. C/O Smith released back to duty w/o any restrictions and

---

**MIZZONI 313: DEF EXH C - 002**



# State of Nevada
# Department of Corrections
*Investigation Detail Report*
*For: AG Office*

---

## Investigation

| | | |
|---|---|---|
| **Investigator:** | **IR Number:** | IR-2015-NNCC-000575 |
| **Assigned Date:** | **Occurrence Date:** | 03/28/2015 |
| **Report Due Date:** | **IA Number:** | IA- |
| **Disposition Date:** | **Institution:** | NNCC |

---

## Staff Involvment

● *Reports*

| Report Type | Report Detail |
|---|---|
| | 5. Myself and the three other officers departed unit 4 enroute to unit 5. Upon arrival Officers Allison, Ardinger, S.Smith, provided assistance to Officer C.Smith, while I began to disperse inmates from the immediate area, clearing the rotunda and securing inmates in their cells. As additional staff members arrived The area was secured. I then observed the escort of inmate Mizzoni #68549. from unit 5 to unit 8 for medical evaluation. |
| INC028 | |
| INC028 | |

| Staff Name | Participation |
|---|---|
| GRIDER, LEE | Witness |

**Comment:** responding officer

● *Reports*

| Report Type | Report Detail |
|---|---|
| INC028 | On 28 March 2015, I (C/O Lee Grider) was assigned to 1 Tower on C-Graves at The Northern Nevada Correctional Center.<br>    At Approx. 2030 hrs, I heard a back-up/staff assault call coming from Unit 5 when I was getting ready to relieve swing shift.  When I arrived at Unit 5, Inmate Mizzoni, #68549, was restrained in the prone position, under officer coverage.  The inmate had to be moved to medical, as he was bleeding from his temple.  However, by continuing to drop his weight, Mizzoni was resistant while staff attempted to assist him to his feet for movement to medical.  I stepped forward and placed Mizzoni's right wrist in a rear wrist lock, while Officer Hightower did the same on the inmate's left side.  As Mizzoni continued to drop his weight, I gave him several orders to stand up.  Mizzoni refused, necessitating Hightower and myself to lift him to a standing position.  Once Mizzoni was on his feet, we escorted him to Unit 8-A for medical evaluation.<br>    Once the inmate was safely in Unit 8, SGT John Henley (Acting Shift Lieutenant) dismissed me to my post. I suffered a minor cut from the inmate's restraints to my right middle knuckle; C-1 submitted.———END OF REPORT |
| USEOF | On 28 March 2015, I (C/O Lee Grider) was assigned to 1 Tower on C-Graves at The Northern Nevada Correctional Center.<br>At Approx. 2030 hrs, I heard a back-up/staff assault call coming from Unit 5 when I was getting ready to relieve swing shift.  When I arrived at Unit 5, Inmate Mizzoni, #68549, was restrained in the prone position, under officer coverage.  The inmate had to be moved to medical, as he was bleeding from his temple.  However, by continuing to drop his weight, Mizzoni was resistant while staff attempted to assist him to his feet for movement to medical.  I stepped forward and slid my right hand through the crook of Mizzoni's right arm, took control of his right hand with mine, and twisted his wrist into a rear wrist lock.  As Mizzoni continued to drop his weight, I gave him several orders to stand up.  Mizzoni refused, necessitating me to pull the wrist lock I had him in so as to bring him to a standing position.  Once Mizzoni was on his feet, I de-escalated my use of force and proceeded to escort him to Unit 8-A for medical evaluation. |

---

MIZZONI 313: DEF EXH C - 004



# State of Nevada
# Department of Corrections
*Investigation Detail Report*
*For: AG Office*

## Investigation

| | |
|---|---|
| **Investigator:** | **IR Number:** IR-2015-NNCC-000575 |
| **Assigned Date:** | **Occurrence Date:** 03/28/2015 |
| **Report Due Date:** | **IA Number:** IA- |
| **Disposition Date:** | **Institution:** NNCC |

## Staff Involvment

● *Reports*

| **Report Type** | **Report Detail** |
|---|---|
| | reported to Unit 4 to assist with count as Officers were displaced due to the incident.  End of Report. |

| Staff Name | Participation |
|---|---|
| PATCHEN, JEREMY | Witness |

**Comment:** Responding Officer

● *Reports*

| **Report Type** | **Report Detail** |
|---|---|
| INC028 | On March 28, 2015 at approximately 2030 while working at Northern Nevada Correctional Center as unit 3B officer, I Correctional Officer Patchen heard a call for "back up" to unit 5 over the hand held radio. I immediately responded to unit 5. When I arrived to unit 5 the inmate involved was already restrained. I stood by in case I was needed then returned to unit 3 when I was released by Sgt Henley. END OF REPORT |

| Staff Name | Participation |
|---|---|
| HIGHTOWER, JOEL | Witness |

**Comment:** Responding officer

● *Reports*

| **Report Type** | **Report Detail** |
|---|---|
| INC028 | While working my regular scheduled shift in Unit 10A at Northern Nevada Correctional Center on March 28, 2015, I Correctional Officer J. Hightower observed the following. At approximately 8:34pm Unit 5 Officer C. Smith called for Officer backup on his institutional radio. When I entered Unit 5 I observed that Officer Smith had marks on the right side of his face. I then observed Inmate Joseph Mizzoni (68549) restrained with partial restraints lying in the prone position in the Unit 5 rotunda. Inmate Mizzoni's legs were unsecured by any restraints so I secured his left leg until Correctional Sargent J. Henley arrived on the scene. Sgt. Henley instructed Officer L. Grider and I to escort Inmate Mizzoni to Unit 8A for medical evaluation as his face was bleeding. Inmate Mizzoni was non-compliant with Officer Grider's and my verbal orders to stand up by dropping his body weight to the ground when we were attempting to assist him to his feet. I put Inmate Mizzoni's left wrist in a rear wrist lock while Officer Grider and I lifted him to his feet. Inmate Mizzoni was then escorted to Unit 8A for medical evaluation. Once Inmate Mizzoni was secured inside Unit 8A Sgt. Henley dismissed me back to my post in Unit 10A. END OF REPORT.... |

| Staff Name | Participation |
|---|---|
| SMITH, SCOTT | Witness |

**Comment:** responding officer

● *Reports*

| **Report Type** | **Report Detail** |
|---|---|
| INC028 | I C/O Scott smith was in Unit 4 when I responded to Unit 5. When I got there Officer C. Smith |

---

MIZZONI 313: DEF EXH C - 006



# State of Nevada
# Department of Corrections

*Investigation Detail Report*
*For: AG Office*



## Investigation

| | |
|---|---|
| **Investigator:** | **IR Number:** IR-2015-NNCC-000575 |
| **Assigned Date:** | **Occurrence Date:** 03/28/2015 |
| **Report Due Date:** | **IA Number:** IA- |
| **Disposition Date:** | **Institution:** NNCC |

## Staff Involvment

● *Reports*

**Report Type**   **Report Detail**

assistance over the radio and I responded with Correctional Officer Ardinger. When Officer Ardinger and I got into unit 5 Correctional Officer C. Smith and inmate Mizzoni were on the ground struggling. I assisted Officer C. Smith by placing my left hand on Mizzoni¿s head so he was unable to bite or spit on the officers. I also assisted by placing my right knee against Mizzoni¿s left shoulder and my right hand on his right shoulder because Mizzoni continued to struggle and resist staff. I gave verbal commands to Mizzoni to quit resisting and to stop fighting. I assisted inmate Mizzoni get to his feet and he was escorted to unit 8 A for medical treatment. End of Report.

| Staff Name | Participation |
|---|---|
| SMITH, CHRIS | Victim |

Comment: officer struck by inmate

● *Reports*

**Report Type**   **Report Detail**

INC028     On March 28th, 2015 I Correctional Officer C. Smith was assigned to housing unit 5 of the Northern Nevada Correctional Center as the only Officer in the unit. At approximately 6:45pm I was approached by inmate Hermanson (#84666) stating that he placed a kite in my mailbox with important information. I then checked my mailbox during the 7:00pm count and retrieved the kite. The kite stated that there was tattoo equipment in the wall of Unit 5 A wing cell 2. I then called search and escort officers Allison, Ardinger, and S. Smith to assist me with cell searches to make it appear as random searches. I searched Unit 5A cell 2 and had negative results. I then randomly searched B wing cell 29 housing inmates Mizzoni (#68549) and Deyerle (#1010262) and had negative results. Search and Escort Officers then departed Unit 5 at approximately 8:30pm. Approximately 10 minutes later at 8:40pm inmate Mizzoni (#68549) approached my office in an aggressive manner. He smacked my door and said " C.O. Shove it up your ass" so I told inmate Mizzoni To place his hands on the wall and that he was being placed in restraints. I ordered the rest of the unit to lock down as I attempted to make a call for assistance on the radio and was unsuccessful due to inmate Mizzoni turning off the wall towards me with his elbow raised in an attempt to strike me. I then assisted inmate Mizzoni to the ground in an attempt to restrain him. Throughout the entire altercation I was verbally instructing inmate Mizzoni to "stop resisting". As I struggled with inmate Mizzoni on the ground he struck me with a closed fist to the right temple. I struggled to position him on the ground where he could not strike me again. I then ordered several inmates to "get back" because my rotunda was full of other inmates. It was at this time that I was able to gain control of inmate Mizzoni and call for backup on the radio. Search and Escort Officer Ardinger was the first to arrive in the unit. At this time I was able to get wrist restraints onto inmate Mizzoni. As soon as other Officers were able to take over restraining inmate Mizzoni I walked out of the unit to catch my breath. I remained at the front of my unit after responding officers had already removed inmate Mizzoni from my unit. I was then relieved by Search and Escort officers to go to medical for an evaluation and fill out a C-1 form. END OF REPORT.

USEOF     On March 28th, 2015 I Correctional Officer C. Smith was assigned to housing unit 5 of the Northern Nevada Correctional Center as the only Officer in the unit. At approximately 6:45pm I was approached by inmate Hermanson (#84666) stating that he placed a kite in my mailbox with

MIZZONI 313: DEF EXH C - 008



# State of Nevada
## Department of Corrections

*Investigation Detail Report*
*For: AG Office*



---

### Investigation

| | |
|---|---|
| **Investigator:** | **IR Number:** IR-2015-NNCC-000575 |
| **Assigned Date:** | **Occurrence Date:** 03/28/2015 |
| **Report Due Date:** | **IA Number:** IA- |
| **Disposition Date:** | **Institution:** NNCC |

---

### Staff Involvment

● **Reports**

| Report Type | Report Detail |
|---|---|
| INC028 | On March 28th 2015 at approximately 2030 I, Correctional Officer Garnica responded to a back up call on the radio to Unit 5. Upon getting there Inmate Mizzoni #68548 was on the ground in restraints. I assisted in securing the unit and escorting the inmate to unit 8A. Upon getting to unit 8A the medical staff determined that the inmate was ok to move to unit 7A for housing. I, along with C/O Samsel and C/O Wyke escorted the inmate over to unit 7A and after securing the inmate in his cell left the unit. End of report. |
| | ...[NGARNICA, 04/05/2015 21:41:03] On March 28th 2015 at approximately 2030 I, Correctional Officer Garnica responded to a back up call on the radio to Unit 5. Upon arriving at Unit 5. Inmate Mizzoni #68549 was on the ground in restraints. I assisted securing the unit and escorting the Inmate Mizzoni to unit 8A for a medical evaluation. The medical staff determined that the inmate was ok and could be moved to Secure housing Unit 7 A. Along with C/O Samsel and C/O Wyke, I escorted the inmate over to unit 7A and secured the inmate in cell 7A38 . End of report. |

| Staff Name | Participation |
|---|---|
| ARDINGER, ROBERT | Witness |

**Comment:** Report Writer

| Staff Name | Participation |
|---|---|
| HIGHLINE, MICHAEL | Witness |

**Comment:** responding officer

| Staff Name | Participation |
|---|---|
| SAMSEL, PAUL | Witness |

**Comment:** Responding Officer

---

**MIZZONI 313: DEF EXH C - 010**

EXHIBITS - D

EXHIBITS - D

*handwritten annotations:*
2-18-10
⟨3-5-07⟩⟨1⟩
11-6-07
⟨2⟩
VIDEO AND DISCIPLENARY TAPE 4-3-05
AND ALL MEDICAL RECORDS
⟨3⟩
WP CLERK

SHOWS A INMATE CAN
RECEIVE VIEWING OF
VIDEO TAPE

1  CASE NO. CF-0708024

2  DEPT. 2

FILED

2010 FEB 18  PM 4: 06

WHITE PINE COUNTY CLERK

DEPUTY

IN THE SEVENTH JUDICIAL DISTRICT COURT OF THE STATE OF NEVADA

IN AND FOR THE COUNTY OF WHITE PINE

* * *

7  JOSEPH L. MIZZONI,                    )
                                          )
8             Plaintiff,                  )
                                          )
9                                         )
                                          )
10            V.                          )        ORDER
                                          )
11  NDOC WARDEN McDANIEL, et. al.,        )
                                          )
12                                        )
                                          )
13            Defendants                  )

Plaintiff Joseph L. Mizzoni filed his Motion Seeking Permission to Object to Joint

Conference Report and Obtain Court Order Medical and Video CD-Rom and Reports on Incidents of

all Excessive Force.  Defendants have objected on the basis of the administrative regulations which

govern Ely State Prison.

Plaintiff's motion to object to the Joint Case Conference Report is denied.  Each party

is required to set forth its list of exhibits and witnesses in the Joint Case Conference Report, whether

or not the opposing side agrees.  The decision of whether the exhibits will be admitted at trial and

whether the witnesses will be allowed to testify is reserved for either pretrial motions, pretrial

conferences or for trial, and is not appropriate at this time.

This court will not interfere with the administration or the administrative regulations

governing Ely State Prison and order the production to plaintiff of items not allowed under Prison

regulations.  However, the items that plaintiff has asked to be produced are relevant or can lead to

relevant material in this case.  Plaintiff has asked for the release of his medical records to this court

EX-B

for trial.  Therefore, defendants are ordered to produce to this court for in camera inspection:

1.  All medical records pertaining to the injuries and treatment of plaintiff resulting from the incidents of March 5, 2007 and November 6, 2007;

2.  Any and all recordings of the incidents of March 5, 2007 and November 6, 2007 whether on CD-ROM or in any other form; and

3.  Any recording of the disciplinary hearing held on April 3, 2007.

IT IS SO ORDERED.

Dated this 16th day of February, 2010.


MIRIAM SHEARING
SENIOR JUDGE

1  The trial will start on November 9, 2010 and continue Tuesdays through Fridays until
2  concluded or by February 19, 2010.

3      IT IS SO ORDERED.

4      Dated this 16th day of February, 2010.

5

6

7  MIRIAM SHEARING

8  SENIOR JUDGE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBITS-E

EXHIBITS-E

Ex-E 9

Log Number _R0060 29986 M_

# NEVADA DEPARTMENT OF CORRECTIONS
## INFORMAL GRIEVANCE

NAME: _Joseph Mizzoni_          I.D. NUMBER: _68549_

INSTITUTION: _NNCC Prison_          UNIT: _7-B-62_

GRIEVANT'S STATEMENT: I am Greiving ~~ever~~ all for All Video Camera Stationary inside and out Unit 5, Unit 8, and Unit 4 outside B-C wings and from Unit 8 to Unit 7-B-318 and all Hand Held Cameras And Videos And Pictures And Those Above Areas on The Night of 3-28-15 from 8PM to 930PM, including I/10 hrs Sooth

## SWORN DECLARATION UNDER PENALTY OF PERJURY

INMATE SIGNATURE: _Joseph L Mizzoni_     DATE: _4-15-15_ TIME: _8PM_

GRIEVANCE COORDINATOR SIGNATURE: _W Clark_     DATE: _4/16/15_ TIME: _11:55 am_

GRIEVANCE RESPONSE:

_____

_____

_____

_____

_____

CASEWORKER SIGNATURE: _____     DATE: _____

___ GRIEVANCE UPHELD ___ GRIEVANCE DENIED ___ ISSUE NOT GRIEVABLE PER AR 740

GRIEVANCE COORDINATOR APPROVAL: _____     DATE: _____

_____ INMATE AGREES ___✓___ INMATE DISAGREES

INMATE SIGNATURE: _Joseph L Mizzoni_     DATE: _6-5-15_

FAILURE TO SIGN CONSTITUTES ABANDONMENT OF THE CLAIM. A FIRST LEVEL GRIEVANCE MAY BE PURSUED IN THE EVENT THE INMATE DISAGREES.

| Original: | To inmate when complete, or attached to formal grievance |
| Canary: | To Grievance Coordinator |
| Pink: | Inmate's receipt when formal grievance filed |
| Gold: | Inmate's initial receipt |

RECEIVED

APR 16 2015

AWP - NNCC

DOC 3091 (12 / 01)

Video Evidence Report  Clos Names for 3-28-1

EX-E

## NEVADA DEPARTMENT OF CORRECTIONS
## GRIEVANT'S STATEMENT CONTINUATION FORM

NAME: Joseph L. Mizzon          I.D. NUMBER: 68519

INSTITUTION: NNCC Prison        UNIT #: 7-B-62

GRIEVANCE #: _____    GRIEVANCE LEVEL: Informal

GRIEVANT'S STATEMENT CONTINUATION:   PG. 2 OF 3

All ~~that~~ Search and Escort OFFICES, NURSES, AND ALL
INMATES THAT SAW MYSELF AND MR SMITH
AROUND US and IN RUTUNDA on 3-28-15 between
8pm + 9:30pm. I would Request all NAMES of
Search and Escort Officers and any other Officers involved
with the Whole incident of handling me from Start
to finish and was present there. I have Ms Robertson (Serg)
Officer, I have Smith (C10), I have Search and Escort Officer Ardinger.
I would request all of their Full NAMES As Employers of
Nevada Dept. Of Corrections here at Northern Nevada Correctional Center.
and Inmate Witnesses in Rutunda on Video that C10 Smith
said was around us and in Rutunda only as witness to
have my lawyer to request as witnesses or at a minimum have
all these Ndoc Perrits and Inmates to be preserved for trial
Criminal and Civil as well as all Video 1Actures, I dont appreciate
hearing your C10s playing and this Administration saying they are going

Original:     Attached to Grievance
Pink:         Inmate's Copy

DOC – 3097 (01/02)



# NEVADA DEPARTMENT OF CORRECTIONS
## GRIEVANT'S STATEMENT CONTINUATION FORM

EX-E

NAME: Joseph Mizzoni          I.D. NUMBER: 68549

INSTITUTION: NNCC Phan        UNIT #: 7-B-62

GRIEVANCE #: _____          GRIEVANCE LEVEL: Informal

GRIEVANT'S STATEMENT CONTINUATION:   PG. 3   OF 3

to Out the Vidios and say they were going to make it look like I hit C/O Smith. I Didn't hit him and this is Illegal obstruction of Justice and C/O Smith doesn't use on his Original Notice of Charges that he has Vidio or witnesses on the evidence part of that Notice of Charges. I don't need to be Intorgated by you games and all other ways of minibulation. Your C/O Phat escorted me to the Unit 7-B-38 Some what read my maranda Rights so if you want to intorgat or question me do it infont of my lawyer now. I will go to my Disciplenary and want Vidio and witnesses that saw any thing in that Rutunda. Wolf v. McDowell.

There is No Vidio Cameras Behind the Unit 5 Buble Area's for any undercover C/O? I Greived All Other Issues: What Happen 3-28-15 and No Medical treatment still to this day 4-15-15.

Original:    Attached to Grievance
Pink:        Inmate's Copy

DOC – 3097 (01/02)

EXHIBITS F

EXHIBITS- F

EX F



# Declaration of Ronald Schreckengost

CASE # 3:15-CV-00313- MMD-VPC

Plaintiff not allowed to counter a response
To this Declaration. See:(Pg 4 Line 23-28) TO
(Pg 5 Line 1-15)



EX-F

7.    As the incident occurred in the rotunda, there is no video coverage and therefore there is not any video footage of the incident of March 28, 2015.

8.    To my knowledge, and in my investigation of the incident of March 28, 2015 involving Joseph Mizzoni, there is also no video footage from elsewhere in the institution capturing any portion of the subject incident.

FURTHER, I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

EXECUTED this ___5½___ day of December, 2016.

RONALD SCHRECKENGOST

MIZZONI 313: DEF EXH L - 002