ADAM PAUL LAXALT
  Nevada Attorney General
ERIN L. ALBRIGHT #9953
  Deputy Attorney General
State of Nevada
Bureau of Litigation
Public Safety Division
100 N. Carson Street
Carson City, NV  89701-4717
Tel:  (775) 684-1257
E-mail:  *ealbright@ag.nv.gov*

*Attorneys for Defendant
Ira Brannon and Christopher Smith*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| JOSEPH L. MIZZONI,<br><br>        Plaintiff,<br><br>vs.<br><br>STATE OF NEVADA, et al.,<br><br>        Defendants. | Case No.  3:15-cv-00499-MMD-WGC<br><br>**MOTION FOR SUMMARY JUDGMENT** |

Defendants, Ira Brannon and Christopher Smith, by and through counsel, Adam Paul Laxalt, Attorney General of the State of Nevada, and Erin L. Albright, Deputy Attorney General, hereby file their Motion for Summary Judgment.

The instant motion is based on following Memorandum of Points and Authorities and all other papers and pleadings on file herein.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    NOTICE OF THE MOTION**

A hearing on this matter is not requested.

**II.    INTRODUCTION**

Plaintiff, Joseph L. Mizzoni ("Inmate Mizzoni"), is an inmate currently incarcerated at Northern Nevada Correctional Center ("NNCC") in Carson City, Nevada by the Nevada Department of Corrections ("NDOC").  Inmate Mizzoni's First Amended Civil Rights Complaint ("Complaint") brought pursuant to 42 U.S.C. § 1983 ("Section 1983") alleges his Fourteenth Amendment rights were

1

violated when Defendant Brannon denied evidence and witnesses during a disciplinary hearing held on May 1, 2015 and when Defendant Smith wrote a false disciplinary report that resulted in the May 1, 2015 disciplinary hearing. (ECF No. 7 at 7-11). This Court's Screening Order allowed Inmate Mizzoni's due process claims against Defendants Brannon and Smith to proceed. (ECF No. 10 at 7).

### III.  UNDISPUTED FACTS RELEVANT TO DISPOSITION OF THIS MOTION

The undisputed material facts, as documented in written evidence, are as follows.

#### A.  March 28, 2015 Physical Altercation Between Defendant Smith and Inmate Mizzoni

On March 28, 2015, Defendant Smith was assigned to housing unit 5 at NNCC as the only correctional officer in the unit. (Exh. A). At approximately 6:45 p.m., Defendant Smith was approached by an inmate and informed that there was a kite in his mailbox with important information. (*Id.*) During the 7:00 p.m. bed count, Defendant Smith checked his mailbox and retrieved the kite. (*Id.*) The kite stated there was tattoo equipment in the wall of housing unit 5, A wing, cell 2. (*Id.*)

Upon receipt of this information, Defendant Smith called escort officers Allison, Ardinger, and S. Smith to assist him with the cell searches to give the appearance that the cell searches were random. (*Id.*) Defendant Smith searched unit 5A cell 2 and did not find tattoo equipment. (*Id.*)

After searching unit 5A cell 2, Defendant Smith randomly searched unit 5B cell 29, which housed Inmate Mizzoni. (*Id.*) Defendant Smith did not find tattoo equipment in Inmate Mizzoni's cell. (*Id.*) After this cell search, escort officers Allison, Ardinger and S. Smith departed housing unit 5 at approximately 8:30 p.m. (*Id.*)

Approximately, ten minutes later Inmate Mizzoni approached Defendant Smith's office in an aggressive manner. (*Id.*) He smacked Defendant Smith's door and stated "C.O. Shove it up your ass." (*Id.*) To which Defendant Smith responded by telling Inmate Mizzoni to place his hands on the wall and that he was being placed in restraints. (*Id.*) Defendant Smith ordered the rest of the housing unit on lock down. (*Id.*)

As Defendant Smith attempted to call for assistance on his radio, Inmate Mizzoni turned off the wall towards Defendant Smith with his elbow raised in an attempt to strike Defendant Smith. (*Id.*) At this point, Defendant Smith assisted Inmate Mizzoni to the ground in an attempt to restrain him. (*Id.*) As Defendant Smith struggled with Inmate Mizzoni on the ground, he was struck by Inmate Mizzoni with a

1    closed fist to the right temple. (*Id.*) Defendant Smith struggled to position Inmate Mizzoni on the ground
2    in a position where he would be prevented from again striking Defendant Smith. (*Id.*) During this entire
3    altercation, Defendant Smith was verbally instructing Inmate Mizzoni to stop resisting. (*Id.*)

4    Once Defendant Smith was certain that Inmate Mizzoni was unable to strike him, he called for
5    assistance on the radio. (*Id.*) Correctional Officer ("CO") Ardinger was the first to arrive on the scene.
6    (*Id.*) As CO Ardinger approached housing unit 5, he observed what appeared to be a fight and called for
7    additional back-up officers on his radio. (Exh. B). As CO Ardinger entered housing unit 5, he saw
8    Defendant Smith on the ground with an unrestrained inmate who was refusing Defendant Smith's verbal
9    commands. (*Id.*) The unidentified inmate was later identified as Inmate Mizzoni. (*Id.*)

10   CO Allison responded to the request for assistance from housing unit 5. (Exh. M). Upon his
11   arrival at housing unit 5, he witnessed Defendant Smith and Inmate Mizzoni on the ground struggling.
12   (*Id.*) Defendant Smith was on top of Inmate Mizzoni attempting to control him while Inmate Mizzoni was
13   attempting to punch Defendant Smith. (*Id.*)

14   CO Allison assisted Defendant Smith by placing his left hand on Inmate Mizzoni's head so he was
15   unable to bite or spit. (*Id.*) He then placed his knee against Inmate Mizzoni's left shoulder and his right
16   hand on Inmate Mizzoni's right shoulder because Inmate Mizzoni continued to struggle and resist staff.
17   (*Id.*) CO Allison also gave Inmate Mizzoni a verbal command to stop fighting and resisting. (*Id.*)
18   Ultimately, Defendant Smith was able to place wrist restraints on Inmate Mizzoni with the assistance of
19   officers Ardinger and Allison. (Exhs. A and B).

20   Even after Inmate Mizzoni was restrained he continued to verbally abuse staff and struggle;
21   therefore, staff secured Inmate Mizzoni's legs to gain compliance and prevent any further incidents. (Exh.
22   B).

23   When CO Hightower arrived on scene in response to a call for back up officers to unit 5, he noticed
24   marks on the right side of Defendant Smith's face. (Exh. E). He also noticed that Inmate Mizzoni was
25   lying in the prone position in the unit 5 rotunda with his legs unsecured. (*Id.*)

26   Once the responding officers were able to takeover restraining Inmate Mizzoni, Defendant Smith
27   left the housing unit to catch his breath. (Exh. A) Defendant Smith remained at the front of housing unit 5,
28   until Inmate Mizzoni was removed from the unit. (*Id.*) Once Inmate Mizzoni was removed, Defendant

3

Smith was allowed to go to medical for an evaluation. (*Id.*) The medical evaluation revealed Defendant Smith had minimal swelling on his right cheek and a small-reddened area on his right cheekbone. (Exh. H).

After the altercation, it was determined that Inmate Mizzoni required medical attention to address his bleeding temple. (Exh. C) Sergeant Henley instructed COs Grider and Hightower to escort Inmate Mizzoni to medical for an evaluation. (Exh. E) Inmate Mizzoni was noncompliant with COs Grider's and Hightower's verbal orders to stand up because he continued to drop his body weight to the ground every time the officers attempted to assist him to his feet. (*Id.*)

Due to Inmate Mizzoni's resistance and noncompliance, CO Grider stepped forward and placed Inmate Mizzoni's right wrist in a rear wrist lock[1] while CO Hightower placed Inmate Mizzoni's left wrist in a rear wrist lock. (Exhs. C and E). Even after Inmate Mizzoni's wrists were placed in rear wrist locks, he continued to drop his weight and ignore orders to stand up. (*Id.*) This continued resistance and non-compliance necessitated the need for COs Grider and Hightower to lift Inmate Mizzoni to a standing position. (*Id.*)

Correctional Sergeant Garnica, CO Samsel and CO Wyke escorted Inmate Mizzoni to Unit 8A for a medical evaluation. (Exh. D). The medical evaluation revealed Inmate Mizzoni had slight swelling to his left eyebrow, a superficial one centimeter laceration to his left eyebrow area, a dime size abrasion to his left kneecap and a small abrasion to his right wrist. (Exh. I).

**B.     Disciplinary Hearing**

Defendant Smith drafted the incident report used in the disciplinary process at the disciplinary hearing. (Exh. F). He was not involved in Inmate Mizzoni's disciplinary hearing and process. (*Id.*)

At the disciplinary hearing regarding the March 28, 2015 incident, Inmate Mizzoni presented Christopher Deyerle as a witness. (Exh. G). Inmate Mizzoni requested video of the incident; however, the video was not presented because the videotape footage taken by the cameras in housing units 5 through 7-A-38 was destroyed in the ordinary course of business prior to NDOC officials receiving notice

---

[1] A rear wrist lock is a commonly used technique for COs to employ if escorting a combative or resistant inmate. (Exh. C). It is designed to control the inmate, afford protection for the officer and apply pain compliance to restrain and aid in cuffing the inmate. (*Id.*) The rear wrist lock has been affirmed in annual CO training as a relevant method for escorting combative inmates. (*Id.*)

of Inmate Mizzoni's request to retain the videotape footage. (ECF No. 114-2 at 2).

After reviewing Inmate Mizzoni's testimony, Christopher Deyerle's testimony, the Notice of Charges and the noted injuries that Defendant Smith was treated for, Defendant Brannon found Inmate Mizzoni guilty of the charge of battery. (Exh. G).

## IV.   LEGAL AUTHORITY

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Summary judgment should be granted where a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The court shall consider all admissible affidavits and supplemental documents attached to a motion for summary judgment. *See Connick v. Teachers Ins. & Annuity Ass'n,* 784 F.2d 1018, 1020 (9th Cir. 1986). The moving party has the initial burden of demonstrating that summary judgment is proper, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152 (1970), and factual inferences should be drawn viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).

To defeat summary judgment, the nonmoving party cannot rely on conclusory allegations. *Berg v. Kincheloe,* 794 F.2d 457, 459 (9th Cir. 1986). Rather, the nonmovant must present "specific facts showing there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. The nonmovant's evidence should be such that a "fair minded jury could return a verdict for [him or her] on the evidence presented." *Id*. at 255. In attempting to establish the existence of this factual dispute, the opposing party may not rely on the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. *See* FED. R. CIV. P. 56(c)(1).

"Although the evidence must be viewed in a light most favorable to the opponent of the motion, and all reasonable inferences must be drawn in his favor, the inferences are limited to those upon which a reasonable jury might return a verdict." *U.S. ex rel. Anderson*, 52 F.3d at 815 (citing *T.W. Elec. Svc., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626 630–31 (9th Cir. 1987)). However, "if the facts make a claim 'implausible' the non-movant must present 'more persuasive evidence than would

otherwise be necessary' in order to defeat a summary judgment motion." *Id*. (citing *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987)). The United States Supreme Court has stated that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

As demonstrated below, Inmate Mizzoni's Complaint consists of little more than conclusory statements, speculative opinions and other assertions uncorroborated by facts, which are insufficient to establish a genuine dispute. *See Nelson v. City of Davis*, 83 F.3d 1075, 1081–82 (9th Cir. 1996). Accordingly, Defendants are entitled to Summary Judgment.

## V. LEGAL ANALYSIS

Based on the following, this Court should grant Defendants' Motion for Summary Judgment.

### A. Defendant Brannon Did Not Violate Inmate Mizzoni's Fourteenth Amendment Due Process Rights

A plaintiff asserting a Fourteenth Amendment due process claim related to disciplinary action that leads to his confinement in disciplinary segregation must first establish he has been deprived of a protected liberty interest in order to invoke the Due Process Clause's protections. U.S. CONST. amend XIV, § 1; *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005); *Chappell v. Mandeville*, 706 F.3d 1052, 1062 (9th Cir. 2013). A prisoner does not have a liberty interest in preventing transfer to more restrictive conditions of confinement, including from general population to disciplinary or administrative segregation, unless the prisoner can demonstrate that the transfer causes an "atypical and significant hardship in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 483–484 (1995); *Serrano v. Francis*, 345 F.3d 1077, 1077–1078 (9th Cir. 2003).

The Ninth Circuit has concluded that to determine whether a particular form of restraint imposes "atypical and significant hardship," a court considers a condition or combination of conditions or factors on a case by case basis, rather than invoking a single standard. *Chappell*, 706 F.3d at 1064 (citation omitted). At least three factors have been used to guide this inquiry:

(1) "whether the conditions of confinement 'mirrored those conditions

>imposed upon inmates in analogous discretionary confinement settings"; (2) "the duration and intensity of the conditions of confinement;" and (3) "whether the change in confinement would 'inevitably affect the duration of the [prisoner's] sentence." Chappell, 706 F.3d at 1064-65 (italics original) (citation omitted). Thus, "Sandin requires a factual comparison between conditions in general population or administrative segregation (whichever is applicable) and disciplinary segregation, examining the hardship caused by the prisoner's challenged action in relation to the basic conditions of life as a prisoner."

*Jackson v. Carey*, 353 F.3d 750, 755 (9th Cir. 2003).

Two of the three factors used to determine whether a particular form of restraint imposes an "atypical and significant hardship" weigh in favor of finding Inmate Mizzoni's placement in disciplinary segregation was not an "atypical and significant hardship." First, Inmate Mizzoni is unable to provide evidence that the conditions confronting him in disciplinary segregation were excessive compared to those in general population. Nor can he show that the conditions "work[ed] a major disruption in his environment." *Sandin*, 515 U.S. at 486.

Moreover, the conditions inmates in disciplinary segregation and inmates in general population confront are very similar. For example, inmates in disciplinary segregation are afforded the same access to legal supplies and resources as supplied to inmates in general population. (Exh. J at p. 2). Since inmates in disciplinary segregation have limited physical access to the law library, inmate library assistants are assigned to the segregated housing units to answer legal concerns or questions for segregated inmates. *Id*. at p. 5. Inmates in disciplinary segregation are afforded the same time to shower or bathe, which is at least three (3) times per week. (Exh. K at p.3 and Exh. L at p. 2).

Second, the change in Inmate Mizzoni's confinement to disciplinary segregation did not increase the duration of Inmate Mizzoni's sentence. Since two of the three factors used to determine whether Inmate Mizzoni's placement in disciplinary segregation imposed an "atypical and significant hardship" weigh in favor of the Defendants, Inmate Mizzoni cannot meet the burden to establish he was deprived of a protected liberty interest thereby entitling him to the protections of the Due Process Clause.

Assuming *arguendo* that Inmate Mizzoni is able to establish he was deprived of a protected liberty interest thereby entitling him to the protections of the Due Process Clause, the conclusion made at the disciplinary hearing by Defendant Brannon was supported by "some evidence" in the record. In

7

1  prison disciplinary proceedings, due process requires that the inmate receive: (1) written notice of
2  charges; (2) at least twenty-four (24) hours between the time the prisoner receives the written notice
3  and the time of the hearing; (3) a written statement by the hearing officer of the evidence relied upon
4  and the reasons for taking disciplinary action; (4) the right of the prisoner to call witnesses in his
5  defense, when permitting him to do so would not be unduly hazardous to institutional safety or
6  correctional goals; and (5) legal assistance if the prisoner is illiterate or the issues presented are legally
7  complex. *Wolff v. McDonnell*, 418 U.S. 538, 564–71 (1974). The inmate's rights are not unfettered;
8  due process protections must accommodate the prison's legitimate institutional needs. *Bostic v.*
9  *Carlson*, 884 F.2d 1267, 12697–0 (9th Cir. 1989).

10  "When prison officials limit an inmate's efforts to defend himself, they must have a legitimate
11  penological reason." *Koenig v. Vannelli*, 971 F.2d 422, 423 (9th Cir. 1992). An inmate's right to
12  present witnesses may legitimately be limited by "the penological need to provide swift discipline in
13  individual cases . . . [or] by the very real dangers in prison life which may result from violence or
14  intimidation directed at either other inmates or staff." *Ponte v. Real*, 471 U.S. 491, 495 (1985). Jail
15  officials "must make the decision whether to allow witnesses on a case-by-case basis, examining the
16  potential hazards that may result from calling a particular person." *Serrano v. Francis*, 345 F.3d 1071,
17  1079 (9th Cir. 2003). In particular, prison officials may "deny a defendant the right to call redundant
18  and unnecessary witnesses," so long as the prison adequately articulates and proves its justification for
19  doing so. *Id*. at 1273–74. Additionally, the hearing officer's decision must be based upon "some
20  evidence." *Castro v. Terhune*, 712 F.3d 1304, 1307 (9th Cir. 2013). The showing required by this
21  standard is "minimally stringent." *Id*. at 1314. Despite this, an inmate has no right to cross-examine or
22  confront witnesses in prison disciplinary hearings. *See Wolff*, 418 U.S. at 567-68.

23  Here, Inmate Mizzoni asserts his due process rights were violated because Defendant Brannon
24  refused to allow him to present evidence and witnesses at his disciplinary hearing. (ECF No. 7 at 1-7).
25  Inmate Mizzoni's disciplinary hearing did not violate Inmate Mizzoni's due process rights. A written
26  Notice of Charges ("NOC") was prepared and served on Inmate Mizzoni on April 2, 2015. (Exh. A).
27  The NOC outlined that Inmate Mizzoni was being charged with battery, assault and abusive language.
28  (*Id*.) The NOC included the charging officer's written report that provided Inmate Mizzoni with a

detailed summary of the facts of the pending charges. (*Id*.) More than twenty-four hours passed between the time the Inmate Mizzoni received the NOC on April 4, 2015, and the hearing, which was held on May 1, 2015. (*Id*., Exh. G). Defendant Brannon, the disciplinary hearing officer, prepared a written statement of the evidence relied upon and the disciplinary action taken. (Exh. G). During the disciplinary hearing, Inmate Mizzoni requested one named witness and multiple unnamed witnesses be allowed to testify. (*Id*.) He also requested any and all video of the incident in question so he could obtain the names of the unnamed witnesses. (*Id*.) Defendant Brannon accepted the testimony of Inmate Mizzoni's named witness and denied Inmate Mizzoni's request for any and all video of the incident as there was no video of the incident. (*Id*., ECF. No. 114-2 at 2).

Finally, Defendant Brannon reached his decision upon evidence that surpasses the minimal "some evidence" standard. Defendant Brannon relied upon Defendant Smith's statement in the NOC, the injuries sustained by Defendant Smith, Inmate Mizzoni's testimony and Christopher Deyerle's testimony when he found Inmate Mizzoni guilty of battery against Defendant Smith. (Exh. G). Thus, Inmate Mizzoni was accorded due process regarding his disciplinary hearing.

  **B.**   **Defendant Smith Did Not Retaliate[2] Against Inmate Mizzoni by Writing a False Disciplinary Report**

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005). The inmate bears the burden of pleading and proving that the state's actions did not advance a legitimate correctional goal and courts accord deference to prison officials when evaluating retaliation claims. *Pratt v. Rowland*, 65 F.3d 802, 806–07 (9th Cir. 1995). The plaintiff has the burden of demonstrating that the state's actions were "arbitrary and capricious," or "unnecessary to the maintenance of order in the institution." *Watson v. Carter*, 668

---

[2] Due to the fact that Defendant Smith was not involved in the disciplinary hearing or disciplinary process associated with the charges arising from the March 28, 2015 incident, Defendants interpret Inmate Mizzoni's claim against Defendant Smith as a First Amendment retaliation claim. (Exh. F).

9

F.3d 1108, 1114–15 (9th Cir. 2012).

Because claims of retaliation are easy for inmates to allege, courts examine such claims with skepticism to avoid interfering too much with prison operations. *See Canell v. Multnomah County*, 141 F. Supp. 2d 1046, 1059 (D. Or. 2001).[3] Further, courts should review prisoner retaliation claims in light of the United States Supreme Court's "disapproval of excessive judicial involvement in day-to-day prison management." *Pratt v. Rowland*, 65 F.3d 802, 807 (9th Cir.1995) (citing *Sandin v. Conner*, 515 U.S. 472, 482 (1995)). A retaliation claim is not plausible if there are "more likely explanations" for the action. *C.f. Ashcroft v. Iqbal*, 556 U.S. 662, 681(2009) (discussing insufficiency of conspiracy allegations).

Here, Inmate Mizzoni cannot demonstrate the actions of Defendant Smith were retaliatory. The evidence demonstrates that on March 28, 2015, Defendant Smith received notice, through an inmate's kite, that there was tattoo equipment in the wall of Unit 5A Cell 2. (Exh. A). After receiving this notice, Defendant Smith called search and escort officers, Allison, Ardinger and S. Smith to assist him with cell searches to make it appear that the search of Unit 5A Cell 2 was random. *Id*. Inmate Mizzoni's cell was one of the cells randomly searched. *Id.*

After the cell searches were complete, Inmate Mizzoni approached Defendant Smith's office in an aggressive manner to express his disapproval of the cell search, reportedly telling Defendant Smith to "Shove it up your ass." *Id*. Based on the manner in which Inmate Mizzoni entered his office and expressed his dissatisfaction with the cell search, Defendant Smith instructed Inmate Mizzoni to put his hands up on the wall so that Inmate Mizzoni could be restrained. *Id*. At this point, Defendant Smith put the unit on lockdown and attempted to call for assistance in restraining Inmate Mizzoni. *Id*.

As Defendant Smith attempted to restrain Inmate Mizzoni, Inmate Mizzoni turned off the wall towards Defendant Smith. *Id*. This led to a struggle, which resulted in Defendant Smith bringing Inmate Mizzoni down to the ground in an effort to restrain him. *Id*. Defendant Smith reported that as he and Inmate Mizzoni were struggling on the ground, Inmate Mizzoni struck him with a closed fist to

---

[3] Quoting *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994); *see also id.* ("Every act of discipline by prison officials is by definition "retaliatory" in the sense that it responds directly to prisoner misconduct. The prospect of endless claims of retaliation on the part of inmates would disrupt prison officials in the discharge of their most basic duties. Claims of retaliation must therefore be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions.")

the right temple. *Id*. Defendant Smith was able to call for backup on the radio, to which many members of NNCC staff responded from their various posts, including Defendants Allison, Ardinger, Garnica, Grider and Hightower[4], as well as other COs and prison staff. *Id*.

CO Allison reported that he witnessed Inmate Mizzoni attempting to punch Defendant Smith when he arrived at Unit 5. (Exh. M). After Inmate Mizzoni was brought back to his feet, Inmate Mizzoni continued to "drop his weight," refusing to stand under his own power, requiring COs Grider and Hightower to implement a wrist lock maneuver and lift Inmate Mizzoni to a standing position. (Exh. C and E). A nurse evaluated Inmate Mizzoni when he arrived at Unit 8, noting a 1 cm laceration above Inmate Mizzoni's left eye, small knee abrasions, and small wrist abrasion from handcuffs. (Exh. I.). Defendant Smith was also evaluated by a nurse in Unit 8, who noted a reddened area on Smith's right cheek and temple area, with some swelling. (Exh. H).

Following the incident, Defendant Smith charged Inmate Mizzoni with Battery, Assault, and Abusive Language. (Exh A). Defendant Smith included in his charging report the allegations that Inmate Mizzoni turned off the wall as Defendant Smith attempted to restrain Inmate Mizzoni and Inmate Mizzoni struck Defendant Smith with a closed fist to the right temple as he struggled to restrain him on the ground. *Id*. Accordingly, Inmate Mizzoni cannot produce evidence demonstrating that Defendant Smith wrote a false disciplinary report in retaliation for Inmate Mizzoni exercising his constitutional rights.

## VI.   CONCLUSION

Since Inmate Mizzoni received a written notice of charges at least twenty-four hours prior to the disciplinary hearing, was provided a written statement by a hearing officer of the evidence relied upon and the reasons for taking disciplinary action, and was afforded the opportunity to call witnesses in his defense, this Court should summarily adjudicate Inmate Mizzoni's due process claim against Defendant Brannon in Defendant Brannon's favor.

Since Inmate Mizzoni cannot produce evidence demonstrating that Defendant Smith wrote a false

---

[4] The declaration of CO Hightower is attached hereto as Exhibit E. The declaration of CO Allison is attached hereto as Exhibit M. The declaration of CO Grider is attached hereto as Exhibit C. The declaration of Correctional Sergeant Garnica is attached hereto as Exhibit D. The declaration of CO Ardinger is attached hereto as Exhibit B.

disciplinary report in retaliation for Inmate Mizzoni exercising his constitutional rights, this Court should summarily adjudicate Inmate Mizzoni's retaliation claim against Defendant Smith in Defendant Smith's favor.

Dated this 16th day of November 2017.

                                            ADAM PAUL LAXALT
                                            Attorney General

                              By: _____
                                            ERIN L. ALBRIGHT
                                            Deputy Attorney General
                                            Bureau of Litigation
                                            Public Safety Division

                                            *Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I certify that I am an employee of the Office of the Attorney General, State of Nevada, and that on this 16th day of November 2017, I caused to be deposited for mailing a true and correct copy of the foregoing, **MOTION FOR SUMMARY JUDGMENT**, to the following:

JOSEPH L. MIZZONI #68549
HIGH DESERT STATE PRISON
P.O. BOX 650
INDIAN SPRINGS, NV 89070

_____
An employee of the
Office of the Attorney General