1  Joseph Mizzoni     ID NO. 68549
2  HIGH DESERT STATE PRISON
   22010 COLD CREEK ROAD
3  POST OFFICE BOX 650
   INDIAN SPRINGS, NEVADA 89070
4
   PRO-SE           , In Proper Person
5

6          IN THE UNITED STATES DISTRICT COURT

7              OF THE DISTRICT OF NEVADA

8
9  JOSEPH MIZZONI
                                 CASE NO: 3:15-CV-00499-MMD-WGC
10         Plaintiff
                                 DEPT NO::_____
11 vs.

12 STATE OF NEVADA, C/O Brown,      DATE OF HEARING: None-Requested
13 C/O C.Smith et.al. for (NDOC)    TIME OF HEARING: 8 t
14                                  MOTION TO OPPOSE DEFENDANTS MOTION
                 Defendants         FOR SUMMARY JUDGMENT AND SEALED
15                                  EXHIBITS (AND REVERSE SUMMARY JUDGMENT
16        COMES NOW, Joseph Mizzoni TO PLAINTIFF FOR ALL RELIEF
                                    #68549     , In Proper Person and
17 Respectfully opposes the Defendants Summary Judgment on Plaintiffs § 1983
18 Civil Rights Complaint PURSUANT TO 42 USC §1983 (EXHIBITS AND Affidavits Attached)
   See: Haines V. Kerner, 404. U.S. 519, 520 (1972) (Allegations of pro-se Complaint are held to less
19 Stringent standards than formal pleadings drafted by lawyers)

20     THIS "Motion"    , is made and based upon the attached Memorandum of Points
21 and Authorities, all of the pleadings and other documents on file in this case, as well as
22 EXHIBITS A, B, C, D, E, F, G, H, I, J, K, AND Declaration/Affidavits Attached.

23 DATED This 18 day of November , 20 17 .

24 Respectfully submitted,

25
26 Joseph Mizzoni      ID NO. 68549
27 PRO-SE           In Proper Person

28

                        PAGE 1

## I. INTRODUCTION

Plaintiff, Joseph Mizzoni #85499 is an inmate currently incarcerated at High Desert State Prison "not" NNCC Prison. H.D.S.P is in Indian Springs Nevada by Nevada Department OF Corrections (NDOC). Plaintiff Filed a 14th Amendment Complaint brought pursuant to 42 USC § 1983 ("Section 1983") that his 14th Amendment rights to the USC were violated when Defendant Brannan Lt C/O denied Plaintiff Video Evidence and witnesses during a (NDOC) disciplinary hearing held on May 1, 2015, and when Defendant Smith wrote a false disciplinary report and used excessive force punishment on plaintiff prior to a disciplinary hearing. See; EX-A Disciplinary Hearing Report. This Courts' Screening Order allowed plaintiff on a 1st Amended Complaint to proceed a due process claim against Defendants Brannan and Smith on the 14th Amendment to the U.S.C.A.

## II. STATEMENT OF FACTS IN SUPPORT I

(FACT 1) Plaintiff will address the Defendants Summary Judgment in Pages of that in order from start to finish, and that plaintiff will prove a set of material facts to reverse the Defendants Version of Summary Judgment, and at a minimum receive a Jury trial. And he will use some of these exhibits as well.

(FACT 2) On Defendants (Page 2 Line 6-28) to (Page 4 Line 1-19) A. March 28, 2015 Physical Altercation Between Defendant Smith and Plaintiff Inmate Mizzoni. Plaintiff opposes Smiths Version and does so by one Inmate Witness, C/O Reports, Video evidence destroyed, and other points and authorities. Plaintiff states the cell Search On plaintiffs cell (5-B-28) was conducted in a "in trusive destructive manner" by C/O's Allison, Ardinger and S. Smith, and they uncovered nothing. They left plaintiffs cell in damage condition See; EX-B NDOC AR 422 States on AR 422 page 4 of 12, 2 (Every reasonable precaution will be taken to avoid damage to personal property and to

I. STATEMENT OF FACTS IN SUPPORT I                    (Continued)
to leave the inmates quarters and property in good order upon completion
of the search. Any damage will be reported.) This is why plaintiff rejected his
cell a disarray by C/O's, not to ask Unit C/O C. Smith to fix the tubs tiped
upside down and cloths and personal property mixed and scattered all over
cell.

Plaintiff did not go to the Unit 5 officer C. Smith and say "Hey C/O kiss
my Ass" (No one does that to mess there time off) its A lie. Yes Plaintiff
said something to C. Smith about his cell a disarray/mess and that he was
not happy about it left that way, and requested the cell to be left the
way it was when C/O' came in it. And plaintiff quit his porter
Job. He then walked towards his cell and C/O Smith came out his bubble
and stated "WHAT THE FUCK DID YOU SAY!! get against the wall I am
going to restrain you. I said for what? I didn't do any thing. As plaintiff
would like to show the Court even if plaintiff said such Ass, which he didn't
it wont mean: A four-legged long-eard mamal related to the horse or donkey.
Or stupid person. This word is not abusive and nor can one be restrained or
punished for saying it. Under AR 707. See: EXHIBIT-C (pages 19 of 38 G4-Abusive
language or actions toward another person. (Class D punishment).

Plaintiff didn't try to raise of the wall intill plaintiffs left
cist was pulled by C. Smith without warning verbally that he was going
to cuff plaintiff, so intum plaintiff reacted by turning to see who was
grabing him, and plaintiff had inmate over the years at Ely prison who were
threatening to harm plaintiff so he reacted accordingly because just like C. Smith
stated in his report "he had to tell inmates to get back the rotunda was
full of inmates". Also plaintiff was blind in his left eye and couldn't see who
it was when plaintiff saw it was Smith he then put his hands on the glass wall

**Page 3**

II. STATEMENT OF FACTS IN SUPPORT I                    (continued)
and C. Smith took plaintiff in a choke hold to the ground, when plaintiff
hit the ground he rolled over and put his hands behind his back, and
said, "cuff me." C. Smith then jumped on plaintiffs back and cuffed him. At
"No" time did plaintiff strike C. Smith on the ground or other wise and
nor was plaintiff resisting at this time or any time. See; EXHIBIT-D
Audio Recording for May 4, 2015 Dis Hearing. Also See; EXHIBIT A Disciplinary
Hearing Report Page MIZZONI 499 DEF EXIT A-002 Witness Inmate Accepted
Relevant Chris Deyerle # 0601010262. and page 006 C. Smith Report.

     The defendants go on to say C/O Ardinger approached housing Unit 5,
he observed what appeared to be a fight and called for assistance on
radio (Id) Correctional Office Ardinger was first to arrive on scene. He saw
Defendant Smith on the ground with an unrestrained inmate Mizzoni
C/O Allison responded to the request from housing Unit 5. Upon his arrival
at housing Unit 5, he witnessed Defendant C. Smith and Inmate Mizzoni on the
ground struggling. Defendant Smith was on top of Inmate Mizzoni attempting
to control him while Inmate Mizzoni was attempting to punch Defendant C. Smith. (Id)
     C/O Allison assisted Defendant C. Smith by placing his left hand on Inmate
Mizzoni's head so he was unable to bite or spit. (Id) He then placed his knee
against Mizzoni's left shoulder and his right hand on Inmate Mizzonis right
shoulder because Inmate Mizzoni continued to struggle and resist staff.
     C/O Allison also gave Inmate Mizzoni a verbal command to stop fighting and
resisting (Id.) Ultimately, Defendant Smith was able to place wrist restraints
on Inmate Mizzoni with assistance of officers Ardinger and Allison (Exhs A and
B). Even after Inmate Mizzoni was restrained he continued to verbally abuse
staff and struggle; there fore staff secured Inmate Mizzonis legs to gain
Compliance and prevent any further incidents. (Exh B).

1. II. Statement OF FACTS In Support I                    (Continued)
2. Plaintiff respond to the C/O's C.Smith Allison and Ardinger that all
3. conspired to this False Reports of all and C.Smith's Disciplinary Charges
4. and reports. Plaintiff proves this by C/O's Reports. See; EXHIBIT-E OO1-
5. OIO.  See; EX-E OO3 to OO4 Hill, John. reporting officer. He says that:
6. On Saturday March 28, 2015 I, Senior Officer J.Hill while assigned to
7. Search and Escort at Northern Nevada Correctional Center did provide assistance
8. in Unit four to secure cell doors at Close of tier time. At approximately
9. 2045 hrs Officers Allison, Ardinger, S Smith did arive in the unit.
10. Shortly there after a radio transmission from Unit 5 Caused officer Allison to
11. suggest a response to unit five. Seconds later additional radio transmissions
12. requested "BACK up" to unit 5 "Myself" and "the three other" officers departed Unit 4
13. enroute to Unit 5. Upon arrival Officers Allison, Ardinger, S smith" provided
14. assistance to Officer C. Smith, while I began to to "desperse inmates from
15. the immediate area, clearing the rotunda and securing inmates in their cells. As
16. additional staff members arrived. The area was secured. I then observed the
17. escort of inmate Mizzoni #68549, from Unit 5 to 8 for medical evaluation.
18. This shows that Senior Hill, Allison, Ardinger and S-Smith arrived on Unit 5
19. "at the same time", not seprate. And that C/O Allison, Ardinger and S.Smith
20. were at my and C.Smith's location at the same time, not seprate like
21. Allison, and Ardinger and C.Smith conspire the reports to say. S.Smith was
22. there  See; EX-E OO5 to OO6  SMITH, SCOTT responding Officer. He stated;
23. I C/O Scott Smith was was in Unit 4 when I responded to Unit 5. When I
24. got there Officer C.Smith had Inmate Mizzoni #68549 on the ground
25. hand cuffed. I helped secured the Unit.  C/O S. Smith states plaintiff was
26. cuffed as plaintiff states in his §1983 Complant C. Cause of Action Pg. 3 to
27. 3-C. Plantiff was cuffed and C.Smith was on top of him. See; Motion For
28.

**II. STATEMENT OF FACTS IN SUPPORT I** (Continued)

Summary Judgment, Case # 3:15-cv-00313-MMD-VPC (Page 4 Line 18-19) Number #15 stated by the NG's Office and those defendants on same material of Facts: As the backup officers started responding, C/O's Smith, Allison, and Ardinger placed Mizzoni in Wrist restrains. Exh. A at 6; Exh B at 10-11; Exh. C at 7-9. (ECF No. 40 at 6)." All this proves by plaintiffs versions and the C/O's and AG on 00313 case that in "material" Facts All (3) C/O's Allison, Ardinger S. Smith and Units C. Smith were togather at the same time and that S. Smith and plaintiff Swore I was hand cuffed and secure as other C/O's on reports say, and that there is enough material Facts to show C. Smith, Allison, Ardinger Conspired/lied on there reports and punished plaintiff, "on the spot" before the May 1, 2015 Disciplinary Hearing, by there version on reports. See; EXE-007 to pg 008. Also See; EXHIBIT-F Declaration of: Joseph Allison, Robert Ardinger and Christopher Smith, under pealty of perjury 81746. They all lied and conspired togather and I can prove it. There punishment and excessive force is in detail and is a violation of plaintiffs 14th Amendmant rights USCA per Wolff v. McDonnell 418 U.S. 538. 564-71 (1974.) Plaintiff was not afforded any of the due process rights intill after these officers and others punished plaintiff on the spot. Plaintiff was cuffed with (2) C/O's on top of him while there Sergent put plaintiff into a choke hold, pulled his spleen area, pounded plaintiffs head on concreate Floor while stating "You Hit my C/O?", "Did You 'Hit My C/O?" then he pushed plaintiffs head down to floor and grinded back and forth plaintiffs face/head intill he Knocked plaintiff out and caused bleeding, while plaintiffs legs and torso was pushed down and some C/O grinded plaintiffs Knees to bleed and cause pain and unwanted and unwarnted "Suffering. Defendant Smith had not one mark on him he and his C/O counterparts lied to cover up what they "All"

1  II STATEMENT OF FACTS IN SUPPORT I                    (Continued)
2  did to the plaintiff. On Defendants Pg 4 it goes on to say Sergent
3  Henely instructed C/O's Grider and Hightower to escort Inmate Mizzoni to
4  medical for a evaluation. When plaintiff was down on ground he stated
5  he had Hepititis-C virus, "to not give it to any one," and was bleeding
6  on his temple and knee areas and complaining of sevior pain to his
7  legs and knees. All C/O's knew I was bleeding and didn't call medical
8  to the Unit on a medical unit and did treat plaintiffs mental Health
9  either, as they said I had a mental health condition called personallity
10 disorder. C/O Grider and Hightower say plaintiff was noncompliant
11 and plaintiff continued to drop his body weight to the ground every
12 time they lift him up to his feet. And Used more excessive force and
13 punishment before due process or Disciplinary Hearing by putting plaintiffs wrists
14 in a wrist lock, and they detail this punishment/force. Plaintiff shall
15 got medical attention on the spot to stop the bleeding and see if he could
16 walk period but no C/O did what was required by there own medical
17 policies and plaintiff did comply the whole time. See: EX-E 003
18 HENLEY, JOHN Shift Sergeant on his report from Line 6 to 8. it states: Inmate
19 Mizzoni "was Compliant at this time." I requested that Officer Hightower
20 and Grider escort Inmate Mizzoni to the Clinic as he had minor facial
21 abraxions and was stating that his left knee was injured. Once again there
22 to C/O Hightower and Grider Used punishment and excessive force without a due
23 process hearing for punishment under the 14th Amendment USCA, and lied about
24 plaintiff not complying, and even if plaintiff was dropping, "He was injured."
25 See: Wolff v. McDonnell, 418 U.S. 538 (1974) also see: EX-C NDOC AR-707
26 Inmate Disciplenary Process Pg 5 of 38 1.9 • At least 24 hrs prior to any formal
27 hearing before an imparcial Disiplenary Hearing Officer a Notice of Charges will be
28

1  II. STATEMENT OF FACTS IN SUPPORT                    (Continued)
2  served. • A qualified opportunity to call witnesses with substantive
3  knowledge of issues and present documentary evidence provided that to do
4  so will not jeopardize institutional security or correctional goals. • A written
5  statement by the Disciplinary Hearing Officer as to the evidence relied
6  on and the reasons for the disciplinary findings. Plaintiff was not afforded
7  these procedures during this punishment. After this punishment before a
8  due process hearing, they all decided: C/O Hill, C/O Serg Henry, C/O Gruder,
9  C/O Hightower, C/O Serg Crowder, C/O Allison, C/O C. Smith, C/O Ardiger, C/O
10 Samsel, C/O Robertson and other C/O's, decided to take me to the front of
11 Unit 5 entrance "all knowing my medical conditions at this time", and said
12 "Forwards or Backwards", All decided Backwards and Serg C/O Hill grabs me
13 in a illegal choke hold and they drag me across the yard to Unit 8 while
14 my feet and ankle were banged over curbs at night and other C/O's beat me
15 up to cause more punishment, and tighten the cuffs up so tight it damaged my
16 wrist and hands. This was all seen by Video Cameras outside Unit 5, 4, and 8 and
17 inside 8. but the defendants conspired and destroyed all Video and didn't take
18 any Handheld Video inside to cover up this punishment before due process
19 hearing under USCA 14th Amend and AR 707 Disciplinary process by Nevada
20 Dept of Corrections. See; EXHIBIT-E, USE OF FORCE NNDC AR-405. Page 6 of 18
21 to 7 of 18. (John Hill did the preliminary DIS Hearing he was not impartial. see EX-A And EX-E)
22 Plaintiffs injuries were pain, unwanted, unwanted suffering, 1 cm laceration concussion
23 the medical never checked for by cat-scan, knee abrasions, wrist abrasions and cartledge
24 and nerve damage. Neck damage, kidney/spleen to left side damage. Permanent scars
25 to face and knee. Permanent damage to wrist/hands. Permanent neck pain and
26 suffering and other related damage and bleeding. The defendants and C.Smith dragged
27 help-c-very all over the prison yard but yet got themselves check out at a

I STATEMENT OF FACTS IN SUPPORT I                    (Continued)

Hospital but not plaintiff only a bandaid and no pain medication, and thrown into Unit 7 the D/S Hole. ]

From Defendants (Page 4 Line 21-25 to Page 5 Line 1-5) B. Disciplinary Hearing. Plaintiff uses the following to defend his version of events on 3-28-15 and at the 5-1-15 Disciplinary Hearing. See: Plaintiffs §1983 1st Amended Complaint Page 3 to Page 3-C. See: ALL Plaintiffs EXHEBITS to support his §1983. See: Doc 112 Filed 9-27-17 Report & Recomendation of U.S. Magistrate Judge "On Video" Page 10 Line 14-28 to Page 11 Line 1-28 states: Here, the Court likewise finds that NDOC is not just a "disinterested third party." The prison is responsible for the training and conduct of its employees, and according to the declaration of Mr. Shreckengost, appears to have had control over the video evidence. See: EXHEBIT-H Declaration of Mr. Shreckengost.  As in Pettit, the State of Nevada, of which NDOC is a department, indemnifies employees for damages for which they become legally responseable within the course and scope of employment, and funds the defense of employees in such lawsuits when requested. See Nevada Revised Statutes (NRS) 41.0339, 41.0349. Therefore, the Court finds that the prison had a duty to preserve the video evidence once Ms. Walsh was put on notice that it was potentially relevant to Plaintiffs claim, and the prison failed to preserve the evidence. See: EXHEBIT-I Inmate Request Form Ms Walsh. See: EXHEBIT-I Grievance #2006-29-98671 for Video evidence.  Under these circumstances, there are grounds for imputing the spoliation to the Defendants. See: EXHEBIT-J Report & Recommendation on Video.        IV. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order GRANTING IN PART DENYING IN PART Plaintiffs motion (ECF No. 100). Plaintiffs requests for some sort of dismissal sanction or per se adverse inference instruction should be denied. It is recommended, however, that the spoliation of the Video

10

1   II. STATEMENT OF FACTS IN SUPPORT I                    (continued)

2   evidence be imputed to the named defendants and that as a sanction Plaintiff

3   should be allowed to present evidence and argument to the "jury" that he

4   asked for this video footage; that the prison had a duty to preserve

5   the footage once he asked for it; that other employees of the prison

6   (and not the Defendants) failed to preserve the video footage; and that

7   the video would would have shown there were other inmates present

8   in the Wings of Unit 5 rotunda that may have witnessed the incident

9   between plaintiff and Smith.   Also See: "Objections to Magistrates

10  Judges Report & Recommendation dated the 2nd day of October 2017. No

11  answer was given or recommendation to this motion for Further Spoliation

12  of "all" video evidence. This "handicaps" the plaintiffs opposition to

13  the Defendants Summary Judgment Motion because it may be more

14  material of facts to support plaintiffs opposition for video the Defendants

15  destroyed to cover-up the punishments from Units 5, 4, 8 and 7 before

16  a Disciplinary Hearing.   See; Summary Judgment ~~~~~ Opposition on

17  Case #3:15-cv-00313-MMD-VPC titled "MOTION TO RESPOND TO

18  DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND REVERSE

19  SUMMARY JUDGMENT FOR PLAINTIFF IN PARCHEL" dated November 14,

20  2016, which is a "Judicial Notice" on the excessive force to go to trial.

21  The Defendants impeached plaintiffs witnesses for due process on his disciplinary destroy Video

22  III. LEGAL STANDARD

23     Summary Judgment is a Procedure designed to dispose of cases without trial

24  Where there are no factual disputes that require a trial. One Court has

25  Called it the put up or shut up moment of the lawsuit, when a party must

26  Show the evidence it has that would convince a trier of fact to accept it

27  version of the events." Summary Judgment is to be granted if the record before

28                          Page 10

1  II. LEGAL STANDARD                                    (continued)
2  the court shows" that there is no genuine issue as to any as to material fact and
3  that ~~the~~ the movant is entitled to a judgment as a matter of law." If
4  the Court finds that there is a genuine issue of material fact, then there will be
5  ~~████████████~~ a trial to determine the facts.
6  A "material fact" is one that "might affect the outcome of the suit under
7  the governing law.... Factual disputes that are irrelevant or unnecessary will
8  be counted." A genuine "issue exists" if evidence is such that a reasonable jury
9  could return a verdict for the nonmoving party." See; Wilson v. City of Chicago
10  707 F. Supp. 379, 381-82 ( N.D. Ill. 1989)( Summary judgment could not be
11  granted to a police supervisor whose conduct permitted the interference that
12  he condoned or engaged excessive force.) See; Smith v. Maschner, 899 F.2d 940,
13  949 (10th Cir. 1990)(Plaintiffs retaliation claim supported by suspicious timing
14  of his discipline, coincidential transfers of his witnesses and assistants, and an
15  alleged pattern by defendants of blocking his access to legal materials and
16  assistance")
17  Rule 56 (F). Fed. R. Civ. P
18  A court should not grant Summary Judgment against a party who has not
19  had an opportunity to pursue discovery or whose discovery request have not
20  been continued. Ingle v. Yelton, 439 F.3d 191, 196 (4th Cir. 2006)(denial of Rule 56(f)
21  Motion "is particularly inappropriate when... the materials sought are the object
22  of outstanding discovery (Citations omitted); Leigh v. Warner Bros., Inc., 212 F.3d
23  1210, 1219 (11th Cir. 2000) (Summary judgment is generally inappropriate when the
24  party opposing the motion has been unable to obtain responses to his discovery request)
25  See; "Objections to Magistrate Judges Report & Recommedation" dated
26  October 2, 2017. No Response to this spoliation video evidence for discovery. Plaintiff
27  was denied witnesses and Video for discovery. See; EX- ☒ Report & Recommedation on Video
28  Pages 10-11.                              Page 11

III. LEGAL STANDARD (continued)

See: Matsushita, 475 U.S. at 586. Material Facts are Facts that might affect the outcome of the case. See: Foster v. Dele, 130 F.3d 307,308 (8th Cir. 1997) (Summary judgment should not have been granted where prisoner said he could get avidavits from prisoners because they were afraid of retaliation, and reported in his papers what they had told him); La Batt v. Twomey, 513 F.2d 641,650 (7th Cir. 1975)(Summary judgment was improper where prisoner made several material offers of proof and said that "the strenuous security system within the prison prevented him from securing affidavits) Plaintiff asked Warden Walsh for Video, pictures, Inmate Witnesses affidavits and the response was "a bear to the process." See: EX- I- Inmate Request from Mr. Walsh.  See: EX-J (NDOC) Grievance # 2006-29-98671 Levels Informal, 1st level and Second for Video evidence. See: EX- K (DOC 112) Report & Recommendation of U.S. Magistrate Judge. Re: ECF No.106 pages 10-11

Plaintiff has indeed proven his burden of material Facts to relief or at a minimum trial by Jury by his affidavits, admissible evidence, and discovery materials. FED. R. Civ. P. 56(e) Matsushita, 475 U.S. at 586 n.11; Anderson, 477 U.S. at 255. The opposing party is not required to established a material issue of fact conclusively as it is enough that the "claimed factual dispute be shown to require a jury (or Judge) to resolve the parties differing versions of the truth at trial." TW. Elec. Serv. Inc. v. Pacific Elec. Contractors Ass'n. 809 F.2d 626, 631 (9th Cir. 1987). The evidence of the Non-moving party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the Court must be drawn in favor of the opposing party. Matsushita, 475 U.S. at 587 (citations omitted); Anderson, 477 U.S. at 255. As the non-moving party Plaintiff has shown "more then simple metaphysical doubt as to material facts. Plaintiff shall receive his opposition Motion for Summary Judgment and the relief and/or trial.

1. IV. LEGAL ANALYSES
2. From Defendants (Page 6 Line 12-28 to Page 9 Line 1-15) A. Defendant Brannon
3. Did Not Violate Inmate Mizzoni's 14th Amendment Due Process Rights.
4. Plaintiff responds to this by stating that the plaintiff was not afforded
5. a legal and fair disciplinary Hearing on May 1, 2015 by Lt. Brannon, and
6. Plaintiff proves this by Lt. Brannon denying plaintiff witnesses and video evidence
7. because he said the video is Official use only and without this evidence
8. plaintiff could not retain witnesses that saw plaintiff "Not" hit C. Smith in Unit 5
9. A, B, C wing. He admitted there was video latter on his Admissions and
10. Integitories. See: DEFENDANT BRANNON'S RESPONSES TO PLAINTIFFS
11. REQUEST FOR INTERROGATORIES [set one] dated the 9 day of March, 2017
12. Page 2 Line 13-26 INTERROGATORY NO. 5': Please state in your own words that on
13. 3-28-15 was there eye witnesses inmates and C10's and videos Cameras working inside
14. and outside Unit 5, Outside Unit 4, inside and outside Unit 8 and outside Unit
15. 7, and that as a disciplinary officer your policy to allow inmates to review such
16. evidence is done how? And if not why? Defendant states; to my knowledge
17. I believe that the Institutional Camera System was working only in Unit 5,
18. Outside Unit 4, Outside of Unit 8 and outside Unit 7 on this date. However,
19. the policy of the Institution is not allow inmates to review any video taken
20. from the Institutional Camera system due to safty and security reasons.
21. Also on Page 3 Line 1-15 INTERROGATORIES NO. 6: Defendant Lt. Brannon please state
22. in your own words why did you deny Mizzoni of video in Units 5, 8 and 7,
23. still pictures, "all" witnesses that he is clearly allowed po-14th Amend USCA?
24. Defendant states: Plaintiff had requested to view the video taken from the
25. Institutional Camera System; however as stated in the policy of the Institution
26. inmates are not allowed to view this video due to safty and security concerns.
27. Plaintiff made a statement that he seen pictures. In regards to "all" witnesses

IV. LEGAL ANALYSES                                                    (Continued)

there was only one witness Plaintiff requested and that witness was allowed. This statement is not true plaintiff asked for "all" I-made witnesses in the rotunda. See; EX-A Disciplinary Hearing Report Page 002. Statement By Offender. Brannon denied this request and it a violation of plaintiff's rights to the 14th Amed.1464 and AR 707(NOCD) policies, and Wolff case.

See; DEFENDANT BRANNON'S RESPONSES TO PLAINTIFF'S FIRST REQUEST FOR ADMISSIONS dated the 31 day of March 2017, Page 3 Line 13-22 ADMISSIONS NO.15: Admit you did not follow AR 707 DIS policies to witnesses and eviststrp allowed to an inmate at NNCC/ prison and violate his 14th Amded rights. Defendant states: I deny this request as the hearing process outlined in "(AR)" 707 was followed. All request made by Plaintiff were assisted with; however, the viewing of the Institutional camera system was not available. Inmate's are not generally allowed to view the Institutional camra system as it is a safty and security concern. This statement is not true Defendant Brannon did not allow Plaintiff to "all" witneses as req. ested by plaintiff, and per AR707. Nor was he allowed the Video requested. At no time has the defendant ever said on Interrogatories and Admissions that the video doesn't exsist or it was destroyed. See; EX-A Disciplenary Hearing Report, page 002 statement of offender. States: (I didn't do it. I plead not guilty on all charges. I request Video and "All" I/M's in rotunda. This is a false police report. I want this on record.) See; Inmate EX-I (Wex) Greivance # 2006-29-98671 "All levels" for video I witnesses. Respond to Informal level: Greivance denied. All materials and disiplenary evidence is retained and kept in the property of "(N.D.O.C)". Respond to First Level: You will not be provided any evidence. Greivance denied. Respond to Second Level: For security reasons, You will not be given access to the Video you are requesting. Greivance Denied.

IV. LEGAL ANALYSIS                                      (continued)

Not once did they ever say that they didn't have the Video or that the Video is destroyed, so they had it, which contradicts the Declaration of Ronald Schreckengost. See; EX-H Declaration of Ronald Schreckengost See; EX-I Inmate Request Form M.S Walsh "For Video 3-28-15 Affidavits, and Witnesses of Inmates." Response: "Ahear to the Process" Not once did the Wardens say there is no Video, witnesses, or destroyed Video. See; EX-C (Nou) AR-707 Inmate Disiplenary Process. Page (AR 707) 5 of 38 1.9 • A qualified opportunity to call witnesses with substantive Knowledge of issues and present documentary evidence provided not to do so will not jepordize istitutional security or correctional goals. Braman Violated this AR 707 by not allowing plantiff to marshel his facts and evidence against him, by deniny the requested Inmate Witnesses and Video of Unit 5 A,B,C Wings, Units 4,8 and 7 inside and out. Not once did Braman say the video does not egsist or its destroyed. See; EX-D Audio Recording for May 1, 2015 Disiplenary Hearing C.D-Recording A6 09:24 HMS ET. Braman says they got the Video. Finally see; EX-K (Document 112) Report & Recommendation of U.S. Magistrate Judge Re; ECF No 100 Pages 10-11.

The Ninth Circuit has concluded that to determine whether a particular form of restraint imposes "atypical and significant hardship," a court considers a condition or combination of conditions or factors in a case by case basis, rather than invoking a single standard. Chappell, 706 F.3d at 1064 (citation omitted). At least three factors have been used to guide this inquiry: (1)"Whether the criminals conditions of confinement 'mirrored those conditions imposed upon inmates in analogous discretionary confinement settings;" (2)" the duration and intensity of the conditions of confinement; and (3) "Whether the change in Confinement would inevitably affect that duration of the [prisoner] sentence."

1  IV. LEGAL ANALYSIS                                    (continued)

2  Chappell, 706 F.3d at 1064-65 (italics original)(citation omitted). Thus,

3  "Sandin requires a factual comparison (whichever is applicable) and discretionary

4  segregation, examining the hardship caused by the prisoner's challenged action

5  in relation to the basic conditions of life as a prisoner."

6  Plaintiff will now show evidence based on all (3) Factors above, starting

7  with (1) Plaintiffs conditions of Confinement were not similar under discretionary

8  confinement setting because: If you compare the whole at (NNCC) prison and

9  Ely State Prison  to General Population it's like night and day: (A) Figures In Hole

10  from (GP) to High Risk Prisoner to max prisoner and plaintiff did 18 months of it. (B)

11  Compare (GP) get cloth and Food packages, max Nothing. (C) Compare (GP) get Coffee Shop, max

12  nothing. (D.) Criminal sanctions possible, had to live under duress, Fear, pain, charges, stress

13  ect. (E) Compare (GP) get yard/Gym with privileges of weights, Band Room, recreational

14  Equipment, MAX yard 1hr a day. (GP) All day yard/Gym. (F) Shot day loss possible (G)

15  possible restitution (H) A beating or the spot punishment without due process (I) Compare (GP)

16  Church and Choir, max nothing. (J.) Compare (GP) Visiting, at Visit room contact Visits

17  outside visiting, get food with Family, max visiting behind glass, orange jumpsuit,

18  belly chain hand cuffs and leg shackles on the whole time, Clo gets Food, no walking with

19  Visitor, nobody contact. (K) Compare GP you get all your register cloths and property

20  max orange jump suit, limited property. (L) Compare (GP) Shower every day any time

21  max shower every (3) days when Clo says. (M.) Compare (GP) tear time every day and

22  night from 6pm to 11pm max None at all (N) Compare (GP) allowed to walk to Culinary

23  or work in culinary  max neither one (O.) Compare (GP) Unhand and leg cuffed

24  freedom of restrain  max cuffed Hands and legs every where you go (P.) compare (GP)

25  Phone privileges day or night any time max phone once a week when the Clo

26  wants to give it to you (Q) Compare (GP) Hobby craft max No Hobby craft (R) Compare

27  (GP) Store Buyer and all appliances in store max get limit store No Food etc. got limited

Visiting visitors must drive 250 miles from any town to Visit.

28  Page 16

1  IV. LEGAL ANALYSIS                                    (continued)

2  appliances, and you only get one appliance every 90 days. (S) Also lost disciplinary

3  of assault and battery on my record, put into High risk prisoner (3) months as due

4  process on that of all. See; EXHIBIT (T) THE write up stoped me from gettin a parol

5  Sept. 14, 2016 because of Institutional Violance. See; EXHIBET - T Parole Hearing Results

6  of Sept 14, 2016 Denial. And other GP privilges and amenties compaired to max

7  prison.

8  (2.) "The duration and intensity of the conditions of confinement. Plaintiff

9  did 18 months out of 24 months under Number (1) conditions without due

10 process of law See; Exhibit A page 004 Results of D/S. 24 Hour locked down in cell

11 compared to out of cell day and night in (GP).

12 (3.) "Whether the change in confinement would inevitably affect the duration

13 of the [prisoner's] sentence." Plaintiff lost his work good time credits

14 of (10) days per month because he cant work in the Hole/D/S which is

15 ruffly a loss of 180 days. I should of got those days but lost them without

16 this due process under the False Disciplinarys and w/ heresaa and Video evidence

17 I should of got to defend (1)(2) and (3) of this brief at his disciplenary Hearing

18 5-1-15. This all truely a "atypical and significant hardship" See; Sandin

19 v Conner, 515 U.S. 472-483-484 (1995); Serrano v Francis, 345 F.3d

20 1077, 1078 (9th Cir. 2003). Chappell, 706 F.3d F.3d at 1064-65.

21  Brannon use of some evidence is no evidence. Smith used no witnesses,

22 or proof to plaintiff hitting him. Plaintiff didn't and can proof all from

23 Start to finish. See; All EXHIBITS attached. And Smith wrote a fake disciplenary.

24

25

26

27

28

IV LEGAL ANALYSES                                    (continued)

From Defendant's (Page 9 Line 16:28 to Page 11 Line 1:19) B.Defendant Smith Did Not Retaliate² Against Inmate Mizzoni by Writing a False Disciplinary Report. Plaintiff responds by Stating C.Smith did write a False Disciplinary Report and he did so by plaintiffs argument on the First Part of this opposition motion on (FACT 2.) Plaintiff covers all this part of the arguement on (FACT 2.)(Page 7 line 20:28 to Page 9 Line 1-3) on this brief. It is unnecessary to repeat the material facts. C.Smiths actions were motivated by conspiring with Allison and Ardinger, and all filed false reports, as the Court can see which is All material facts. All the Court has to do is read this on there own C/O reports and plaintiff will put those reports out in order by EXHIBIT once again. See; EX-E Page 003 HILL,JOHN; Page 006 SMITH SCOTT; Page 007 ALLISON, JOSEPH; Page 008 SMITH,CHRIS, Page 010 ARDINGER, ROBERT. The Senior John Hill has security over all C/O above his report states it all he and Allison, Ardinger and Scott Smith arrived "at the same time""not seperately" and all (3) C/O's Allison, Ardinger and Scott Smith assisted C.Smith in Unit 5. C.Smith, Allison, and Ardinger conspired the storys and reports/Disciplinary to justify the force they use on plaintiff when he was clearly down, cuffed, and C.Smith on top of plaintiff then these (3) C/O's and administration decided with other C/O's that used excessive force outside Unit 5 to personally destroy evidence. "Video Evidence". It so happens C/O Sergeant Robertson; Hand Held Video Camra was not working at this time either. because Ms Robertson took Hand held Video of plaintiffs force used on him and destroyed it by lieing there camra was not working. AR 405 says she or the other Sergents were to have Hand Held Video Camra in working condition apon there arrival of a Spontanious use of force insident. See; EX-B USE OF FORCE AR 405 pages 6 of 18 -7 of 18. Then when you look at C/O Scott Smith's report he states; I C/O Scott Smith was

1  IV. LEGAL ANALYSIS                              (Continued)
2  in Unit 4 when i responded to Unit 5. When I got there Officer C. Smith had Inmate
3  Mizzon #68549 on the ground HandCuffed. I help secure the Unit. This is
4  consistent with plaintiff version of #1983 Complaint, Plaintiff was cuffed at this
5  time when All (3) C/os Atkion, Andigar, and Scott Smith. Scott Smith even
6  says I was so secure that he left and secured the Unit 5. He doesn't say
7  Plaintiff was none combative or not compling to verbal orders, or throwing
8  punches or anything. C. Smith lied and to get out of it he filed a false police
9  report, and plaintiff can prove it. C. Smith violated plaintiffs 14th Amended
10 rights by filing a false report and it so happens Senior John Hill did the
11 preliminary Disciplinary Hearing to further cover the report up. Hill was not
12 impartial. See; EX-C AR 707 Disiplenary Process page 4 of 38 PRELIMINARY
13 HEARING OFFICER - An impartial correctional employee who presents the written
14 Notice of Charges to the accused inmate and advises the inmate of the procedures
15 applicable under Code. Hill was NOT impartial, he was first on seen with C. Smith
16 to assit him, just as he assited this write up with him to a false write up. I
17 fries on John Hill he was dismissed? Why?  C. Smith is a part of the disiplenary
18 Process he was a CHARGING EMPLOYEE. See; AR 707 page 2 of 38. He works for
19 The Nevada Dept. of Corrections. See; AR 707 page 3 of 38 DEPARTMENT. C. Smith is
20 a part of the Disciplenary Processes. See AR 707 page 3 of 38 DISCIPLENARY
21 PROCESS - This term is intended to describe the collective steps necessary to resolve
22 a violation, including "the Service of the Notice of Charges". EMPLOYEE - NRS 284.015.
23 See; AR 707 page 4 of 38 NOTICE OF CHARGES - THE document used to describe the
24 incident and list the disiplenary charges against the inmate. OFFENSE/VIOLATION.
25 And all through AR 707 C. Smith is a part of the disiplenary process. Theres nothing
26 retaliitory in plaintiff complaint #00499 Case C. Smith wasn't retaliitory he did
27 just blantly lied to cover up his excessive force and punishment before a due process
28                        Page 19

1

2   hearing could be conducted, then he wrote a false report to do that and violate

3   plaintiff 14 Amended rights to due process and equal protections to the laws.

4   See; Wolff v. McDonell. 418 U.S. 538-564-71 (1974). See; EX-C (NDx) AR707

5   Inmate Disciplinary Process. Plaintiff was afforded those rights before punishment

6   on the spot "not after." The Attorney Generalls Argument on "retaliation is moot

7   its not part of plaintiffs lawsuit her argument should be striken from the

8   record. C. Smiths Summary Judgment should be dismissed for violating plaintiffs

9   14th Amendment Rights. Defendant C. Smith didnt even answer the complaint even after

10  being served by U.S. marshalls and "defaulted." Plaintiff staid of even his case on

11  that alone. Smith committed perjury, obstruction of justice, malicious prosecution false Report Assault

12  and Battery. Attempt murder on plaintiff and I want him and the other c/o's prsouted.

13  V. COCLUSION

14      Wherefore Plaintiff has proven his 14 Amendment due process claim

15  and damages for the releif he asked for under "Points and Authorities." C. Smith

16  wrote a false disciplinary, lie about plaintiff hitting him, conspired with defendants

17  in case# 3:15-CV-00313-mmn-vpc Allison and Adsger to write a false disciplinary

18  report, then He and defendants on both cases# 00313 and # 00499 destroyed all (c/o's)

19  Video's evidence and tack vo HandHold and destroyed what was took to cover up (video)

20  Punishment on the spot before a Due process hearing on 5-1-15. As for as Defendant

21  Brannon he violated plaintiffs due process rights to the 5-1-15 hearing he refused

22  witnesses requested by plaintiff, he did not allow video to Evidence to be

23  seen by plaintiff, or the witnesses to that video. It was destroyed. He also

24  punished plaintiff on his past disciplinarys and he would nt read the reports he would

25  see what plaintiff show C. Smith and other c/o's lied on the reports including

26  the disciplinary process report, because Brannon was by that report to convict

27  plaintiff of 5-1-15 Disciplinary. See; EX A page 023 Evidence Relied on for Disciplinary

28  hearing.

Page 20

1  V. CONCLUSION                                        (Continued)
2  He would of seen, and dismissed the disciplinary but instead violated plantiffs
3  14 personal rights to Due process and equal protection to laws USCA.
4  Plantiff respectfully ask for the defedants Summary Judgment to
5  be dismissed and award plantiff "All" releif asked for.
6
7                                    RESPECTFULLY SUBMITTED
8                                    this 28 day of November 2017
9
10                                   BY: Joseph M.
11                                   JOSEPH ANTONINI
12                                   #68549
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28                        Page 21

VI.

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| JOSEPH MEZZONI | } | Civil Action No. 3:15-CV-00499-MMD-WGC |
| Plaintiff | } | |
| | } | |
| vs. | } | |
| | } | |
| STATE OF NEVADA et al, | } | |
| Defendants | } | |

## AFFIDAVIT FOR OPPOSITION TO DEFENDANTS MOTION FOR SUMMARY JUDGMENT

STATE OF NEVADA )
                  ) SS
COUNTY OF CLARK )   AFFIDAVIT OF JOSEPH MEZZONI

Comes Now the plaintiff in the above styled action. Mezzoni and after being duly sworn, depones and says:

1) He is representing himself pro se in the above styled action without counsel.

2) Plaintiff pro se Mizzoni swears by his "MOTION TO OPPOSE DEFENDANTS MOTION FOR SUMMARY JUDGMENT AND SEALED EXHIBITS / AND REVERSE SUMMARY JUDGMENT TO PLAINTIFF FOR ALL RELIEF." with "Points and Authorities."

3) The Plaintiff is entitled by law to receive all damages asked for at swears under Penalty of Perjury §1746 / NRS 1 Law.

4) This is plaintiffs Declaration of truth to 3-28-15 Incident.

RESPECTFULLY SUBMITTED            BY: Joseph Mezzoni #68549

This 28 day of November 2017      Page 22      JOSEPH MEZZONI #68549

**CERTIFICATE OF SERVICE BY MAILING**

1  I, _Joseph Mizioni #68549_, hereby certify, pursuant to NRCP 5(b), that on this _28_

day of _November_, 20_17_, I mailed a true and correct copy of the foregoing, " _Motion To OPPOSE_

_Defendants Motion For Summary Judgment And Sealed Exhibits / And ____ Reverse Summary_

_Judgement To Plaintiff For All Relief:_ by depositing it in the High Desert State Prison, Legal Library, First-Class Postage, fully prepaid,

addressed as follows:

1) _Clerk, U.S. District Court_          2) _OFFICE OF ATTORNEY GENERAL_
   _District of Nevada_                     _NV/AAA_
   _400 S. Virginia Street   Room 301_      _MS Albright (361)_
                                            _100 N. Carson Street_
   _Reno, Nevada  89501_                    _Carson City, NV: 89701-4717_

3) _Address of Plaintiff_
   _HIGH DESERT STATE PRISON_
   _P.O. Box 650_
   _INDIAN SPRINGS, NV 89070_

CC:FILE

DATED: this _28_ day of _November_, 20_17_

_Joseph Mizioni_                          _# 68549_
_Joseph Mizioni_                          _# 68549_
                            **In Propria Personam**
                            Post Office box 650 [HDSP]
                            Indian Springs, Nevada 89018
                            **IN FORMA PAUPERIS**

PAGE 23

24

# EXHIBIT A

## DISCIPLINARY HEARING REPORT

# EXHIBIT A


25

O.P. 707

**GREG COX**
**DIRECTOR**



**ISIDRO BACA**
**WARDEN**

### Nevada Department of Corrections
### Northern Nevada Correctional Center
#### Disciplinary Sanction Notification

Inmate: _MIZZONI, DSWH_          NDOC #: _68549_

Date: _5-1-15_          Housing: _736ZA_

Inmate Pled:  Guilty ☐   Not Guilty ☒          OIC #: _390034_

Has been found guilty of a violation of the Code of Penal Discipline and has received the following sanctions;

| | | | | |
|---|---|---|---|---|
| Loss of visiting: | All Visits: | | From: _____ To: _____ |
| | All Contact visits: | | From: _____ To: _____ |
| | Visits with: _____ | | From: _____ To: _____ |

Loss of Canteen/Store:          From: _____ To: _____
Loss of Phones:          From: _____ To: _____

Loss of Yard Privilege:          From: _____ To: _____
Loss of electrical appliances: _____ Days ASAP          Loss of gym privileges: _____ Days ASAP

Extra duty:          YLC:____ hrs.   and/or   Unit: ____   for ____ hrs.

Restitution:          (_$ TBD_)

Property loss/forfeiture:          Return (I/M & Date):_____
          Sent out:_____
          Dispose:_____

Institutional transfer:          Recommended Institution:_____

Stat referral:          A: _X_   B:_____   C:_____

Parole Board/Attorney General referral:          _____PB   _____AG   (Check if applicable)

Other (specify):_ 24 MOS DS _

Service/Hearing Officer: _Lt. Brandon_

PO Box 7000, Carson City, NV 89702  Phone (775) 887-9297 / Fax (775) 887-9267



# State of Nevada
# Department of Corrections

### DISCIPLINARY FORM III
### SUMMARY OF DISCIPLINARY HEARING

---

**INMATE INFORMATION**

INMATE NAME:  MIZZONI, JOSEPH 68549
CURRENT LOCATION:  NNCC-U7-B-62-A;  ;NC
LOCATION OF INCIDENT:  NORTHERN NEVADA CORRECTIONAL CENTER HOUS
OIC#:  390034

**HEARING INFORMATION**

DATE OF HEARING: 05/01/2015  TIME OF HEARING:  01:03 pm
NAME OF HEARING OFFICER:  BRANNON, IRA
DATE OF SERVICE OF NOTICE OF CHARGES:  04/02/2015
CHARGING EMPLOYEE:  SMITH, CHRIS

---

**INMATE PROFILE OR EXPLANATION OF EXCEPTIONAL CIRCUMSTANCE**

DH is on time.

---

**CHARGES AND PLEAS**

| Chrg | Description | Plea |
| --- | --- | --- |
| MJ3 | Battery | Not Guilty |
| MJ2 | Assault | Not Guilty |
| G9 | Abusive Language | Not Guilty |

**ADDITIONAL HEARING INFORMATION**

Counsel Substitute Requested:  NO

Name of Counsel Substitute:

Proceeding Recorded:  X

Stat Forfeiture Possible:  X

Potential Category:

Offender Cautioned Regarding Possible
Criminal Charges and Right to Remain Silent:  X

---

**WITNESS INFORMATION**

Witness Decision Justification:  I/M Mizzoni requested I/M Deyerle #1010262 and I/M's testimony was accepted and is as follows: Four cops came in our house and tore it apart.  I know Joe was going to tell the cop that the house needs to be put back together.  When I came out Joe was on the wall.  CO Smith went to grab his arm and Joe said what are you doing.  CO Smith took him to the ground and said stop resisting. He then yelled for everyone to lock down.  Other Officers arrived and yelled lock down and I locked down.

| Name | | NDOC/ID# | Decision | Reason | Table |
| --- | --- | --- | --- | --- | --- |
| DEYERLE, CHRISTOPHER | | 0001010262 | ACCEPTED | RELEVANT | INMATE |

---

**CONFIDENTIAL INFORMATION (CI) CHECKLIST (BOTH A & B MUST BE 'YES' TO RELY ON CI)**

A  CI RELIABLE:  CHECK AT LEAST ONE BOX BELOW

INVESTIGATION OFFICER TESTIFIES PERSONALLY AS TO THE TRUTHFULNESS OF THE CONFIDENTIAL INFORMATION IN HIS REPORT.

CORROBORATING TESTIMONY

DISCIPLINARY CHAIR HAS FIRST HAND KNOWLEDGE OF SOURCE AND SOURCE HAS BEEN RELIABLE IN THE PAST

IN-CAMERA REVIEW OF DOCUMENTS FOUND RELIABLE

B  STATEMENT BY CORRECTIONAL OFFICIAL: SAFETY PREVENTS DISCLOSURE OF CI

---

**DISCIPLINARY STATEMENT OF OFFENDER**

I didn't do it, I plead not guilty on all charges.  I requested video and all I/M's in the rotunda.  IG's showed me pictures claiming it was my hand that were doctored.  This is a false police report.  I want this in the record.

---

499 Plaintiff
MIZZONI [ ]: [ ] EXH A - 002



# State of Nevada
# Department of Corrections

### DISCIPLINARY FORM III
### SUMMARY OF DISCIPLINARY HEARING

| INMATE INFORMATION | HEARING INFORMATION |
|---|---|
| INMATE NAME:  MIZZONI, JOSEPH 68549 | DATE OF HEARING: 05/01/2015   TIME OF HEARING:  01:03 pm |
| CURRENT LOCATION:   NNCC-U7-B-62-A,  ;NC | NAME OF HEARING OFFICER:  BRANNON, IRA |
| LOCATION OF INCIDENT:   NORTHERN NEVADA CORRECTIONAL CENTER HOUS | DATE OF SERVICE OF NOTICE OF CHARGES        04/02/2015 |
| OIC#   390034 | CHARGING EMPLOYEE.   SMITH, CHRIS |

**INSTITUTION PRESENTATION**

I/M is present for this recorded disciplinary hearing and does understand the process.  I/M cautioned against criminal charges and of his right to remain silent.  I/M advised that a plea of guilt waives any right to appeal whatever decision that may be made at this hearing.  I/M asked if he wants to call any witnesses and named I/M Deyerle #1010262.

**EVIDENCE RELIED ON FOR DISCIPLINARY HEARING**

| Date | UserName | Statement |
|---|---|---|
| 05/01/2015 | LI Brannon | Officer's report and injuries noted that the Officer was treated for. |

Report Name: NVRSDH                                         Page 2 of 4
Reference Name: NOTIS-RPT-OR-0066.9
Run Date:   MAY-01-15 01:37 PM


MIZZONI          EXH A - 003





# State of Nevada
# Department of Corrections

## DISCIPLINARY FORM III
## SUMMARY OF DISCIPLINARY HEARING

| INMATE INFORMATION | HEARING INFORMATION |
|---|---|
| INMATE NAME:  MIZZONI, JOSEPH 68549 | DATE OF HEARING: 05/01/2015    TIME OF HEARING:  01:03 pm |
| CURRENT LOCATION:    NNCC-U7-B-62-A; ; ;NC | NAME OF HEARING OFFICER:  BRANNON, IRA |
| LOCATION OF INCIDENT:   NORTHERN NEVADA CORRECTIONAL | DATE OF SERVICE OF NOTICE OF CHARGES        04/02/2015 |
| OIC#:   390034 | CENTER HOUS | CHARGING EMPLOYEE:   SMITH, CHRIS |

### DISCIPLINARY HEARING ACTION

| Chrg | Description | RChrg | Description | Finding |
|---|---|---|---|---|
| MJ3 | Battery | MJ3 | Battery | Guilty |
| MJ3 | Battery | MJ3 | Battery | Refer to Disciplinary Hearing |
| MJ2 | Assault | MJ2 | Assault | Not Guilty |
| MJ2 | Assault | MJ2 | Assault | Refer to Disciplinary Hearing |
| G9 | Abusive Language | G9 | Abusive Language | Not Guilty |
| G9 | Abusive Language | G9 | Abusive Language | Refer to Disciplinary Hearing |

### RESULTS OF DISCIPLINARY HEARING

| Line | Description | Mths | Days | Eff Date | End Date | SSL | Rest Act | Penalty Comment |
|---|---|---|---|---|---|---|---|---|
| 44 | DS |  | 24 | 05/01/2015 | 05/01/2017 |  |  |  |
| 45 | REST |  |  | 05/01/2015 |  |  | ALL_REST | Your account will be frozen until the amount is determined and posted |
| 46 | STAT_REF |  |  | 05/01/2015 |  |  |  |  |

### ANCILLARY INFORMATION AND INSTRUCTIONS

| X | STAT FORFEITURE REFERRAL |
|---|---|
| A+ | RECOMMENDED CATEGORY |
| X | POST DISCIPLINARY CLASSIFICATION |

| HEARING QUESTIONS: | HEARING ANSWERS: |
|---|---|
| Inmate Defendant Present? | Yes |
| Counsel Substitute Requested | No |
| Stat forfeiture possible? | Yes |
| Proceedings Recorded? | Yes |
| Stat Referral Sent | Yes |

Report Name: NVRSDH                                      Page 3 of 4
Reference Name: NOTIS-RPT-OR-0066.9
Run Date:   MAY-01-15 01:37 PM


MIZZONI v. ... EXH A - 004





# State of Nevada
# Department of Corrections

### DISCIPLINARY FORM III
### SUMMARY OF DISCIPLINARY HEARING

| INMATE INFORMATION | HEARING INFORMATION |
|---|---|

INMATE NAME:  MIZZONI, JOSEPH 68549

CURRENT LOCATION   NNCC-U7-B-62-A, : :NC

LOCATION OF INCIDENT:   NORTHERN NEVADA CORRECTIONAL
                        CENTER HOUS

OIC#   390034

DATE OF HEARING: 05/01/2015   TIME OF HEARING:  01:03 pm

NAME OF HEARING OFFICER:  BRANNON, IRA

DATE OF SERVICE OF NOTICE OF CHARGES:   04/02/2015

CHARGING EMPLOYEE:   SMITH, CHRIS

| | |
|---|---|
| Recommended Category? | Cat A |
| Potential Category? | CAT A |
| Cautioned for Possible Criminal Charges? | Yes |
| Reminded of Right to Remain Silent? | Yes |
| Corroboration Testimony for CI Info? | Not applicable |
| Does Investigator Validate CI? | Not applicable |
| Does Chair Validate CI Source? | Not applicable |
| Are CI Documents Reliable? | Not Applicable |
| Does Safety Prevent Disclosure of CI? | Not applicable |
| Was CI Info Accepted? | Not applicable |
| Parole Board Referral? | No |
| Post Disciplinary Classification? | Yes |
| Director Review Required? | Yes |
| Does the offender want a witness | Was asked and wants a witness |

| SIGNATURES AND RECEIPT | DISTRIBUTION |
|---|---|

DATE OF SERVICE: _5-1-15_   TIME OF SERVICE: _1250_   I-FILE (Original)

PRINTED NAME OF HEARING OFFICER _I. Brannon_   Inmate Services (Copy)

SIGNATURE OF HEARING OFFICER _[signature]_

SIGNATURE OF INMATE  X _Joseph M_   Inmate (Copy)

(Signature indicates receipt only. It is not a plea, refusal to sign should be noted)

WARDEN/DESIGNEE _[signature]_

Report Name: NVRSDH
Reference Name: NOTIS-RPT-OR-0066.9
Run Date:   MAY-01-15 01:37 PM

Page 4 of 4

MIZZONI 203:   EXH A - 005





# State of Nevada
## Department of Corrections
### DISCIPLINARY FORM I
### NOTICE OF CHARGES

| INMATE INFORMATION | VIOLATION INFORMATION |
|---|---|
| **INMATE NAME:** MIZZONI, JOSEPH 68549 | **CHARGING EMPLOYEE:** Correctional Officer C. Smith |
| **CURRENT LOCATION:** NNCC-U7-B-62-A; : ;NC | **DATE OF INCIDENT:** 03/28/2015 |
| **OIC#:** 390034 | **DATE CHARGES WRITTEN:** 03/28/2015 |

### CHARGES AND EVIDENCE

| Chrg | Description | Evidence | Evidence Disposition |
|---|---|---|---|
| MJ3 | Battery | Staff Report | |
| MJ2 | Assault | Staff Report | |
| G9 | Abusive Language | Staff Report | |

### REPORT OF VIOLATION

1 On March 28th, 2015 I Correctional Officer C. Smith was assigned to housing unit 5 of the Northern Nevada Correctional Center as the
2 only Officer in the unit. At approximately 6:45pm I was approached by inmate stating that he placed a kite in my mailbox with important
3 information. I then checked my mailbox during the 7:00pm count and retrieved the kite. The kite stated that there was tattoo equipment in
4 the wall of Unit 5 A wing cell 2. I then called search and escort officers Allison, Ardinger, and S. Smith to assist me with cell searches to
5 make it appear as random searches. I searched Unit 5A cell 2 and had negative results. I then randomly searched B wing cell 29 housing
6 inmates Mizzoni (#68549) and Doyerlo (#1010262) and had negative results. Search and Escort Officers then departed Unit 5 at
7 approximately 8:30pm. Approximately 10 minutes later at 8:40pm inmate Mizzoni (#68549) approached my office in an aggressive manner.
8 He smacked my door and said " C.O. Shove it up your ass" so I told inmate Mizzoni To place his hands on the wall and that he was being
9 placed in restraints. I ordered the rest of the unit to lock down as I attempted to make a call for assistance on the radio and was
10 unsuccessful due to inmate Mizzoni turning off the wall towards me with his elbow raised in an attempt to strike me. I then assisted inmate
11 Mizzoni to the ground in an attempt to restrain him. Throughout the entire altercation I was verbally instructing inmate Mizzoni to "stop
12 resisting" As I struggled with inmate Mizzoni on the ground he struck me with a closed fist to the right temple. I struggled to position him on
13 the ground where he could not strike me again. I then ordered several inmates to "get back" because my rotunda was full of other
14 inmates. It was at this time that I was able to gain control of inmate Mizzoni and call for backup on the radio. Search and Escort Officers
15 Ardinger was the first to arrive in the unit. At this time I was able to get wrist restraints onto inmate Mizzoni. As soon as other Officers
16 were able to take over restraining inmate Mizzoni I walked out of the unit to catch my breath. I remained at the front of my unit until after
17 responding officers had already removed inmate Mizzoni from my unit. I was then relieved by Search and Escort officers to go to medical
18 for an evaluation and fill out a C-1 form. END OF REPORT.

---

**CHARGING EMPLOYEE SIGNATURE** _____  **SUPERVISOR SIGNATURE** _____

### SERVICE OF NOTICE OF CHARGES

**DISTRIBUTION**

**DATE OF SERVICE:** 4-4-15  **TIME OF SERVICE:** 01 27

**PRINTED NAME OF HEARING OFFICER** _____

**SIGNATURE OF HEARING OFFICER** _____

**SIGNATURE OF INMATE** _____

Primary Hearing Officer (Original)

Charging employee (Copy)

Inmate (Copy)

(Signature indicates receipt of notice only. It is not a plea, refusal to sign should be noted)

---

Report Name: NVRNOC
Reference Name: NOTIS-RPT-OR-0061.1
Run Date   APR-02-15 02:19 AM

Page 1 of 1





# State of Nevada
## Department of Corrections

### DISCIPLINARY FORM II
### SUMMARY OF HEARING OFFICER'S INQUIRY AND DISPOSITION

INMATE NAME:   MIZZONI, JOSEPH 68549
CURRENT LOCATION:   NNCC-U7-B-62-A; : ;NC
OIC#:   390034

DATE OF HEARING: 04/04/2015   TIME OF HEARING:  01:27 am
NAME OF HEARING OFFICER:  HILL, JOHN
DATE OF SERVICE OF NOTICE OF CHARGES:   04/02/2015

| | | |
|---|---|---|
| MJ3 | Battery | Not Guilty |
| MJ2 | Assault | Not Guilty |
| G9 | Abusive Language | Not Guilty |

Inmate did not make a statement at this time.

| | | | | | |
|---|---|---|---|---|---|
| MJ3 | Battery | | MJ3 | Battery | Refer to Disciplinary Hearing |
| MJ2 | Assault | | MJ2 | Assault | Refer to Disciplinary Hearing |
| G9 | Abusive Language | | G9 | Abusive Language | Refer to Disciplinary Hearing |

| Date | Dept Name | |
|---|---|---|
| 04/04/2015 | Mizzoni | Officers Report |

Counsel Substitute Requested:   [X]   Name of Counsel Substitute:   To Be Determined

Witness Decision Justification:   Inmate Requested witnesses. Names to be announced at a later date



32



# State of Nevada
# Department of Corrections

### DISCIPLINARY FORM II
### SUMMARY OF HEARING OFFICER'S INQUIRY AND DISPOSITION

| INMATE INFORMATION | HEARING INFORMATION |
|---|---|
| INMATE NAME:   MIZZONI, JOSEPH 68549 | DATE OF HEARING: 04/04/2015   TIME OF HEARING:  01:27 am |
| CURRENT LOCATION:   NNCC-U7-B-62-A; : ;NC | NAME OF HEARING OFFICER:  HILL, JOHN |
| OIC#:   390034 | DATE OF SERVICE OF NOTICE OF CHARGES:   04/02/2015 |

**SIGNATURES AND RECEIPT**          **DISTRIBUTION**

DATE OF SERVICE: 4-4-15     TIME OF SERVICE: 0127     Primary Hearing Officer (Original)

PRINTED NAME OF HEARING OFFICER _____     Charging employee (Copy)

SIGNATURE OF HEARING OFFICER _____     Inmate (Copy)

SIGNATURE OF INMATE _____

(Signature indicates receipt only; it is not a plea; refusal to sign should be noted)

Report Name: NVRSID
Reference Name: NOTIS-RPT-OR-0062.8
Run Date:   APR-04-15 02:56 AM

Page 2 of 2

MIZZONI  EXH A - 008

## ADMINISTRATIVE SEGREGATION
### CLASSIFICATION RESULTS NOTICE

To:___Mizzoni 68549_____ Date: 3-31-15_____

From: Classification Committee          Institution:_____NNCC-_____

Your request to be classified from Administrative Segregation to the General
Population has been considered with the following results:

      1. ___ Your request has been approved

          ___ a.  Re-integration can take place now
          ___ b.  Re-integration is subject to 60 day plan (see reverse side)

      2.  X___ Your request has been disapproved based upon the following consideration(s).
             (see reverse side for list of protracted goals)

      ___ a. History of repetitive intuitional violence, assaults, fights.
      ___ b. Repetitive involvement in controlled substance abuse.
      ___ c. Sexually assaultive behavior.
      ___ d. Escape or recent attempted escape.
      ___ e. Prison Gang Affiliation
      _X_ f. Other.
Explanation of above (required) __pending OIC for officer assault_____ ___ _____

_____ _____ _____ _____

_____ _____ _____ _____ _____

_____ ____ _____ _____

3. Your request has been deferred for __30_____ days, for the following reason(s)

_____ _____ · _____

Your next review before the Classification Committee is: __4-30-15_____

_____          _____
Associate Warden                         Associate Warden

J Rexwinkel
Unit CCS                                 CCS III

DOC 2020 (06/11)
Page 1

MIZZONI       EXH A - 009

*12- 2015-NNCC-000575*

*34*

# ADMINISTRATIVE SEGREGATION
# NOTICE OF CLASSIFICATION HEARING

INMATE'S NAME: Mizzoni, Joseph   NUMBER: 68549   DATE: March 28, 2015

You have been moved to a lock-up area of: NNCC U7-A 38 A
(Institution)

You will appear before an Administrative Segregation Classification Committee on:

April 1a, 2015   5:00 pm   NNCC
(Date)   (Approximate time)   (Location)

REASON: Pending disciplinary for staff assault.

PROVISIONS

1.   You may have the assistance of inmate substitute counsel or a staff member in preparing for the meeting. The substitute counsel or staff member may attend the meeting with you. You shall be expected to be responsible for your own presentation except in those situations where assistance is necessary to an adequate presentation of your case due to your illiteracy, complexity of the issues involved, or other reason deemed sufficient by the Committee.

INMATE SUBSTITUTE COUNSEL/STAFF ASSISTANCE REQUESTED:   (X) YES   ( ) NO

NAME: Law Library

2   You may present witnesses and written statements to the Committee and you or your substitute counsel/staff member assisting may ask questions of persons participating in the meeting unless doing so would be redundant, irrelevant, or unduly hazardous to the institution's security or correctional goals. Witnesses may be excluded if their testimony is irrelevant, redundant or otherwise unnecessary or would jeopardize security.

WITNESSES REQUESTED:   (X) YES   ( ) NO

NAMES: Chris Dycke

3.   In the event that the Committee is concerned with your alleged involvement in an incident for which you could face criminal charges, you have the right to remain silent at the meeting and to know that anything you say at the meeting may be used against you in a criminal prosecution.

4.   In addition to the specific reasons for which the meeting is being conducted, the Committee may consider your past and present institutional attitude, adjustment and record and criminal record

5.   This Notice is only required at the initial Administrative Segregation Classification Committee Hearing. Subsequent hearings, if required, are set forth by Departmental regulations.

6   If the Warden/Designee has reasonable cause to believe that you are an immediate danger to yourself or to others, or to the security of the institution, he may place you in Administrative Segregation prior to an Administrative Segregation meeting. In such an event, the meeting shall be held within three (3) working days after you are placed in Segregation This period may be extended by special approval of the Warden. You shall be notified, in writing, of any such extensions and the reasons therefor.

_____   March 28, 2015   _____
Warden/Designee   Date/Time   Inmate's Signature   Date/Time

Refused to sign C/O Allison
S/O Sergeant
Cot _____ 3-08-15

cc:   Original - I-File
      Canary - Inmate
      Pink - Custody

DOC 2003 (8/02)

499 _____

MIZZONI ___ EXH A - 010

# I-FILE

## INMATE REQUEST FORM

| 1.) INMATE NAME | DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Joseph Mizzoni | 68549 | 4-B-17 | 1-28-16 |

**4. ) REQUEST FORM TO: (CHECK BOX)**

___MENTAL HEALTH          ___CANTEEN

___CASEWORKER       ___MEDICAL          ___LAW LIBRARY          ___DENTAL

___EDUCATION        ___VISITING         ___SHIFT COMMAND

___LAUNDRY          ___PROPERTY ROOM    ✓OTHER  WARDENS

**5.) NAME OF INDIVIDUAL TO CONTACT:**  All WARDEN
(NOT FLOOR C/OS)

**6.) REQUEST: (PRINT BELOW)** Tell Your CERT/COS in the UPPER AIR DUCT ~~in the~~ Crawlspace using Chymicals in to my cell to assalt me and by spreying and saturating pepper spray, bug spray, and other chymical into my cell to stomming my health and most destroying my most 1-11-16 eye surgery buruing my left eye to get out of a law but while they brak doing International to me verbally in cell. I will sue. I have reported to you on Grievances and medical kites to see my surgeon Mr Carr, because every time I weth my eye at they keep spreying into my cell from thee spot - 8th Admed 14 Amd Violater
I be seting here going to put drugs in too   I been clean 12 year they better nit!

**7.) INMATE SIGNATURE** Joseph Mizzoni     DOC # 68549

**8.) RECEIVING STAFF SIGNATURE** _____ DATE _____

**9.) RESPONSE TO INMATE**

You have already written a grievance regarding this matter

**10.) RESPONDING STAFF SIGNATURE** _____ DATE _____

RECEIVED

FEB 01 2016

HDSP 2/1/16

DOC - 3012 (REV. 7/01)

MIZZONI  EXH A - 011

# EXHIBIT – B

NDOC AB-422 Search and Shakedown Proceduers
Page 4 of 12 Number 2.

# EXHIBIT –B

*(EXHIBIT B)*  *37*

| STATE OF NEVADA<br>DEPARTMENT OF PRISONS<br><br>**ADMINISTRATIVE REGULATIONS** | A.R. No.   422 | Page......1......of....12.... |
|---|---|---|
| | Attorney General<br>Review Date:<br><br>3/17/91 | Effective Date:<br><br>5/2/91 |
| | Supersedes:<br>IB 91-32 dated 4/1/91<br>AR 422 dated 3/24/88) | |
| CHAPTER:<br><br>INSTITUTIONAL MANAGEMENT | Subject:<br><br>Search and Shakedown Procedure | |

## I. PURPOSE

To provide written policy and procedure governing the frequency and manner for conducting searches of institutions/facilities under the jurisdiction of, or contracted by, the Department of Prisons, and inmates, employees, and visitors for the control of weapons and contraband, and to ensure the legal protection of all parties concerned.

## II. AUTHORITY

NRS 209.131, 209.239 and 209.423.

## III. POLICY

It is the policy of the Department of Prisons that searches of its institutions/facilities and inmates, employees and visitors are an essential element in the maintenance of safety and security.

## IV. DEFINITIONS

A. Living Area Inspection

The outside visual examination of an inmate's room, cell or other living area and their contents.

B. Cell Search

A detailed inspection of the cell made specifically to ascertain that the room is contraband free and to locate and retrieve any contraband secreted in the room.

C. Area Search

The searching of a large area, such as a warehouse or visiting room, or any other area larger than a cell.

D. Clothed Body Search

The examination of a person by running the hands over his clothed body in

SUBJECT:  Search and Shakedown Procedure

_____

an attempt to locate contraband.

E.  Unclothed Body Search

The visual inspection of all areas of the unclothed body including the anal, oral and genital areas.

F.  Vehicle Search

The inspection of any vehicle, for items not permitted by law, policy or procedures.

G.  Appliance Search

A detailed examination of any appliance such as a television set, radio or stereo owned by an inmate, or any musical equipment, etc., in which contraband may be secreted.  These searches are to be made by qualified maintenance personnel only.

H.  Security Inspection

The searching of the perimeter or of any housing unit, warehouse, or other area for breaches of security, security hazards and contraband.

I.  Cavity Search

The physical inspection of any bodily orifice.

J.  Locker Search

The searching of the locker and sleeping area of any inmate assigned to a dormitory setting.

K.  Special Searches

Any search not defined under the above.

V.  PROCEDURE

A.  Each Warden/Manager is responsible for formulating and implementing institutional procedures governing the search of institution/facilities, inmates, employees and visitors under their jurisdiction.  The procedure must meet requirements under the law and the guidelines of this regulation. The search procedure must provide for search policy orientation for all employees and the training of all persons who will be required to conduct searches.

1.  The shift supervisor will be responsible for the supervision and coordination of all search activities and, at the end of each shift, will prepare a summary of areas searched and significant findings. Copies of the search summary will be distributed to the Warden and each

EFFECTIVE DATE     5/2/91                    AR #422

SUBJECT:  Search and Shakedown Procedure                    Page 3 of 12

---

division head affected.

2.  All managers and supervisors are responsible to ensure their subordinates are aware of and comply with the departmental search policy. Managers and supervisors shall provide on-the-job training; schedule searches as may be required; provide general supervision of scheduled search activity and review all related reports.

3.  All employees are responsible for being aware of the contents of the institution/facility search operational procedure; to review and comply with Post Order search instructions and to prepare reports as required.

B.  Search Plan Requirements:

Each Institution/Facility's search plan and procedure must provide for:

1.  Unannounced and irregular timed searches of cells, dormitories, and living areas inmates and their work/assignment areas.

2.  Frequent search and careful supervision of inmate workers both inside and outside the security area.

3.  Inspection of all vehicular traffic, supplies, packages and mail entering the institution/facility.

4.  Use of metal detectors where ever feasible.

5.  Complete search and inspection of each cell, or living area, prior to occupancy by a new inmate, in so far as possible.

6.  Written authorization by the Warden/designee to conduct other than routine searches of visitors, employees and/or inmates and/or their property.

7.  Specific detail governing the authorization and method for conducting unclothed and body cavity searches of inmates, visitors and/or employees.

8.  Post Orders describing minimum search frequency requirements, authority and method of accomplishment.

9.  A walk-through metal detector is to be used at all major institution entrance buildings to inspect all persons visiting.

10. Frequency of search.

Each institution's/facility's search procedure must include minimum search frequency.

a.  Housing Areas:

EFFECTIVE DATE   5/2/91          AR #422                    Page 4 of 12

SUBJECT:  Search and Shakedown Procedure

---

1. In so far as possible, a cell, room, dorm or living area and locker will be searched immediately upon its vacancy and again, if there is a significant time lapse, before it is reassigned. Such inspections are required and must be recorded for segregation, disciplinary detention and security housing unit cells.

2. Every reasonable precaution will be taken to avoid damage to personal property and to leave the inmate's quarters and property in good order upon completion of the search. Any damage to personal property will be reported in writing to the shift supervisor.

b. Work and Non-Housing Area Searches:

1. Teachers, work supervisors and instructors are responsible for daily security and contraband searches of the areas they supervise. Custody Post Orders should include ongoing searches every day. A thorough search of each inmate, work area, assignment shop and classroom is to be conducted on a routine basis as determined by the Warden.

2. Inmates are subject to an inspection of their person either clothed or unclothed when there is cause to believe the inmate may have unauthorized or dangerous items or substances concealed on their person. Such inspections may also be a routine requirement for inmate movement. Spot check inspections of inmates may also be authorized by the Warden/designee as a means to prevent the possession and movement of unauthorized and dangerous items and substances into, out of, or within the institution/facility.

3. The Associate Warden Programs/Facility Manager will ensure that regular and routine visits are made to community work sites by designated staff members and that reports of these visits are prepared.

11. At no time are inmates (medically trained or otherwise) allowed to participate in the search of any person.

c. Degrees and Types of Searches for Inmates

1. The degree and intensity of the search will be the least required to bring the search to a conclusion. As the search progresses, with each new piece of evidence to support the presence of contraband, the inmate will be given ample opportunity to voluntarily remove and surrender the contraband.

2. Each degree of the search must be thoroughly evaluated in order to determine cause to proceed with a more intrusive method of search.

SUBJECT:  Search and Shakedown Procedure

---

    a. Routine searches will be conducted for preventive as well as evidence gathering measures. Authorization is derived from administrative or supervisorial orders or directives.

    b. Oral cavity searches may be conducted visually as a routine element of any search of an inmate. When evidence indicates an inmate is concealing contraband in his/her mouth, the following steps will be taken:

       1. The inmate will be restrained or placed under constant visual observation.

       2. No restraints or holds may be applied in any manner which inhibits breathing or swallowing. However, the inmate may be physically controlled and isolated from other inmates if necessary in order to avoid his/her disposal of the contraband.

       3. When there is reasonable belief that contraband has been swallowed, any attempt to retrieve the contraband will be accomplished by the physician or physician's extender.

3. When an employee has reasonable belief that an inmate has contraband in a body cavity, the employee's supervisor will be immediately notified. All information which may establish reasonable belief for a search will be submitted to the highest ranking custody officer on duty or the facility manager for evaluation. Reasonable belief may be established from the following evidence:

    a. Confidential information from a reliable source.

    b. Irregularities found in the area of the body cavities during an unclothed body search.

    c. Detection of contraband on the person of an inmate's visitor after physical contact with the inmate, and with reasonable belief that the visitor's possession of contraband was for the purpose of smuggling it into or out of the institution.

    d. Any other objective evidence that would indicate that the inmate has contraband secreted in a body cavity.

4. Authorization for a Body Cavity Search

Authorization to initiate a body cavity search requiring any degree of intrusion must be given by the Warden, Acting Warden, or AOD after consideration of the following:

    a. Assurance that reasonable belief is not dependent upon the outcome of the search.

EFFECTIVE DATE    5/2/91              AR #422                    Page 6 of 12

SUBJECT:  Search and Shakedown Procedure

---

    b.  The search is related to institution or facility security, the safety of persons, or to evidence involving a criminal offense.

    c.  Prior to the initiation of the first phase of the search, and before each successive escalation of the search, the individual will be given ample opportunity to voluntarily remove and surrender the contraband.

    d.  Documentation will be as outlined in Section "G" of this regulation.

5.  Types of searches include:

    a.  Visual and metal detector searches;

    b.  X-ray examinations;

    c.  Physical intrusions by physicians or physician extenders;

    d.  Physical isolation and observation;

    e.  Surgical removal.

6.  All searches listed above in this section (Section C, 6), excluding sub-paragraph a, will be conducted in a medical setting under the supervision of authorized medical personnel. X-ray examinations will be conducted as ordered for medical reasons and interpreted by qualified medical personnel. Any physical intrusion into a body cavity must be performed by a physician or physician's extender. Any less qualified staff will only be utilized to supervise and control the inmate.

7.  Provisions for Different Types of Inmate Searches

    a.  Clothed Body Search

    Custody Post Orders will require spot-check clothed body searches of inmates or when cause is established. The routine search of inmates entering and/or leaving certain specified areas is not precluded.

    b.  Unclothed Body Search .

    Correctional personnel, other than qualified medical personnel, will not conduct unclothed body searches or inspections of an inmate of the opposite sex except in an emergency, i.e., riot, escape, etc. This does not preclude routine inspections or searches of clothed inmates without regard for the sex of the inmate or of personnel making such inspections or searches. All unclothed body searches will be conducted in an area out of view of others, to the extent possible. In high security units, the

safety of staff and inmates precludes total privacy.  In these areas, unclothed body searches will be conducted with the most privacy available, considering the unit design and Post Orders.

c.  Body Cavity Search

Any search or inspection of an inmate's body cavity, other than visual or metal detector inspections, will only be conducted after reasonable belief has been established and upon orders of the Warden, Acting Warden or AOD.  (Refer to Section C, paragraphs 4 and 5 of this Regulation).

Any physical intrusion into an inmate's body cavity must be performed by a physician or physician's extender in a medical setting.

In conducting any search of an inmate's body cavity, the individual's right to privacy of his/her own body may be abrogated to the extent necessary to preserve the security of the institution and the safety of persons.  The essential element required to initiate a body cavity search is reasonable belief.

Inmates will be given ample opportunity to voluntarily remove and surrender the contraband.

Inmates will sign an Inmate Consent for Body Cavity Search (DOP-2566) form authorizing their consent.  If an inmate does not consent, he/she will be advised that a non-consensual, forcible body search may take place under conditions permitted by Nevada and Federal Law.

d.  Oral Cavity Search

When an inmate is suspected of having secreted contraband in his/her mouth, or when the inmate attempts to swallow the evidence, no attempt will be made to retrieve the contraband by force.  A choke hold or any other physical restraint which prevents the inmate from swallowing or breathing may not be used.  If reasonable belief exists that the evidence has been swallowed and that it is retrievable in useable form, the search process may be intensified as provided in this Regulation.

e.  X-Ray Examination

X-ray examinations for the purpose of confirming the ingestion of contraband or concealment of contraband in body cavities will be utilized only upon the approval of authorized medical personnel and under the same medical requirements and precautions as apply to any x-ray examination for medical reasons.  An x-ray examination must be ordered and interpreted only by a physician/physician's extender, who will make the following determinations:

SUBJECT;   Search and Shakedown Procedure

1.  Whether or not a foreign object(s) is within the inmate's body.

2.  A determination, if possible, of the nature of any foreign object(s).

3.  The effects of forcible removal or failure to remove the foreign object(s) upon the inmate's health and safety.

4.  Recommendations for consideration regarding the least intrusive way to retrieve the contraband.

D.  Supervision of Searches

All searches other than routine searches and each progressive step in the search process must be made under the direct supervision of supervisory staff at not less than the level of correctional sergeant.

E.  Quarantine

1.  When it becomes apparent through medical examination that an inmate has ingested or concealed contraband in his/her body, and the inmate cannot or will not voluntarily remove and surrender the contraband, or when the physician/physician's extender has determined that the physical removal of contraband may be hazardous to the health and safety of the inmate, the inmate may be placed in a medically approved isolated setting under constant visual supervision until the contraband can be retrieved through natural means.

2.  This natural alimentary canal process will be used as an alternative to forcible intrusion into body cavities or surgery when a physician/physician's extender determines that the natural method is feasible and does not pose a hazard to the inmate's health and/or safety.

F.  Forcible Retrieval

The forcible retrieval of contraband by intrusion into the inmate's body will be avoided except as follows:

1.  When a physician/physician's extender has determined that failure to remove the contraband presents an imminent danger to the life of the inmate; or

2.  The contraband is clearly identifiable and constitutes a clear and present danger to the security of the institution or the safety of other persons; or

3.  The contraband must be retrieved but cannot be retrieved by any less intrusive or forcible manner.

---

    4.  Surgical removal of contraband from the body of an inmate shall be the decision of the Medical Director/designee and in keeping with the rights of the individual.

G.  Documentation

    1.  Complete and detailed documentation of all body cavity searches, and other non-routine searches, will be submitted to the Warden by all staff involved in the process, including medical personnel if applicable.

    2.  The report will include the following information:

        a.  Chronology of events leading up to the search and escalation of the search process.

        b.  Name and rank of all persons participating in the search process or supplying information which justified the search.

        c.  Whether or not the inmate signed a consent form for a body cavity search, if applicable.

        d.  All evidence and information regarding the justification for each degree of the search.

        e.  Results at the conclusion of the search.

    3.  When body cavity searches are conducted, the person authorizing the search will send a complete, comprehensive report to the Director outlining the evidence relied upon in establishing reasonable belief. A complete report from the medical personnel involved, detailing how the search was accomplished, what problems if any occurred, and the final result will also accompany the report to the Director.

H.  Search of Visitors and Employees

    1.  Warning Sign

        Each Institution/Facility will post a warning sign stating that entrance onto the property of the prison constitutes consent to be searched.

    2.  Degrees and Types of Searches

        a.  Any person coming onto the grounds of an institution/facility or any DOP contracted facility, their vehicle and the articles of property in their possession are subject to inspection to whatever degree is consistent with security needs.  Such inspections may include a search of the visitor's/employee's person, property or vehicle.  The search of a visitor/employee and/or his/her property will only be made pursuant to consent; or after a warrant has been

Case 3:15-cv-00499-MMD-WGC   Document 123   Filed 12/01/17   Page 46 of 157

obtained; or where there is <u>probable</u> cause to believe a crime has been or is being committed, that evidence will be found and there are exigent circumstances without consent.  Exigent circumstances exist when there is probable cause to believe that the contraband and/or unauthorized weapon will be destroyed if the search is not immediately undertaken and under the circumstances there is no time to obtain a search warrant.

b.  The degree and intensity of the search will be the least required to bring the search to a conclusion.  As the search progresses, with each new piece of evidence to support the presence of contraband, the visitor/employee will be given ample opportunity to remove and surrender the contraband.

c.  Each degree of the search must be thoroughly evaluated in order to determine reasonable cause to proceed with a more intrusive method of search.

   1.  Clothed body searches and metal detector inspections may be conducted in a routine manner for preventive as well as evidence gathering measures.  Authorization is derived from administrative or supervisorial orders or directives.

   2.  Unclothed body searches will be only conducted pursuant to the employee/visitor's consent or after a search warrant has been obtained or where there is probable cause and exigent circumstances (as defined in H, 2, a, of this regulation).

   3.  Body cavity searches of a visitor/employee will only be conducted after a search warrant authorizing a body cavity search has been obtained.

d.  Correctional personnel, other than qualified medical staff, will not conduct unclothed body searches or inspections of visitors/employees of the opposite sex.

e.  No restraints or holds may be applied in any manner which inhibits breathing or swallowing.  A person may be physically controlled and isolated from other persons if he has been arrested and is awaiting transport.  Under these circumstances, the visitor/employee will remain under constant supervision.

f.  All searches other than the clothed body search or metal detector inspection and each progressive step must be under the general supervision of supervisory staff not less than the level of a correctional sergeant.

g.  Documentation

   A complete and detailed report will be submitted to the Warden by the highest ranking custody officer no later than the first working

EFFECTIVE DATE    5/2/91                    AR #422
SUBJECT:  Search and Shakedown Procedure

day following any extraordinary search of a visitor/employee.  The report will include the following information:

1.  Chronology of events leading up to the search and escalation of the search process.

2.  Name and rank of all persons participating in the search process or supplying information which justified the search.

3.  All evidence and information regarding the justification for each degree of the search.

4.  Results at the conclusion of the search.

The reporting requirements as outlined in AR 121 -- Incident Reporting and Notification Requirements must also be met.

3.  Employees

All employees of the Nevada Department of Prisons shall be advised that their person, vehicle and articles of property in their possession are subject to inspection to whatever degree is consistent with the institution's/facility's security needs.  An employee who declines to submit to a requested search will be subject to disciplinary action.

4.  Visitors of Inmates

a.  Refusal to submit to a requested search will result in the visitor not being permitted to visit on that day.  Visits may be denied until the individual agrees to submit to a search of his/her person, vehicle or other property prior to the visit; or until such time as the institution officials no longer have reasonable belief that the individual will attempt to smuggle contraband items or substances into the institution/facility.

b.  Denial of an initial application to visit, and any subsequent restriction, suspension, or termination of previously approved visits, shall be documented for inclusion in the inmate's institutional file and a copy sent to the applicant or visitor as soon as practicable.  Such document shall include the name of the official taking or ordering the action; shall clearly explain the reason for the action, the length of time the action will apply, the circumstances under which the action will be reconsidered, and instructions for appealing the action taken.

c.  Visitors are to be processed through metal detectors.  Those persons unable to clear the metal detector are to be given the following options:

1.  Cancellation of the visit.

EFFECTIVE DATE    5/2/91              AR #422

SUBJECT:  Search and Shakedown Procedure

---

        2.  Submit to a clothed body search.

        3.  Submit to an unclothed body search.

    5.  Use of Force Prohibited

        When a visitor/employee is suspected of having secreted contraband in his/her mouth or attempts to swallow the evidence, no attempt will be made to retrieve the contraband by force.

        The person may, however, be physically controlled and isolated from other persons if necessary in order to avoid disposal of the contraband.  Under these circumstances, the visitor/employee will be under constant visual observation.

VI.  REFERENCES

      ACA Standards, 1990 Edition, 3-4184, 3-4185, 3-4186, 3-4269, and 3-4445.


RON ANGELONE, DIRECTOR
NEVADA DEPARTMENT OF PRISONS

                                           4/1/91
                                     ISSUE DATE

THIS PROCEDURE SUPERSEDES ALL PRIOR WRITTEN PROCEDURES ON THIS SPECIFIC SUBJECT.

# EXHIBIT-C

48

(NDOC) AR-707 Inmate Disciplenary Process
Pages 1-38

# EXHIBIT-C

EXHIBIT-C

44

SUPERSEDED

| NEVADA DEPARTMENT OF CORRECTIONS | SERIES 700 INMATE REGULATIONS | SUPERSEDES: |
|---|---|---|
| ADMINISTRATIVE REGULATIONS MANUAL | ADMINISTRATIVE REGULATIONS 707 INMATE DISCIPLINARY PROCESS | EFFECTIVE DATE: 11/01/04 |

## TABLE OF CONTENTS

PURPOSE
AUTHORITY
RESPONSIBILITY
DEFINITIONS
APPLICABILITY
PROCEDURES
707.01    DEPARTMENT POLICY
707.02    DISCIPLINARY PROCESS STRUCTURE
707.03    INMATE TRANSFERS
707.04    INMATE DISCIPLINARY PROCESS
707.05    DISCIPLINARY OFFENSES
707.06    DISCIPLINARY SANCTIONS GUIDELINES
707.07    DISCIPLINARY SEGREGATION ████████████ GUIDELINES
707.08    STATUTORY GOOD TIME GUIDELINES
707.09    REFERRALS FOR CRIMINAL PROSECUTION
707.10    REFERRALS FOR PAROLE ████████ VIOLATION
707.11    USE OF CONFIDENTIAL INFORMATION
707.12    SPECIAL PROCEDURES FOR MJ44 AND MJ54 VIOLATIONS/SANCTIONS
707.13    MISCELLANEOUS DISCIPLINARY PROCEDURES
707.14    MAINTENANCE OF DISCIPLINARY RECORDS
REFERENCES
ATTACHMENTS
MANDATORY REVIEW DATE                      02/20/05

## PURPOSE

To establish an inmate disciplinary system within the Department. (3-4215)

To establish policy and procedures for the inmate disciplinary process that will:

- Maintain security, control and safety.

- Define and give notice of unacceptable behavior.

- Specify the range of sanctions that may be imposed for a violation. **(3-4214)**

- Establish guidelines for the conduct of the disciplinary process.

- Maintain a record of disciplinary action and activities.

## AUTHORITY

NRS 209.131
NRS 209.246

## RESPONSIBILITY

The Associate Warden of Operations is responsible for the management of the inmate disciplinary process.

All staff and inmates are responsible to have knowledge of and to comply with this procedure.

## DEFINITIONS

**AUSTERE HOUSING** – A medium-custody form of separation from the general population assessed by a Disciplinary Hearing Officer in which an inmate's privileges may be restricted.

**AUTHORIZED PROPERTY** – Authorized property is that which is defined in Administrative Regulation 711 or regulations of Department contractors, and that property permitted under Institutional Procedures peculiar to a particular institution or facility. Any and all other property, including but not limited to altered authorized property, is considered contraband.

**CHARGING EMPLOYEE** – The person who submits the Notice of Charges.

**CHART OF DISCIPLINARY SANCTIONS** – The matrix used by an inmate disciplinary process, which sets forth the range of sanctions for violations of AR 707.

**CODE** – Code of Penal Discipline

**CONTRABAND** –

- Any item or article not authorized by departmental regulations, or in excess of the maximum quantity permitted, or which is received or obtained from an unauthorized source is contraband; and,

- Any item or article of property that poses a serious threat to the security of an institution and is ordinarily never approved for possession or admission into the institution, and any item or article which may be, or has been authorized for possession at one time, but now is prohibited for possession due to health, fire or safety concerns; and,

- Any authorized property that has been altered.

**COUNSEL SUBSTITUTE** – Any inmate assigned by the classification committee to assist another inmate charged with a violation of the Code.

**DEPARTMENT** – The Nevada Department of Corrections.

**DISCIPLINARY CASE** – A term intended to describe the total violations arising out of a single incident and included together on a Notice of Charges.

**DISCIPLINARY DETENTION** – A form of separation from the general population, in which an inmate is confined to a single-occupancy cell, without privileges, for a period not exceeding 15 days in any 30 day period.

**DISCIPLINARY HEARING OFFICER** – A correctional employee who resolves all charges, which are not disposed of by the Preliminary Hearing Officer.

**DISCIPLINARY PROCESS** – This term is intended to describe the collective steps necessary to resolve a violation, including the service of the "Notice of Charges", the "Preliminary Hearing Officers Inquiry and Disposition", the "Disciplinary Hearing", the "Appeal" (if any), and any incidental tasks such as referrals for sentence credit forfeiture and parole revocation.

**DISCIPLINARY SEGREGATION** – A form of separation from the general population in which an inmate's privileges may be restricted.

**EMPLOYEE** – A person legally holding a position with the Department in the public service as defined in NRS 284.015.

**EXCEPTIONAL CIRCUMSTANCES** - Circumstances involving safety, security and inmate management necessitating exceptions to procedures.

**FORFEITURE** – Permanent loss of property.

**MONETARY RESTITUTION** – Payment by an inmate, as defined in NRS 209.246.

**NEVADA CORRECTIONS INFORMATION SYSTEM (NCIS)** - An integrated, micro-computer based information system used to manage the inmate population through the employment of applications related to count, supervision, sentence management, classification and casework, planning, and statistical activities.

*Dismissed on this no notice of charge in 10 days per Ar707*

**NOTICE OF CHARGES** – The document used to describe the incident and list the disciplinary charges against the inmate.

**OFFENSE/VIOLATION** – In the context of this regulation the words "offense" and "violation" have been used interchangeably and have the same meaning. That is, conduct which is prohibited by this Code.

**PRELIMINARY HEARING OFFICER** – An impartial correctional employee who presents the written Notice of Charges to the accused inmate and advises the inmate of the procedures applicable under the Code.

**STATUTORY GOOD TIME CREDITS** – Automatic credits allowed against an inmate's sentence for parole or discharge as provided in the Nevada Revised Statutes, also referred to as "credits".

**APPLICABILITY**

This procedure applies to all employees and inmates in the Department.

**PROCEDURES**

**707.01 DEPARTMENT POLICY**

1.1     Inmates committed to the Department shall be subject to disciplinary action for violations of the Code.

1.2     Disciplinary action should be taken as soon after the misconduct as is practicable.

1.3     Discipline should be applied in an impartial and consistent manner.

1.4     Corporal punishment or inhumane treatment is prohibited. (3-4268)

1.5     Prison disciplinary proceedings are an administrative process, unrelated to and not bound by the rules for criminal procedure, civil trials, administrative codes or procedures.

1.6     Upon entry, all inmates shall be issued, and required to sign for, a copy of the Code. (3-4216)

- Signed acknowledgment will be maintained in the inmate's I-file.

- When a literacy or language problem prevents an inmate from understanding the Code, a staff member or translator will assist the inmate in understanding the rules.

1.7     The Code will be available to all inmates. Availability is satisfied if a copy is kept in the institutional law library or in the living units for those facilities without a law library.

416

1.8     All inmates are assumed to have notice of this Code.

1.9     Within the prison disciplinary process an inmate has access to three procedures:

- At least 24 hours prior to any formal hearing before an impartial Disciplinary Hearing Officer a Notice of Charges will be served.

- A qualified opportunity to call witnesses with substantive knowledge of issues and present documentary evidence provided that to do so will not jeopardize institutional security or correctional goals.

- A written statement by the Disciplinary Hearing Officer as to the evidence relied on and the reasons for the disciplinary findings.

1.10    Reliance on any published standard, the use of mandatory language, if such exists, or the creation of procedures related to the conduct of the disciplinary process, including but not limited to timeframes, witnesses or appeals is solely for the purpose of providing guidance for employees and shall be considered representative of the manner in which the Department has chosen to exercise it's discretion in such matters.

- The failure of any employee of the Department to follow any procedure shall not result in any mandatory outcome, e.g., dismissal of charges, but shall be one of many factors to be considered in exercising discretion as to the outcome of any violation.

1.11    Any disciplinary case may be continued so that the Preliminary Hearing Officer or the Disciplinary Hearing Officer may obtain guidance from the Attorney General's Office concerning any matter in this Code.

1.11.1  Inmates do not have any right or privilege to request or participate in obtaining guidance from the Attorney General's Office.

1.11.2  The guidance may be sought either in writing or verbally.

1.11.3  Such requests for guidance shall be made only if there is confusion as to the application of the guidelines set forth in this Code.

1.11.4  The Office of the Attorney General shall not be asked to render any opinion as to the guilt or innocence of an inmate facing disciplinary charges.

## 707.02 DISCIPLINARY PROCESS STRUCTURE

1.1     The inmate disciplinary process is divided into four major areas:

- Notice of Charges (NDOC-3017)

- Preliminary Hearing Officer's Inquiry and Disposition (NDOC-3018)

- Disciplinary Hearing (NDOC-3019)

-  Appeals

## 707.03 INMATE TRANSFERS

1.1    When conduct requires an inmate be transferred from one institution or facility to another, any pending disciplinary cases should be completed prior to the transfer.

- If circumstances are such that the transfer must proceed prior to completion of the disciplinary process, the sending institution shall prepare the Notice of Charges and the receiving institution shall complete the disciplinary process.

- The receiving institution will review the inmate's status within three (3) working days of receipt. **(3-4223)**

- Copies of the completed disciplinary will be returned to the sending institution.

1.2    The Associate Warden of Operations (AWO)/designee at the sending institution or facility is responsible for insuring that the pending case is properly transferred ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

## 707.04 INMATE DISCIPLINARY PROCESS

 1.1    Notice of Charges

1.1.1    Upon the reasonable belief of a correctional employee that a Code violation has been committed, the employee shall file a Notice of Charges using DOC Form 3017, before the completion of their shift and submit it to the shift supervisor.

1.1.1.1 If a non-Department employee observes a violation, a report shall be submitted to the AWO who will designate a Departmental-charging employee.

1.1.1.2 If a violation is a result of an investigation, the investigator may submit the Notice of Charges or the investigative report to the AWO who may designate a charging employee.

1.1.2    The report shall be a factual and professional description of the violation.

- Opinions and assumptions shall not be included.

- Recommendations shall not be included.

1.1.3    The report shall contain specific details of the violation, including the following: **(3-4221)**

- The name and ID number of the inmate committing the alleged violation.

- The date and time of the violation.

- Evidence, if collected, and location.

- The facts surrounding the violation, in chronological order.

- Any immediate action taken.

- The names of witnesses to the violation, if any.

- The exact disposition of any evidence involved.

- The title, printed name, and signature of the reporting employee.

1.1.4   The institution will have procedures in place to insure the following:

- Review by shift supervisor.

- Assigning of charges.

- Input information into the NCIS.

- Designate a Preliminary Hearing Officer.

- Begin the process to determine if restitution is applicable.

1.1.5   In the event of a serious incident the shift supervisor will:

- Collect all reports of the violation.

- Refer for investigation or have a Notice of Charges initiated.

- Complete the process as stated in 1.1.4

1.1.6   In the event of an investigation, the investigator may complete a Notice of Charges or submit a report to the institutional Warden who will insure that a Notice of Charges is initiated. (3-4220)

- Once the Notice of Charges has been prepared the remaining steps will be followed as stated in 1.1.4.

1.1.7   Handling Minor Violations Without a Notice of Charges (3-4218)

1.1.7.1 In the case of minor violations, a correctional employee may correct an inmate's behavior by a warning and/or counseling.

1.1.7.2 An informative or counseling report may be made at the discretion of the employee.

1.1.7.3 Such a report shall be provided to the inmate's caseworker, for inclusion in the inmate's file.

1.1.7.4 A copy shall be provided to the inmate.

1.1.8    The AWO will designate supervisor(s) to act as a Preliminary Hearing Officer and Disciplinary Hearing Officer.

1.1.8.1 The Preliminary Hearing Officer must have the rank of Senior Correctional Officer or above.

1.1.8.2 The Disciplinary Hearing Officer must have the rank of Sergeant or above.

- In conservation camps, the caseworker may act as the Disciplinary Hearing Officer.

1.1.8.3 All supervisors involved in the disciplinary process should be impartial in that they:

- Did not witness or investigate the alleged violation.

- Were not a victim of the alleged violation.

- Did not participate in the writing of the Notice of Charges.

- Did not sit as a member of the classification committee, which authorized pre-disciplinary ██████████ for the same offense.

- Were not the Preliminary Hearing Officer for the same offense.

1.1.8.4 A supervisor is not necessarily partial based on such facts as:

- Having general knowledge of the case through the "grapevine"

- Being the subject of grievances and lawsuits brought by the inmate.

- Having a previous unpleasant encounter with the inmate.

- Having knowledge of the case by virtue of having heard the violations of others included in the same incident.

57

■ Placing disciplinary charges on the Notice of Charges

1.1.8.5 The lists noted in 1.1.8.3 and 1.1.8.4 are not exclusive.

1.1.9  If additional evidence is discovered subsequent to the disciplinary hearing and new charges are warranted, an additional notice of charges may be initiated.

1.2  Preliminary Hearing Officer's Inquiry and Disposition

1.2.1  Review of Charges

1.2.1.1 As soon as practicable after receipt, an impartial Preliminary Hearing Officer shall review the description of the incident and the violations, which are charged.

1.2.1.2 The Preliminary Hearing Officer may:

- Proceed with the service of the Notice of Charges,

- Refer the matter back to the shift supervisor for further clarification/investigation.

- Amend the charges, if appropriate, prior to service. Any amendment must be documented in the NCIS.

1.2.2  Service of Notice of Charges

1.2.2.1 An inmate accused of a violation shall receive a written Notice of Charges.

1.2.2.2 The designated Preliminary Hearing Officer shall serve such notice within 10 calendar days of the discovery of the violation, or within 10 calendar days of the completion of investigative work concerning the incident, whichever is appropriate. (3-4218)

- This period may be extended for exceptional circumstances.

- The investigation must begin within 24 hours of the time the violation is reported. (3-4222)

1.2.2.3 The inmate is not entitled to any explanation for any delay in the disciplinary process.

- However, in the interest of providing for complete documentation of each case, an explanation for any delay shall be included with the Notice of Charges, at the time of service.

AR 707                                          Page 9 of 38

- The explanation may be included as an attachment to the Notice of Charges or may be written on the Preliminary Hearing Officer's summary.

1.2.3   When the Notice of Charges are presented to the accused inmate, the Preliminary Hearing Officer shall:

- Read the charges to the inmate.

- Advise the inmate of the procedures, under the Code, which apply to him.

- If the Code violation could result in a criminal prosecution referral, the inmate shall be advised of the right to remain silent.

- Ask the inmate to submit a plea to each charge.  If the inmate remains silent, such shall be considered a plea of "not guilty."

- Provide the inmate with a copy of the Notice of Charges and any applicable attachments, and obtain the inmate's signature as proof of receipt.  Refusal to sign shall be noted.

- Update the NCIS disciplinary program with the date of service.

1.2.4   Preliminary Hearing Officer Options

1.2.4.1 After the service of the charges has been completed, and after having discussed the matter with the accused inmate, the Preliminary Hearing Officer may immediately conclude their inquiry and announce a disposition, or may take an additional three (3) calendar days to consider the actions to be taken.

1.2.4.2 In either case, the Preliminary Hearing Officer may:

- Summarily dismiss some or all of the charges.

- Reduce a major, work release or general violation to a lesser violation.

1.2.4.3 The Preliminary Hearing Officer may hear and resolve minor and general violations through an informal, summary hearing.  The Preliminary Hearing Officer:

- Shall conduct an informal, summary hearing on any Class E violation, regardless of the inmate's plea, and may, upon a finding of guilt, impose any Class E violation sanction.

- Upon a plea of guilty to a Class D violation, the Preliminary Hearing Officer may conduct an informal, summary hearing, and may impose any minor violation sanction.

59

- Shall not impose a general or major violation sanction.

- May refer charges back to the charging employee for clarification.

- May refer the case to the Disciplinary Hearing Officer.

- May add additional charges.

- May remove charges.

- May not ██████ suspended sanctions from prior disciplinary hearings.

1.2.4.4 The Preliminary Hearing Officer shall conduct the proceedings as follows:

- The Preliminary Hearing Officer may conduct such independent inquiry as they find necessary and fair.

- The Preliminary Hearing Officer may permit the testimony of witnesses, including the charging employee, or may disapprove a request for witnesses, based solely upon their assessment of necessity and relevancy.

- The accused inmate shall be present at the hearing and shall be given the opportunity to explain their version of the violation, unless the inmate refuses to attend or their behavior justifies removal from the hearing.

- A finding of guilty shall be based solely on the reports, evidence, and testimony presented to the Preliminary Hearing Officer.

- When a Preliminary Hearing Officer conducts a summary hearing, a decision should be reached with the inmate present. The Preliminary Hearing Officer may, however, excuse the inmate if they feel it is necessary.

- When the inmate has pled guilty, no hearing is required. The Preliminary Hearing Officer may proceed directly with the imposition of sanctions or refer to the Disciplinary Hearing Officer for resolution.

- The Preliminary Hearing Officer shall announce the decision to the inmate and provide the inmate with a copy of the written summary.

- The Preliminary Hearing Officer shall take steps to have their disposition entered into the record of this case in the NCIS "disciplinary program."

- The original of all forms and attachments shall be routed to the records

office for recording and filing.

1.3     Hearings by the Disciplinary Hearing Officer

1.3.1   The Disciplinary Hearing Officer shall handle all violations of the Code not handled by the Preliminary Hearing Officer.

- The Disciplinary Hearing Officer may consider the charges as written or may reduce any charge to a more appropriate lesser charge.

- This reduction may occur prior to the hearing, during the hearing, or during deliberations.

1.3.2   If the Disciplinary Hearing Officer determines that the inmate has been charged incorrectly, the officer may modify the charges.

1.3.3   If the officer chooses this option, then:

- The disciplinary hearing shall be continued,

- The inmate will be informed in writing of the modified charges, and

- The disciplinary hearing will reconvene within the timeframes in 1.3.4 below.

- A new Disciplinary Hearing Officer will conduct the rescheduled hearing.

1.3.4   Timeframes

1.3.4.1 If the Preliminary Hearing Officer refers a case to the Disciplinary Hearing Officer for a formal hearing, the charges shall be heard no sooner than 24 hours and no later than 30 days after the Notice of Charges are served. **(3-4224)**

1.3.4.2 The 30 day period may be extended under exceptional circumstances. **(3-4227)**

- The accused inmate is not entitled to any explanation for any delay in the disciplinary process.

- However, in the interest of providing for complete documentation of each case, an explanation for any delay shall be announced at the disciplinary hearing, and made a part of the record.

1.3.5   Procedures During the Disciplinary Hearing

1.3.5.1 The inmate will be present at the hearing except when:

- They refuse to attend and/or waive their appearance before the Disciplinary Hearing Officer. (3-4225)

- Their behavior is disruptive.

- Confidential information is being presented.

- The reason for an inmate's absence will be documented.

1.3.5.2 In addition to the Notice of Charges, the inmate shall receive copies of any evidentiary documents, which the Disciplinary Hearing Officer considers, except in cases where non-disclosure has been approved under the "confidential information" provisions of this Code.

1.3.5.3 An inmate who has been charged with a major or work release violation can, if they wish, consult with an inmate counsel substitute prior to the hearing, providing that the classification committee has assigned the inmate counsel substitute to that position.

- Inmate should have at least 24 hours notice prior to the resolution of the disciplinary by the Disciplinary Hearing Officer. (3-4226)

- Participation by counsel substitute shall be voluntary.

- The Disciplinary Hearing Officer will not allow the inmate to be represented by an inmate substitute counsel or staff member at the hearing unless it is determined that the inmate's psychological or emotional state is so impaired as to make the inmate incapable of understanding, or supporting their own defense. (3-4231)

- [redacted]

1.3.5.4 If the Code violation could result in a criminal prosecution referral, the inmate shall be advised of the right to remain silent.

- This warning shall be made a part of the record of the disciplinary hearing.

- If the inmate remains silent and makes no plea, such shall be considered a plea of not guilty.

- Silence may not be used to draw an adverse inference against the inmate. Silence alone shall not be used to support a finding that an inmate committed a violation.

1.3.5.5 If the inmate pleads "guilty," no further evidence, statements or witnesses shall be considered.

- The Disciplinary Hearing Officer may consider mitigating and/or aggravating evidence or circumstances from whatever source, including the inmate and/or Department files.

- Prior to entering the guilty plea the inmate shall be warned that a plea of "guilty" waives any appeal, or any subsequent challenges to the disciplinary process.

- During a hearing for a major or work release violation and prior to entry of plea, the inmate should be advised of the range of statutory good time credits that could be subject to forfeiture for their particular violation(s).

1.3.5.6 If the inmate pleads "not guilty," they shall have the opportunity to make a statement and present evidence to the Disciplinary Hearing Officer. (3-4230)

1.3.5.7 If the inmate pleads "not guilty," they shall be given a qualified opportunity to call witnesses on their behalf. (3-4230)

- The Disciplinary Hearing Officer may deny any witness if it is felt that the testimony would be irrelevant, redundant, hazardous to the security of the institution/facility, or would in any way endanger the safety of any individual, including the witness. Such denial will be documented.

  *Did not Document why*

- The Disciplinary Hearing Officer may also stipulate as to the proffered testimony of any proposed witness of the inmate.

- The Disciplinary Hearing Officer may take the testimony of any witness (employee or inmate) over the telephone if said telephone has the capability for all present at the hearing to hear the questions and answers.

- The testimony of the charging employee shall be permitted at all hearings for major and/or work release violations. The charging employee may also testify over the telephone.

1.3.5.8 The inmate or their counsel substitute if applicable, not both, shall have the opportunity to question witnesses.

- Questions of all witnesses are to be directed through the Disciplinary Hearing Officer.

1.3.5.9 Questioning of any witness, whether adverse or not, may be limited or curtailed, at the discretion of the Disciplinary Hearing Officer, if:

- The questioning is redundant.

- The questioning is irrelevant.

- The questioning is abusive.

- The questioning would produce information that may present a danger to the security of the institution, the inmate, employees or other inmates.

1.3.5.10 Hearings for major and work release violations will be tape recorded, even for guilty pleas.  NO EXCEPTIONS. (3-4228)

- The inmate may not waive the tape recording.

- Hearings for minor and/or general violations may be tape recorded at the discretion of the Disciplinary Hearing Officer.

- Recorded tapes of major and/or work release violations shall be retained for three years.

- Tape recorder should be checked prior to the hearing to insure it is properly functioning.

1.3.6   Evidence

1.3.6.1 The formal rules of evidence do not apply in disciplinary hearings.  Hearsay evidence may be accepted.

- The reliability and relevancy of the evidence is within the discretionary determination of the Disciplinary Hearing Officer or Preliminary Hearing Officer.

- A finding of guilt must be based on some evidence, regardless of the amount.

1.3.6.2 Evidence is relevant if it assists the Disciplinary Hearing Officer or the Preliminary Hearing Officer in determining a fact necessary to determine guilt or innocence.

- Evidence is reliable if it is trustworthy.

- In determining the reliability of evidence, the Disciplinary Hearing Officer shall consider the integrity of the person offering the information, the quality of the person's memory, the person's perceptive abilities, and the ability of the person to communicate the information.

- Reliable evidence need not be corroborated by any other source.

### 1.3.7 Reaching a Decision

1.3.7.1 The Disciplinary Hearing Officer may excuse the inmate and reach a decision in private.

1.3.7.2 Guilt or innocence shall be determined solely on the evidence presented at the hearing or reviewed prior to the hearing by the Disciplinary Hearing Officer. (3-4232)

*No closely evidence said 3-28-13*

- If any evidence is reviewed prior to the hearing, a description of the evidence will be noted for the record in the presence of the inmate.

- Specific content may not be disclosed if it is confidential or poses a threat to safety or security.

1.3.7.3 If the Disciplinary Hearing Officer finds the inmate guilty, or the inmate pleads guilty, the Disciplinary Hearing Officer may give the inmate or substitute counsel if applicable, not both, an opportunity to make a statement in mitigation.

- Such a statement is strictly within the discretion of the Disciplinary Hearing Officer.

1.3.7.4 At the conclusion of the hearing, the inmate shall receive a written statement of the findings, including the evidence relied upon and the sanctions imposed. (3-4233)

- The original documentation will be maintained in the inmate's I-File.

## 1.4 Plea/Sanction Bargaining

### 1.4.1 Plea Bargaining

1.4.1.1 A violation may be plea-bargained at the Disciplinary Hearing Officer level.

- A major offense may be plea-bargained to a related general or minor violation.

1.4.1.2 If an inmate enters into a plea agreement, they expressly waive their right to a hearing and appeal.

1.4.1.3 Any plea bargaining negotiations shall be documented, using NDOC Form 3010, made part of the record and signed by the Disciplinary Hearing Officer and the inmate.

1.4.2    Sanction Bargaining

1.4.2.1 An inmate may plead guilty to a charged violation under the condition that they receive a special sanction from the Disciplinary Hearing Officer. The inmate must sign the Plea Bargain form.

1.4.2.2 If an inmate makes such an agreement, they expressly waive their right to a hearing or appeal.

1.4.2.3 Any sanction bargaining negotiations shall be documented using DOC Form 3010, and made part of the record and signed by the Disciplinary Hearing Officer and the inmate.

1.4.2.4 Restitution will not be sanction bargained.

1.4.3    All plea-bargaining and sanction bargaining shall be tape recorded.

1.4.4    Charges of G20, G27, and MJ10 may not be plea-bargained or sanction bargained.

1.4.5    Plea bargain and sanction bargains must remain within the Chart of Disciplinary Sanction disciplinary sanctions.

1.5    Disciplinary Appeals

1.5.1    Following a finding of guilt an inmate shall be advised that they may submit <u>one</u> appeal to the Warden using the inmate grievance processes outlined in AR 740. (3-4236)

1.5.2    The appeal of a disciplinary conviction shall be submitted in writing and shall concisely state the factual basis upon which the finding is appealed.

1.5.3    Limitations on Appeals

1.5.3.1 A plea of guilty may not be appealed.

1.5.3.2 A plea or sanction, which is negotiated, may not be appealed.

1.5.3.3 A sanction, which has not otherwise been suspended, shall not be suspended for the purpose of awaiting the results of an appeal.

1.5.4    Warden's Response

1.5.4.1 When reviewing an appeal, the Warden may enlist the assistance of an impartial staff member. The review may include fact-finding related to the violation and/or inquiry related to the disciplinary process.

1.5.4.2 In deciding an appeal the Warden or designee shall consider three factors:

- Whether there was substantial compliance with requirements of the Code.

- Whether the disciplinary committee's decision was based on some evidence, and

- Whether, under the circumstances, the sanction was imposed in accordance with the Chart of Disciplinary Sanctions – Attachment A.

1.5.4.3 After reaching a decision concerning the appeal, the Warden may affirm or reverse the decision outright, return the decision back to the committee for further proceedings, or modify, but not increase the sanction imposed.

1.5.4.4 The Warden's response to the appeal shall conform to the following outline:

- Charges and findings.

- Inmate's basis for appeal.

- Warden's findings and decision.

- Instructions, if any, to disciplinary staff.

## 707.05 DISCIPLINARY OFFENSES

NOTE:  Deleted or additional infractions will not lead to the renumbering of charges.

1.1   All offenses listed below will also include an attempt or conspiracy to commit that violation.

1.2   Work Release violations may only be charged if the inmate has minimum or community trustee status.

1.3   Minor Infractions (All Class E Violations)

- M1 – Purchasing, selling, trading, giving, receiving or possessing any item of property, with a value less than $50, in a manner other than that which is authorized by Administrative Regulation 711.

- M3 – Possession of unauthorized items with a value less than $25.00.

- M4 – Roughhouse, horseplay or "gunseling".

- M5 – Failure to keep one's person or assigned area neat and clean.

- The need to modify inmate's behavior.

- Set expectation for other inmates.

1.2.3   If the chart is not followed, written documentation must be submitted to the Warden justifying the departure from the Chart of Disciplinary Sanctions for review and approval.

1.3     There is no requirement that charges of similar nature must result in identical penalties.

- Other factors in mitigation and/or aggravation should be considered.

1.4     Disciplinary sanction imposed may not include:

- Medication;

- Bible or other religious items;

- Basic cell furnishings;

- Basic personal hygiene items (soap, toilet paper, toothpaste, toothbrush);

- Food (except as authorized by Administrative Regulation 732 – Alternative Diet); (3-4301)

- Bedding and state issue clothing;

- Access to the courts (legal telephone calls, book check-out from law library); or

- Any item that has been determined to be a constitutional entitlement.

1.5     Loss of privileges may include, but is not limited to:

- Canteen/coffee shop

- Electrical appliances

- Personal phone calls

- Use of gymnasium

- Hobby Craft

1.6     An inmate serving disciplinary segregation sanctions may not be subjected to the loss of minimal outdoor exercise periods as a result of any disciplinary incurred while serving disciplinary segregation unless the misconduct relates specifically to an incident on or en-route to or from the

- M6 – Failure to perform work as instructed or a failure to attend work, school or other assignment.

- M7 – Unauthorized use of institutional supplies, tools, equipment or machinery.

- M10 – Failure to produce inmate identification card upon request of correctional employee.

1.4     General Violations (All Class D Infractions)

- G1 – Disobedience of an order from any correctional employee or anyone who has the authority to supervise inmates in work or other special assignments.

- G2 – Unauthorized contact of any on- or off-duty correctional employee or member of the correctional employee's family; or any unwanted contact with any private citizen, not amounting to harassment or threats.

- G3 – Organizing, participating in, operating any gambling game or betting pool, or possessing any equipment used for gambling or betting purposes.

- G4 – Intentionally destroying, altering or damaging property of another or state property, which has a replacement value less than $50.00.

- G5 – Self-mutilation.

- G6 – Fighting or challenging another to fight.

- G7 – Issuing a brass slip with knowledge that it is not covered by sufficient funds.

- G8 – Possession of another inmate's identification card.

- G9 – Abusive language or actions toward another person.

- G10 – Tampering with evidence or influencing a witness involved in any disciplinary process, not amounting to threats.

- G12 – Failure to appear at the proper time and place for count or interfering with the count.

- G13 – Cutting into line.

- G14 – Failure to follow rules and regulations.

- G15 – Presence in areas identified as off limits to inmates by posted regulations or signs that identify areas that are restricted, not amounting to an attempted escape.

- G18 – Delaying, hindering or interfering with a correctional employee in the performance of his duties.

- G20 – Preparing, soliciting, or giving false or misleading information to or about a staff member and representing the statement as fact. <u>NOTE</u>:
  - ➢ Cannot be plea-bargained or sanction bargained.

- G21 – Possession of gang materials including, but not limited to, jewelry, stationary, emblems and patches.

- G24 – Possession of prescribed medication that is not a controlled substance without the approval of the proper authority.

- G25 – Purchasing, selling, trading, giving, receiving or possessing any item of property, with a value equal to or greater than $50.00, in a manner other than that which is authorized by Administrative Regulation 711.

- G26 – Smoking in an unauthorized area.

- G27 – Abuse of the inmate grievance process. <u>NOTE</u>:

  - ➢ This violation may only be charged by the ADO.

  - ➢ Cannot be plea-bargained or sanction bargained.

### 1.5    Major Violations

- MJ1 – Arson:  Setting a fire with the potential of causing damage or injury to persons or property. (Class A)

- MJ2 – Assault:  Unlawful attempt coupled with present ability to commit a violent injury on the person of another. (Class A)

- MJ3 – Battery:  Any willful use of force or violence upon the person of another. (Class A)

- MJ4 – Burglary:  The entering of a building, structure or vehicle with the intent to commit a crime therein. (Class B)

- MJ5 – Embezzlement:  The fraudulent conversion of the property of another by one who is already in lawful possession of it. (Class B)

- MJ6 – Escape:  The departure or absence from custody of a person who is imprisoned, before he is entitled to his liberty by the process of law.  This violation shall be charged in cases of walk-a-ways from assignments of minimum or community custody where no weapons, force or injury to others was involved. (Class B)

- **MJ7 – Extortion:** The obtaining of property or money from another by wrongful use of actual or threatened force, violence or fear. (Class A)

- **MJ8 – False Imprisonment:** The unlawful violation of the personal liberty of another, which consists of confinement or detention without sufficient legal authority. (Class A)

- **MJ9 – False Pretenses:** A false representation of a material present or past fact, which causes the victim to pass title to his property to the wrongdoer who knows his representation to be false and intends thereby to defraud the victim. (Class B)

- **MJ10 – Gang Activities:** A validated Security Threat Group member who has engaged or is engaging in criminal activities, threatens the order and security of the institution and/or promotes racism. ▓▓▓▓ NOTE:

    ➢ Only the AWO may charge the inmate with this violation.

    ➢ Cannot be plea-bargained or sanction bargained.

- **MJ11 – Kidnapping:** The unlawful taking and carrying away of a human being by force or against his will. (Class A)

- **MJ12 – Larceny:** The trespassory taking and carrying away of personal property of another with intent to steal it. (Class C)

- **MJ13 – Larceny by Trick:** Obtaining possession of another's property by falsehood with the intent to convert it for his own use. (Class C)

- **MJ14 – Manslaughter:** The unlawful killing of another human being without malice either expressed or implied. It may be either voluntarily, in the heat of passion, or involuntarily. (Class A)

- **MJ15 – Mayhem:** The infliction of an injury, which disfigures, disables, or dismembers another. (Class A)

- **MJ16 – Murder:** The unlawful killing of another human being with malice aforethought, either expressed or implied, and all lesser included offenses. (Class A)

- **MJ17 – Receiving Stolen Property:** One must receive stolen property, know it is stolen, and intend to deprive the owner of it. (Class C)

- **MJ18 – Robbery:** A larceny where the taking of the property must be from the person of the victim or in his presence and the taking must be by means of violence or intimidation. (Class A)

- **MJ19 – Sexual Assault:** Subjecting another person to any sexual act against their will

and/or understanding. (Class A)

- MJ20 – Tattooing:  Tattooing oneself or another or possession of tattooing equipment. (Class C)

- MJ21 – Theft:  The taking of property without the owner's consent. (Class C)

- MJ22 – Tampering with any locking device. (Class B)

- MJ23 – Intentionally destroying, altering or damaging the property of another or state property with a replacement value equal to or greater than $50. (Class C)

- MJ24 – Adulteration of any food or drink. (Class A)

- MJ25 – Threats:  Issuing a threat, either verbally, by gesture or in a written statement to or about any person. (Class B)

- MJ26 – Possession of contraband, including items that present a threat to safety and security of the institutions, excluding drugs and drug paraphernalia. (Class A)

- MJ27 – Rioting or inciting others to riot. (Class A)

- MJ28 – Organizing, encouraging or participating in a work stoppage or other disruptive demonstration or practice. (Class B)

- MJ29 – Charging or collecting a fee or favors for services as a counsel-substitute, legal assistant or "writ writer." (Class C)

- MJ30 – Sexually stimulating activities, including but not limited to caressing, kissing or fondling, except as authorized by Departmental visitation regulations. (Class C)

- MJ31 – The unauthorized or inappropriate use of telephone, mail, computer, state equipment, or supplies. (Class C)

- MJ32 – Being in an unauthorized area, or hiding on the prison grounds or hiding at a place of assignment or classification. (Class B)

- MJ33 – Bribery:  Giving or offering a bribe to any person. (Class B)

- MJ34 – Trading, bartering, lending or otherwise engaging in any personal transactions when such transaction has not been specifically authorized. (Class C)

- MJ35 – Counterfeiting, forging or making an unauthorized reproduction of any document. (Class B)

- MJ39 – Running from a correctional employee when ordered to halt. (Class C)

- **MJ40** – Propelling any substance toward any person that strikes them or has the potential to strike them. (Class A)

- **MJ41** – Gathering around, blocking, or impeding any correctional employee or visitor, in a threatening or intimidating manner and exhibiting conduct, which causes the person to fear for his safety. (Class A)

- **MJ42** – Unauthorized contact, including harassment, of any on-duty or off-duty correctional employee or other private citizen. (Class A)

- **MJ44** – Failure to submit to a drug and/or alcohol screening. (Class B)

- **MJ46** – The possession or use of tape recording devices. (Class C)

- **MJ47** – Escape: The departure or absence from custody of a person who is imprisoned, before he is entitled to his liberty by the process of law. This violation shall be charged in cases of escape from assignments of medium custody or above, or escapes from any custody where weapons, force, violence, the taking of hostages or injury to others was involved. (Class A)

- **MJ48** – Any violation of the Rules of Court, contempt of court, submission of forged or otherwise false documents, submissions of false statements, violations of Rules of Civil Procedure, Criminal Procedure or Appellate Procedure and/or receiving sanctions and/or warnings for any such actions from any court. Although not necessary for disciplinary purposes, any Order from any court detailing such action shall be sufficient evidence for disciplinary purposes. (Class C)

- **MJ49** – Possession of any confidential prison regulation. Any prison regulation, which is not specifically delineated as accessible to inmates, is considered confidential. A prison regulation includes, but is not limited to, Administrative Regulations, Institutional Procedures, Emergency Response Regulations, and Post Orders. (Class C)

- **MJ50** – Sexual Harassment: Conduct that is sexually abusive or offensive to any person and that may include, but is not limited to, suggestive language directed to another, or as an aside; unwanted or inappropriate touching; exposing one's self; performing a private sex act with knowledge that it will be observed by another; displaying sexually provocative or explicit materials/photos/drawings. (Class B)

- **MJ51** – Compromising Staff: Conduct that includes, but is not limited to, bribery, extortion, sexual contact, or any other behavior designed to violate the safety and security of an institution and/or obtain favorable treatment. (Class A)

- **MJ52** – Refusal to complete or ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ (Class C)

68

- MJ53 – Possession, introduction, or sales of any narcotics, drugs, alcohol, or other intoxicants or possession of materials suitable for such manufacture. (Class A)

- MJ54 – Use of any narcotics, drugs, alcohol, or other intoxicants. (Class B)

1.6    Work Release Violations (All Class C)

- W1 – Failure to comply with travel arrangements outside the facility.

- W2 – Failure to report to the work assignment contacts in the community as specified and agreed upon in the release plan.

- W3 – Failure to remain in the particular area designated in the release plan.

- W4 – Operation of a motor vehicle, unless such operation is a condition of the job and the Department prior authorization was approved.

- W7 – Failure to return to the facility on or before the time specified in the schedule of the release plan. This includes leaving or hiding from supervision or custody.

- W8 – Failure to report an incident that delays the inmate's return to the facility.

- W9 – Failure to complete ████████████████████████

- W10 – Performing work for private persons that are not authorized by the Department.

- W11 – Any violation or attempt to violate rules or conditions of the work program contract.

- W13 – Possession of coin, currency, checks, money orders or other negotiable instruments in excess of the amount authorized by regulation.

## 707.06 DISCIPLINARY SANCTIONS GUIDELINES

1.1    The Chart of Disciplinary Sanctions – attachment A, will guide the imposition of sanctions.

1.2    Disciplinary Hearing Officers involved in the inmate disciplinary process must recognize that the Chart of Disciplinary Sanction cannot accurately, fairly or consistently address every situation.

1.2.1    Disciplinary Hearing Officers must conduct an individual analysis of each incident for each inmate.

1.2.2    In determining the sanction, the following should be taken into account:

- Maintain a safe and secure environment.

436

exercise yard.

1.7    An inmate may not be subject to the loss of visiting privileges unless the misconduct relates specifically to an incident involving visitors or MJ44/▓▓▓▓ conviction (see 707.12).

1.8    Sanctions may be imposed either singly or in combination with other sanctions as noted in
1.9    Determining the Sanction

1.9.1    Preliminary Hearing Officers and Disciplinary Hearing Officers shall impose a sanction or sanctions that are appropriate and are the minimum required to deter further offenses by the inmate.

1.9.1.1 In setting the sanction, factors in mitigation and aggravation shall be considered.

1.9.2    Other factors may be considered at the discretion of the Preliminary Hearing Officer and/or the Disciplinary Hearing Officer.

1.9.3    The following are examples of factors in mitigation and aggravation:

1.9.3.1 Mitigation

- The inmate has a minor disciplinary record or no prior disciplinary record.

- The inmate has not been involved in prior acts of the same or similar nature.

- The misconduct was situational and spontaneous as opposed to planned.

1.9.3.2 Aggravation

- The inmate's disciplinary record reflects prior acts of similar misconduct.

- The inmate's disciplinary record reflects that the type of misconduct is becoming increasingly more serious.

- The misconduct was planned as opposed to situational or spontaneous.

- Serious injury to staff or inmate occurred as a result of the misconduct.

- The inmate has not responded to suspended disciplinary sanctions.

- History of chronic disciplinary violations.

1.10    If more than one violation arises from a single incident, disciplinary detention may be imposed only once, and not consecutively on each charge.

1.10.1 An inmate shall not be confined to disciplinary detention for more than 15 days in one 30-day period.

1.10.2 If a major or general violation is committed and the Disciplinary Hearing Officer suspects that the inmate's mental condition was a substantial cause of the misconduct, then they may request a psychological evaluation and subsequently conduct or suspend disciplinary actions as appropriate.

1.11    Refer to 707.12 for disposition of MJ44 and MJ54.

1.12    Disciplinary sanctions may have been suspended, may be imposed upon a finding of guilt on another disciplinary charge within the probationary period.

- The inmate sanction suspension must be revoked.

## 707.07 DISCIPLINARY SEGREGATION/AUSTERE HOUSING GUIDELINES

1.1    Refer to AR 733 for details of disciplinary segregation procedures.

1.2    At the conclusion of each three (3)-month period in disciplinary segregation, if the inmate has not been convicted of a general or major violation during that time, and if the inmate is serving a term greater than three (3) months, one month of credit for good behavior will be granted.

1.2.1   Such credit shall be applied toward completion of the term.

1.2.2   Once earned, these sanction reductions become vested and shall not be revoked.

1.2.3   This grant of credit for good behavior does apply to austere housing sanctions.

1.3    Whenever there is a shortage of beds in disciplinary segregation, the Warden may grant early releases to those inmates who are closest to being eligible for release and/or least security risk until sufficient bed space is created for inmates with new segregation/austere housing terms.

1.3.1   If granted, the remainder of the segregation/austere housing remains in suspension until the original end date of the segregation/austere housing.

1.3.2   If the inmate violates the early release by subsequent misconduct, they may be required to serve the total unserved portion of the segregation.

## 707.08 STATUTORY GOOD TIME GUIDELINES

1.1    The forfeiture of credits earned for good behavior, as provided for in NRS 209.451, is a

sanction, which may be imposed for major and work-release violations.

1.2     This sanction may be imposed singly, or in combination with other sanctions.

1.3     Credits subject to forfeiture are those that were earned on the sentence the inmate is currently serving, up to the date of the violation.

1.4     Credits earned on prior sentences are not subject to forfeiture.

1.5     In instances where the Disciplinary Hearing Officer recommends a forfeiture of sentence credits, the category will be determined by referring to the Chart of Disciplinary Sanctions.

1.6     Referrals for good time forfeiture are made to the Offender Management Division for processing (see AR 564).

1.7     Categories shall not be subject to sanction negotiations.

1.8     The categories reflect the violation severity level; based on the following:

| CATEGORY | AMOUNT OF LOSS (DAYS) |
|----------|------------------------|
| A | 120 credits or more |
| B | 60 to 119 credits |
| C | 1 to 59 credits |

1.9     The forfeiture of good behavior credits is subject to final approval by the Director or designee.

1.10    Following a find of guilty the inmate should be permitted to make a separate statement concerning the forfeiture of sentence credits.

1.11    An inmate may appeal a forfeiture sanction through the inmate grievance process.

1.12    A sanction for forfeiture on statutory credits may not be suspended.

1.13    ██████████████████████████████████████████████████████████

## 707.09 REFERRALS FOR CRIMINAL PROSECUTION (3-4219)

1.1     The administrative disciplinary process, as described by this Code, and the system to prosecute a person in state or federal court are not related or interdependent.

1.2     An inmate may be held accountable for a violation of the Code, through the disciplinary

process, and may also receive a criminal prosecution for the same offense at a later date.

1.3     Inmate disciplinary actions shall not be postponed pending the outcome of a criminal prosecution unless the Director or designee determines it is in the best interests of the Department to do so.

1.4     A referral for criminal prosecution is not a sanction under the Code.

- Preliminary Hearing Officers and the Disciplinary Hearing Officer shall make no promises and shall not agree to negotiate any plea or sanction on the basis of a referral for criminal prosecution or absence thereof.

1.5     Conviction for a violation of the Code is not a prerequisite for a criminal prosecution referral.

1.6     Although a referral for criminal prosecution is not a sanction under the Code, a referral may arise from the disciplinary process, at any time during the process, based on information that a crime may have been committed.

1.7     Refer to AR 708 for processing of criminal referrals.

1.8     The institution where the violation occurred is responsible to submit the criminal referral regardless where the disciplinary hearing is held.

- Copies of all documentation will be sent to the originating institution.

## 707.10 REFERRALS FOR PAROLE/████████ REVOCATION

████ Parole Revocation

████     An inmate pending release to the community on parole, or one who is serving a parole from a previous sentence may be subject to revocation proceedings or a review of a previous board order based on a disciplinary conviction of a major or a work release violation.

- A parole violation is not considered to have occurred until an inmate has been found guilty of a major or work-release violation.

████     A referral for parole violation is not a sanction under the Code.

████     Upon the finding of guilt on a major or work release violation the matter will be reviewed for parole revocation procedures.

████ The Warden will determine if such an action is appropriate.

- If approved, a written report will be submitted by the Warden to the Offender Management ██████ Administrator ██████.

██████ The ██████ will approve or disapprove the referral in writing.

██████ If approved, the Associate Warden of Programs will coordinate with the Executive Secretary of the Parole Board for a Review of Previous Order (RPO) or a parole revocation hearing.

1.1.4 The Department is authorized to place a stay on parole release plans for inmates who are accused of a major or work release violation.

1.1.5 Refer to AR 537 for processing of parole revocations.

████ ████████ ████████████

████ ██ ██████ ██ ████████ ██████ ████████ ████████ ██████ ██████ ██ ███████████ ████████████ ██ ██████ ██ ███████████ ████ ██████ ███ ██ ███████ ██ █ ████ ██████ ██████████

████████ ██████████ ██ ███ ██████████ ██ ████ ██ ████ ████ ███████ ██████ ██████ ██ ██████ ██ ████ ██████ ██████████

1.2.2 ████████ ███ ████████ ████████ ██ ███ ███████ ██████ ███ ██████

1.2.3 ██████ ██████ ██ ██████ ██ █ ██████ ██ ████ ██████ ██ ██████ ███ ██████ ███ ██ ███████ ██████████ ██████████ █ ███████

████ ███ ██████ ████ ████████ ██████ █ ████ ██ ██████████

• ████████ █ ██████ ██████ ████ ██ ████████ ██ ███ ██████ ██ ███ ██████ ██████ ████ ██████ ██ ████ ██ ██████ ████

████ ███ ████ ████ ███████ ██ ████████ ███ █████████ ██ ██████

████ ██ ████████ ███ ████████ ██████ ██ ████████ ████ ██████████ ████ ███ ████████ ██████ ██ ████████ ███ ████████████ ████ ███ ████████ ██████ ██ ███████ ██ ████ ██ ████ ██████████ ███ ████ ██████ ████ █████ ██ ██████ ██ ████ ██ █ ███████████ ██████████

## 707.11 USE OF CONFIDENTIAL INFORMATION

1.1    An inmate may be found guilty of an offense on the basis of information from a source whose identity is not disclosed to the inmate at the hearing.

1.2    Such information may be presented verbally or in writing, subject to the conditions set forth in this section.

1.3    Two-Prong Test for Determining Reliability and Necessity

1.3.1   The record shall contain some factual information from which the Disciplinary Hearing Officer can reasonably conclude that the confidential information is reliable.

1.3.2   The reliability of the informant's information can be established by any of the following:

- The oath of the investigating officer appearing before the Disciplinary Hearing Officer as to the truth of their report that contains confidential information, or

- Corroborating testimony, or

- A statement on the record by the Disciplinary Hearing Officer that they had firsthand knowledge of the sources of information and considered them reliable based on the informant's past record, or

- An in-camera review of the documentation from which credibility was assessed.

1.3.3   The record of the disciplinary hearing shall contain a prison official's affirmative statement that safety considerations prevent the disclosure of the informant's name to the accused.

1.4   Disclosure of Source's Identity to Hearing Officer

1.4.1   In order to conduct the test identified in item 1.3 above, the identity of the confidential source shall be made known to the Disciplinary Hearing Officer, out of the presence of the accused inmate.

1.4.2   The Warden may, however, withhold the identity from the Disciplinary Hearing Officer.

1.4.3   If the Disciplinary Hearing Officer is not to be informed of the identity of the source, the record of the disciplinary hearing shall contain an affirmative statement from the Warden or AWO that the test was satisfied.

1.4.3.1 The statement shall minimally reflect that the Warden or AWO considered the source of the information, judged the source to be reliable, and allowed that the Disciplinary Hearing Officer may use the information.
1.4.3.2 The statement shall also reflect that safety considerations prevent the disclosure of the informant's identity to the Disciplinary Hearing Officer.

1.5   Disclosure of Details of Testimony to Accused

1.5.1   After hearing the testimony of, or reading the statements of a confidential informant, the Disciplinary Hearing Officer shall, to the extent possible, disclose the details to the accused inmate.



1.5.2    The details of the informant's testimony may be withheld from the accused inmate if disclosure would place the informant at risk by indirectly revealing their identity.

1.6    Record Keeping Requirements

1.6.1    In each instance where the Disciplinary Hearing Officer relies upon confidential information to reach a finding of guilt, a separate confidential file shall be created and maintained at the institution.

1.6.1.1 Each such file shall be sequentially numbered and shall contain a record of the informant's statement, the identity of the informant, and a copy of the disciplinary documents.

1.6.1.2 If the Disciplinary Hearing Officer was not permitted to know the identity of the informant, the file shall also contain the statement of the official who approved non-disclosure.

- This statement shall establish the reliability of the informant, and the necessity of anonymity.

1.6.2    The Warden shall review the complete record of all decisions in which the identity of an anonymous source was withheld from the Disciplinary Hearing Officer, provided they were not involved in the decision to withhold the identity.

1.6.2.1 If the Warden was involved in the original decision, than the ADO or designee shall conduct the review.

1.6.2.2 Such reviews shall be completed within 15 days of the completion of the hearing, or the resolution of the appeal, whichever is later.

1.6.3    The confidential file remains at the institution or facility where it was created and used, regardless of whether the subject inmate later transfers.

## 707.12 SPECIAL PROCEDURES FOR MJ44 AND MJ54 CONVICTIONS/SANCTIONS

1.1    Inmates who are suspected of having ingested a controlled substance or alcohol will go through and complete the disciplinary process.

1.2    Inmates who are found to have a positive urinalysis are to remain in general population, pending the outcome of the disciplinary hearing unless they need to be placed in more secure housing as they pose an immediate threat to the safety or security of the institution.

- This does not preclude; however, moving an inmate to a more restrictive level in general population.

1.3    A reasonable sanction for a positive urinalysis (MJ54) or refusal to test (MJ44) is restricted

visiting; statutory referral; and austere housing.

    **1.3.1**  Inmates are to be directed to a substance abuse treatment program, such as WINGS or OASIS.

    **1.3.2**  The austere housing sanction may be implemented pending placement into the program; however, sanctions are to be suspended once the inmate is approved for and placed in the program.

**1.4**    Inmates found to have drugs or alcohol in their systems, as proved by a positive urinalysis, will be removed from their jobs, whether they be in Prison Industries, a Vocational Training program, Nevada Division of Forestry or a departmental job such as culinary, porter, grounds, etc.

**1.5**    There will be **NO** visits for one calendar year from the date of the incident.

- All visits will then be non-contact for the second calendar year.

**1.6**    Upon successful completion of treatment, the inmate:

- May apply for restoration of statutory good time credits;

- ████████████████████████████████████████████████████████████████

- Will receive the 90 merit credits that are awarded for WINGS, or OASIS completion

- Note:  There is no partial credit for completion of a portion of the treatment program. Credit is all-or-nothing, awarded at the end, upon successful completion of Phases I, II and III; and

- Can again obtain a work assignment ████████████████████████████████████

**1.7**    Inmates quitting, or being dropped from, therapeutic community treatment prior to successful completion of the entire program will face the following consequences:

- No restoration of statutory good time credits;

- No award of any merit credits;

- Assignment to Austere Housing to serve the full sanction, if any is pending;

- Return to their original institution, if they were transferred to WINGS or OASIS from another institution; and

- A reduction in the Level System.

## 707.13 MISELLANEOUS DISCIPLINARY PROCEDURE

1.1    Disciplinary Documentation

1.1.1    All disciplinary activities shall be documented in the Nevada Corrections Information System (NCIS) as those activities occur.

1.1.2    The NCIS is designed to provide status reports of needed disciplinary actions.

1.1.3    Disciplinary process is not complete until the final entry of dispositions has been entered.

▉▉▉▉ All references to the violation shall, remaining in the inmate's institutional file, if the inmate is found not guilty of, have all charges dismissed.

1.2    Expungement (3-4234)

▉▉▉▉ The file shall clearly indicate that the inmate was not guilty of the alleged violation.

▉▉▉▉ The NCIS will reflect this finding.

1.3    Correction of Minor Technical Violations

1.3.1    A disciplinary case need not be dismissed due to minor technical errors or violations.

- For example, if an employee involved in the incident also acted as the Disciplinary Hearing Officer, the case need not be dismissed.

1.3.2    The case shall be reheard by another Disciplinary Hearing Officer and the disciplinary hearing rescheduled.

1.3.3    A typographical error, spelling error or other clerical error can be repaired by correcting the problem.
- If the error did not, in the judgment of the Disciplinary Hearing Officer, impair the inmate's ability to prepare a defense, the error may be corrected at the hearing, and the hearing may continue.

- If, however, the error impaired the inmate's ability to prepare a defense, the hearing may be rescheduled.

1.4    Placement of the Notice of Charges in I-File as "Informative Only"

1.4.1   This is done when the Disciplinary Hearing Officer finds that the charges do not constitute a violation of the Code, but shall be maintained as relevant file information.

1.4.2   This is done by checking the box labeled "other" on the "Summary of Disciplinary Hearing" form.

1.4.3   This provision may not be used in plea or sanction bargaining.

1.5   Warden's Review

1.5.1   The Warden, or an impartial official whom is designated, shall review the action of the Preliminary Hearing Officer and Disciplinary Hearing Officer, regardless of whether an appeal is taken, and may reverse the decision, remand the decision, or modify the sanction imposed, whenever such action is warranted in the record. (3-4366)

1.5.2   Under such a review, a sanction imposed by the Disciplinary Hearing Officer may not be increased.

1.6   Disposition of Forfeited Property or Contraband

1.6.1   A forfeited item will be held as evidence as long as necessary, then as the Warden or Facility Manager directs be disposed of or destroyed.

- Currency, coin, checks, money orders or other negotiable instruments shall be deposited in the Inmate Welfare Fund, and used for the purpose, which the appropriate administrative regulation authorizes.

- Items of property may be disposed of in an environmentally appropriate manner, or donated to charity, except that an item may not be given as a gift to an employee or the general public.

1.7   Staff Training (3-4217)

1.7.1   Supervisors who act as Preliminary Hearing Officers or Disciplinary Hearing Officers should receive training prior to their participation in the inmate disciplinary process.

- EEO/Employment Development Division will conduct this training.

1.7.2   New employees will receive training and receive a copy on this procedure during their Pre-Service Training.

1.7.3   Current Employees will receive a copy of the Code when revised. (3-4216)

# 707.14 MAINTENANCE OF DISCIPLINARY ACTIVITY RECORDS

AR 707                                              Page 35 of 38

1.1     The NCIS "Disciplinary Program" is not a substitute for any of the paper forms that are used to carry out the disciplinary process (Notice of Charges, Summary of Preliminary Hearing Officer, Summary of Disciplinary Hearing).

> 1.1.1   The NCIS "Disciplinary Program" is a method to record, summarize and analyze these activities.
>
> 1.1.2   Institutions and facilities shall not maintain or develop disciplinary management or documentation systems, manual or automated, other than those provided through the NCIS.

1.2     Initiation of Disciplinary Record

> 1.2.1   A record of the disciplinary shall be started by making an appropriate entry in the "disciplinary program" in the NCIS upon the writing of a Notice of Charges, and prior to delivery of the charges to the Preliminary Hearing Officer.
>
> 1.2.2   The date of the record is the date the Notice of Charges is written.
>
> 1.2.3   The entry of the record causes the creation of a 10-day suspense date for the Preliminary Hearing Officer.

1.3     Hearing Officer Function

> 1.3.1   After the Notice of Charges has been served, the disciplinary record shall be updated with the date of service.
>
> 1.3.2   If the Preliminary Hearing Officer resolved the charges, and did not refer the case to the Disciplinary Hearing Officer the disposition shall also be entered into the disciplinary record at this time.
>
> 1.3.3   If the Preliminary Hearing Officer refers the case to the Disciplinary Hearing Officer, the date of service creates a 30-day suspense date for the scheduling of the disciplinary hearing.

1.4     Disciplinary Hearing Date and Disposition Date

> 1.4.1   At the conclusion of the disciplinary hearing, the date and disposition of the hearing shall be entered into the disciplinary record.
>
> 1.4.2   This will complete the record of that particular case.
>
> 1.4.3   If after the Warden's/designee's review and if changes are made, the changes will be noted in the NCIS.
>
> 1.4.4   If an appeal is filed and modification is made, the Warden/designee will enter the

changes in the NCIS.

1.4.5   If necessary, a special case note will be made on the NCIS Chrono Screen detailing the modification(s).

1.5   **Responsibility**

1.5.1   The Disciplinary Hearing Officer is responsible for insuring that the requirement of the NCIS "disciplinary program" is properly carried out.

1.5.2   In the event that an inmate transfer interrupts a disciplinary case in progress, the last completed phase of the process shall be entered into the record of that case that has been established in the "disciplinary program."

- This will insure that the staff of the receiving institution are aware of the status of a particular case, and do not initiate a duplicate record.

1.5.3   The receiving institution will check the disciplinary status of all inmates and complete the disciplinary process, if necessary.

1.6   **Restitution**

1.6.1   DOC Form 3043 will be completed on all disciplinary sanctions requiring ▓▓▓▓ ▓▓▓▓ restitution.

- The completed form will be submitted to Inmate Services.

1.6.2   Whether or not the amount of restitution is known at the time, total restitution may be on-going due to changing medical treatment or other costs related to the incident.

**REFERENCES**

ACA 3-4214 – 4225; 3-4227 – 4236

**ATTACHMENTS**

Chart of Disciplinary Sanctions
NDOC Form 3010
NDOC Form 3017
NDOC Form 3018
NDOC Form 3019 Page 1
NDOC Form 3019 Page 2
NDOC Form 3043

Jackie Crawford, Director                    9/14/04
                                             Date

**CONFIDENTIAL**   ___   XX
                   Yes   No

**THIS PROCEDURE SUPERSEDES ALL PRIOR WRITTEN PROCEDURES ON THIS SPECIFIC SUBJECT.**

# CHART OF DISCIPLINARY SANCTIONS

| | 1ST OFFENSE | | 2ND OFFENSE | | 3RD OFFENSE |
|---|---|---|---|---|---|
| | MINIMUM | MAXIMUM | MINIMUM | MAXIMUM | |
| **A** | - Any Class B sanction<br>- 18 months DS<br>- Director referral for Class A stat of 180 days | - Any minimum Class A sanction<br>- 2 years DS<br>- Director referral for Class A stat loss | - Any first offense Class A sanction<br>- Case-by-Case Basis | - Any previous Class A sanction<br>- Case-by-Case Basis | - Case-by-Case Basis |
| **B** | - Any Class C sanction<br>- 120 days DS/AH<br>- Loss of visiting or non-contact 90 days<br>- Director referral for Class B state not to exceed 90 days | - Any minimum Class B sanction<br>- 180 days DS/AH<br>- Loss of visiting or non-contact 180 days<br>- Referral for Director for Class B stat loss | - Any first offense Class B sanction<br>- 9 months DS<br>- Loss of visiting or non-contact 1 year<br>- Sanctions may be consecutive | - Any previous Class B sanction<br>- 1 year DS | - Minimum sanction for Class A |
| **C** | - Any Class D sanction<br>- 10 days DD susp 60 days clear conduct<br>- 60 days DS/AH susp 180 days<br>- Loss of visiting or non-contact 75 days<br>- Director referral for Class C stat less than 30 days | - Any min Class C sanction<br>- 10 days DD<br>- 60 days DS/AH<br>- Loss of visiting or non-contact 90 days<br>- Loss of privileges 30 days<br>- Director referral for Class C stat loss | - Any first offense Class C sanction<br>- 15 days DD<br>- 75 days DS/AH<br>- Loss of privileges 60 days<br>- Sanctions may be consecutive | - Any previous Class C sanction<br>- 90 days DS/AH | - Minimum sanction for Class B |
| **D** | - Any Class E sanction<br>- 15 days DS/AH susp 30 days<br>- Loss of 1 privilege 30 days susp 30 days<br>- Loss of visiting or non-contact 30 days susp 60 days | - Any minimum Class D sanction<br>- 15 days DS/AH sanction<br>- Loss of 1 privilege 30 days<br>- Loss of visiting or non-contact 30 days | - Any first offense Class D sanction<br>- 5 days DD susp 60 days<br>- 30 days DS/AH<br>- Loss of visiting or non-contact 45 days<br>- Sanctions may be consecutive | - Any previous Class D sanction<br>- 45 days DS/AH<br>- 5 days DD<br>- Loss of visiting or non-contact 60 days | - Minimum sanction for Class C |
| **E** | - Verbal reprimand and/or 10 hours extra duty<br>- Restitution<br>- Forfeiture unauthorized/altered property<br>- Confiscate authorized prop. | - Any minimum Class E sanction<br>- Loss of 1 privilege 10 days<br>- Confiscate authorized property 10 days | - Any first offense Class E sanction<br>- Confiscation of auth. property 20 days<br>- Sanctions may be consecutive | - Any previous Class E sanction<br>- Confiscate unauthorized property 30 days | - Minimum sanction for Class D |

455

# EXHIBIT- D

82

Audio Recording for May 1, 2015 Disciplenary Hearing

C.D-Recording / AG OFFICE HAS IT

# EXHIBIT- D

EXHIBIT - E

83

(NDOC) Investigation Detail Reports for All C/O's
Night of March 28, 2015.

EXHIBIT - E





# State of Nevada
# Department of Corrections

*Investigation Detail Report*
*For: AG Office*

(EXHIBIT-E)



34



## Investigation

| | |
|---|---|
| **Investigator:** | |
| **Assigned Date:** | **IR Number:** IR-2015-NNCC-000575 |
| **Report Due Date:** | **Occurrence Dates:** 03/28/2015 |
| **Disposition Date:** | **IA Number:** IA- |
| | **Institution:** NNCC |

## Narrative

On March 28, 2015 at approximately 2034, Correctional Officer C.Smith, Unit 5 officer, requested Via radio backup assistance for a disruptive inmate. Sgt. Roberson and Search and Escort responded to unit. Inmate had struck the officer in the face. Inmate was checked by medical and placed into Administrative Segregation. Unit officer and one responding officer completed C-1 paperwork. Both were seen by institutional Medical. Photos were taken of inmate and officers. No officer released at this time. Warden Baca was advised. Message left for AW Schreckengost. Reports to follow from officers. ...[MSMITH, 03/29/2015 09:14:54] The inmate involved in this incident is inmate Joseph Mizzoni #68549 (5B-29A). Inmate Mizzoni was served with a notice of classification hearing and housed in 7A-38A. Inmate Mizzoni is on the communicable disease list. Officer Smith, C. was treated at CTRMC for a possible blood exposure and checked for injuries as a result of the incident. Officers Samsel and Grider were treated at CTRMC for possible blood exposure.

## Offender Involvement

| 68549 | MIZZONI, JOSEPH | | Suspect |
|---|---|---|---|
| **Comments:** | | | |

## Staff Involvement

| SHERMAN, FRANK | | Witness |
|---|---|---|
| **Comments:** Shift command reporting 019 | | |

● *Reports*

| **Report Type** | **Report Detail** |
|---|---|
| INC028 | On March 28, 2015, I, Sergeant Frank Sherman, was arriving at Northern Nevada Correctional Center to work C-Graveyard Shift as the Acting Shift Lieutenant. At approximately 2035 hours, a radio call for back-up at Unit 5 was received from Correctional officer Christopher Smith. Sergeant Roberson, RMF Sergeant, and Sergeant John Henley, C-Graveyard Shift Sergeant, responded from Operations. I remained at operations to monitor the shift change for C-Graveyard Shift and the phones. I began checking the institutional cameras to check Unit 5 for any information. I was not able to see any of the incident on camera. I began checking the playback of the unit for any possible information. Nothing was seen. Inmates were seen mingling in the wings. At this time, Sgt. Crowder responded to the unit to assist. |
| | At approximately 2046 hours, Sgt. Henley advised that the institution would remain locked down for the evening and the incident was code 4. The inmate, later identified as Mizzoni, 68549, Unit 5 B 29 A, was being escorted to the infirmary for further evaluation. After the evaluation and photos taken, inmate Mizzoni was moved to Unit 7 A 38 A pending reclassification and disciplinary. The Institutional Count was delayed to complete this move. |
| | At approximately 2050 hours, Sgt. Henley returned to operations with Sgt. Roberson and briefed me on the incident. Search and Escort were in Unit 5 completing some random cell searches and one cell that was searched was Unit 5 B 29 where inmate Mizzoni, 68549, resides. Unit 5 officer, Correctional Officer Christopher Smith, was monitoring the Unit rotunda. Inmate Mizzoni was becoming irate and disruptive and Officer C. Smith, went to calm the inmate. As the inmate became more irate, Officer Smith requested assistance by radio. C/O Smith was attempting to |

---



*499 pruff*

MIZZONI EXH E - 001





### State of Nevada
### Department of Corrections
*Investigation Detail Report*
*For: AG Office*

**Investigation**

| | |
|---|---|
| **Investigator:** | **IR Number:** IR-2015-NNCC-000575 |
| **Assigned Date:** | **Occurrence Date:** 03/28/2015 |
| **Report Due Date:** | **IA Number:** IA- |
| **Disposition Date:** | **Institution:** NNCC |

**Staff Involvment**

- **Reports**
  **Report Type**    **Report Detail**

  place Inmate Mizzoni into restraints and had ordered the inmate to move to the wall. Inmate Mizzoni appeared he was going to comply but moved in an aggressive mannner toward Officer Smith. C/O Smith used hands on force to attempt to control Inmate Mizzoni. C/O Smith radioed for Back up at this time. Inmate Mizzoni was able to get loose from Officer Smith and used a closed fist to swing at the officer. Inmate Mizzoni's closed hand struck Officer Smith on the right cheek. As officers arrived to assist at the incident the unit was secured. With Inmate Mizzoni restrained, C/O Grider, C/O Samsel and C/O Allison escorted the inmate to the infirmary for further evaluation.

  At this time, Sgt. Henley had to leave the institution due to a family emergency. Sgt. Roberson remained on post as the second supervisor and assisted with reports. Sgt. Roberson did assist with completing the C-1 Paperwork for staff from this incident.  C/O Smith was moved to Unit 2 to complete his paperwork and C-1 paperwork for possible injury from the incident. An initial evaluation was giving by the Institutional Medical Nurse, Stephanie Andrews. Photographs were taken of the injuries of the officer at this time.

  Warden Baca was advised on the situation at approximately 2055 hours. A message was left on the cell phone for AW Ron Schreckengost. At approximately 0015 hours, it was discovered that Inmate Mizzoni had bled during the incident and he was screaming he was Hep C positive. I found that two other officers with C/O Smith may have been exposed to blood borne pathogens. I checked the Communicable list and did find Inmate Mizzoni was on it. At this time, Sgt. Roberson contacted C/O Smith and advised him he would be leaving as soon as we were able to get C-1 completed for him to take to the Carson Tahoe Regional Medical Center. The other officers were identified at C/O Lee Grider and C/O Paul Samsel. To release the officers as soon as possible, I had the institution below minimum security staffing. C/O Smith was release at approximately 0100 hours. C/O Grider and C/O Samsel were released at approximately 0330 hours to complete a blood draw. I had spoken with the Medical Department and it was unknown as to why Inmate Mizzoni was on the List. I was also advised that Inmate Mizzoni would have a blood draw for testing of Hep C on Monday, March 30, 2015.

| Signature | Participation |
|---|---|
| ANDREWS, STEFANIE | Witness |
| **Comment:** Responding Medical Nurse | |

- **Reports**
  **Report Type**    **Report Detail**
  USEOF

  On 3/28/2015 at approx 2100, Inmate Mizzoni was brought to medical for evaluation. I/m sustained a 1cm laceration above the Lt eye which required cleansing and steristrip. Dime sized abrasion to both knees were treated with bandaids. Small abrasion from handcuff noted to wrist, no treatment needed. Vital signs were stable and I/M was released back to unit with custody. At approx 2110 C/O Smith was brought to medical for evaluation. Vital signs were stable. Reddened area noted to Rt cheek and temple area. No broken skin noted. No other injuries noted. No complaints of vertigo , blurred vision or headache. Instructed C/O Smith to follow up per exposure protocol and work comp protocol. C/O Smith released back to duty w/o any restrictions and

MIZZONI SMS: EXH E - 002



# State of Nevada
# Department of Corrections

*Investigation Detail Report*
*For: AG Office*

| | |
|---|---|
| **Investigator:** | **IR Number:** IR-2015-NNCC-000575 |
| **Assigned Date:** | **Occurrence Date:** 03/28/2015 |
| **Report Due Date:** | **IA Number:** IA- |
| **Disposition Date:** | **Institution:** NNCC |

## Staff Involvment

● *Reports*

**Report Type**    **Report Detail**
instructed on symptoms to watch for. Unusual occurance paperwork completed for both I/M and C/O.

| Staff Name | | Witness |
|---|---|---|
| HENLEY, JOHN | | |

**Comment:** Shift Sergeant

● *Reports*

**Report Type**    **Report Detail**
INC028

On March 28, 2015 I Correctional Sergeant John Henley was assigned as the Shift Sergeant at Northern Nevada Correctional Center. At approximately 20:35 I overheard a radio call for ¿back-up Unit 5¿. I immediately responded collecting Oc gas and a Tazer on the way. At approximately 20:40 I entered unit 5 and noticed that inmate Mizzoni, Joseph #68549 was on the ground still struggling with multiple staff members. I calmed inmate Mizzoni down and requested for Officers to stand inmate Mizzoni up. Inmate Mizzoni was compliant at this time. I requested that Officers Hightower and Gridley escort inmate Mizzoni to the clinic as he had minor facial abrasions and was stating that his left knee was injured. I walked with the escorting officers to the infirmary. Upon arrival in the infirmary Nurse Andrew completed an evaluation noting a 1cm laceration to the eye brow and minor abrasions to his wrist and knees. I took pictures of the injuries and then left the evaluation room to check on Correctional Officer C. Smith. I asked C/O C. Smith if he was ok and he stated that he was. I did notice a slight abrasion to Officer C. Smith¿s right cheek. I ordered Correctional Officer Smith to complete an injury packet and he complied. I then discontinued interviewing Correctional Officer Smith and reported back to the evaluation room. I requested via radio for a cell in unit 7. Central Control provided cell 7A-38. I then requested Officers Garnica and Samsel to escort inmate Mizzoni to unit 7. Both Officers complied and completed the escort. I then reported back to unit 5. I asked C/O Allison to book inmate Mizzoni¿s glasses into evidence and I took a picture of the ground where inmate Mizzoni was subdued. I then assigned Correctional Officer Darnell to unit 5 and notified all units via radio that all inmates would remain in their assigned housing for the remainder of the evening. At approximately 21:10 I left unit 5 and entered unit 4 to assist with count. END OF REPORT

| Staff Name | | Witness |
|---|---|---|
| HILL, JOHN | | |

**Comment:** responding officer

● *Reports*

**Report Type**    **Report Detail**
INC028

On Saturday March 28 2015, I, Senior Officer J.hill while assigned to Search and Escort at Northern Nevada Correctional Center did provide assistance in unit four to secure cell doors at close of tier time. At approximately 2045hrs Officers Allison, Ardinger, S.Smith did arrive in the unit. Shortly there after a radio transmission from unit 5 caused officer Allison to suggest a response to unit five. Seconds later additional radio transmissions requested "BACK UP" to unit

Page 3 of 10

Report Name: AGIDR
Reference Name: NOTIS-RPT-OR-0248
Run Date: APR-04-16 11:07 AM


MIZZONI ... EXH ...



# State of Nevada
# Department of Corrections

*Investigation Detail Report*
*For: AG Office*



## Investigation

| | |
|---|---|
| **Investigator:** | **IR Number:** IR-2015-NNCC-000575 |
| **Assigned Date:** | **Occurrence Date:** 03/28/2015 |
| **Report Due Date:** | **IA Number:** IA- |
| **Disposition Date:** | **Institution:** NNCC |

## Staff Involvment

● *Reports*

**Report Type**       **Report Detail**

5. Myself and the three other officers departed unit 4 enroute to unit 5. Upon arrival Officers Allison, Ardinger, S.Smith, provided assistance to Officer C.Smith, while I began to disperse inmates from the immediate area, clearing the rotunda and securing inmates in their cells. As additional staff members arrived The area was secured. I then observed the escort of inmate Mizzoni #68549, from unit 5 to unit 8 for medical evaluation.

INC028

INC028

**GRIDER, LEE**                                                    Witness

**Comment:** responding officer

● *Reports*

**Report Type**       **Report Detail**

INC028       On 28 March 2015, I (C/O Lee Grider) was assigned to 1 Tower on C-Graves at The Northern Nevada Correctional Center.
At Approx. 2030 hrs, I heard a back-up/staff assault call coming from Unit 5 when I was getting ready to relieve swing shift. When I arrived at Unit 5, Inmate Mizzoni, #68549, was restrained in the prone position, under officer coverage. The inmate had to be moved to medical, as he was bleeding from his temple. However, by continuing to drop his weight, Mizzoni was resistant while staff attempted to assist him to his feet for movement to medical. I stepped forward and placed Mizzoni's right wrist in a rear wrist lock, while Officer Hightower did the same on the inmate's left side. As Mizzoni continued to drop his weight, I gave him several orders to stand up. Mizzoni refused, necessitating Hightower and myself to lift him to a standing position. Once Mizzoni was on his feet, we escorted him to Unit 8-A for medical evaluation.
Once the inmate was safely in Unit 8, SGT John Henley (Acting Shift Lieutenant) dismissed me to my post. I suffered a minor cut from the inmate's restraints to my right middle knuckle; C-1 submitted.——END OF REPORT

USEOF       On 28 March 2015, I (C/O Lee Grider) was assigned to 1 Tower on C-Graves at The Northern Nevada Correctional Center.
At Approx. 2030 hrs, I heard a back-up/staff assault call coming from Unit 5 when I was getting ready to relieve swing shift. When I arrived at Unit 5, Inmate Mizzoni, #68549, was restrained in the prone position, under officer coverage. The inmate had to be moved to medical, as he was bleeding from his temple. However, by continuing to drop his weight, Mizzoni was resistant while staff attempted to assist him to his feet for movement to medical. I stepped forward and slid my right hand through the crook of Mizzoni's right arm, took control of his right hand with mine, and twisted his wrist into a rear wrist lock. As Mizzoni continued to drop his weight, I gave him several orders to stand up. Mizzoni refused, necessitating me to pull the wrist lock I had him in so as to bring him to a standing position. Once Mizzoni was on his feet, I de-escalated my use of force and proceeded to escort him to Unit 8-A for medical evaluation.

MIZZONI           DEF EXH 6 - 004



**State of Nevada**
**Department of Corrections**
*Investigation Detail Report*
*For: AG Office*

| Investigation | |
|---|---|
| Investigator: | IR Number: IR-2015-NNCC-000575 |
| Assigned Date: | Occurrence Date: 03/28/2015 |
| Report Due Date: | IA Number: IA- |
| Disposition Date: | Institution: NNCC |

## Staff Involvment

● **Reports**
**Report Type**        **Report Detail**
Once the inmate was safely in Unit 8, SGT John Henley (Acting Shift Lieutenant) dismissed me to my post. I suffered a minor cut from the inmate's restraints to my right middle knuckle; C-1 submitted.———— END OF REPORT

| | Witness |
|---|---|
| CROWDER, STEVEN | |

**Comment:** Responding Sgt.

● **Reports**
**Report Type**        **Report Detail**
INC028        On this date March 28, 2015 while assigned to Northern Nevada Correctional Center working 1:00pm to 9:00pm as a Shift Supervisor I Sergeant Steve Crowder observed the following. At approximately 8:45pm I responded from Operations to a 2 Officer backup call from the Unit 5 officer C/O S. Smith. Upon arrival into the unit I observed inmate Mizzoni, J. #68549 being escorted in hand restraints by officers C/O Grider and C/O Hightower in the unit rotunda. I then walked with the escorting officers from Unit 5 to Unit 8 where inmate Mizzoni received a medical assessment by the nursing staff. Inmate Mizzoni remained calm during this time. I then relieved by Sgt. J. Henley who was the Graveyard Sergeant as my shift was over and departed Unit 8 at approximately 9:00pm. End of Report

| | Witness |
|---|---|
| ROBERSON, JULLIETTE | |

**Comment:** Shift Sergeant

● **Reports**
**Report Type**        **Report Detail**
INC028        On Saturday March 28th 2015 I Sergeant J. Roberson was assigned as the Swing Shift RMF Sergeant here at NNCC. At approximately 8:35 PM, I responded to Unit 5 for a backup call that had been called via radio. When I arrived to the Unit 5 yard area, I was briefed that there had been an assault on an officer, and the suspect had been subdued and restrained. I relayed this information to Central Control via radio, and requested medical to standby for further instruction and response. When I arrived in Unit 5, I witnessed Inmate Mizzoni, J NDOC# 68549 in a compliant pin on the floor of Unit 5, and got a visual on Officer Christopher Smith. I relayed via radio that I got a visual confirmation on the Unit 5 Officer: Christopher Smith. Officer Smith told me that he had been hit by an inmate, and that he was OK. I told him that he would be seen by medical anyway. I briefed Sgt Henley, who had arrived on the scene shortly after I did with less-than-lethal weapons from the operations building. As I had the camera in my possession from a previous incident, attempted to photograph the right side of Officer Smith's face, and failed due to a camera malfunction. I went to the operations building to retrieve another camera and extra batteries. I rendezvoused with Sgt. Henley in the medical Unit where the inmate and Officers were being evaluated by medical staff with the camera so that photos could be taken. I then

Report Name: AGIDR
Reference Name: NQTIS-RPT-OR-0248
Run Date:   APR-04-16 11:07 AM

MIZZONI     DEF EXH 6 - 0




# State of Nevada
## Department of Corrections

*Investigation Detail Report*
*For: AG Office*

---

**Investigation**

| | |
|---|---|
| **Investigator:** | **IR Number:** IR-2015-NNCC-000575 |
| **Assigned Date:** | **Occurrence Date:** 03/28/2015 |
| **Report Due Date:** | **IA Number:** IA- |
| **Disposition Date:** | **Institution:** NNCC |

---

**Staff Involvment**

● **Reports**

| Report Type | Report Detail |
|---|---|
| | reported to Unit 4 to assist with count as Officers were displaced due to the incident. End of Report. |

**PATCHEN, JEREMY** — Witness

**Comment:** Responding Officer

● **Reports**

| Report Type | Report Detail |
|---|---|
| INC028 | On March 28, 2015 at approximately 2030 while working at Northern Nevada Correctional Center as unit 3B officer, I Correctional Officer Patchen heard a call for "back up" to unit 5 over the hand held radio. I immediatley responded to unit 5. When I arrived to unit 5 the inmate involved was already restrained. I stood by in case I was needed then returned to unit 3 when I was released by Sgt Henley. END OF REPORT |

**HIGHTOWER, JOEL** — Witness

**Comment:** Responding officer

● **Reports**

| Report Type | Report Detail |
|---|---|
| INC028 | While working my regular scheduled shift in Unit 10A at Northern Nevada Correctional Center on March 28, 2015, I Correctional Officer J. Hightower observed the following. At approximately 8:34pm Unit 5 Officer C. Smith called for Officer backup on his institutional radio. When I entered Unit 5 I observed that Officer Smith had marks on the right side of his face. I then observed Inmate Joseph Mizzoni (68549) restrained with partial restraints lying in the prone position in the Unit 5 rotunda. Inmate Mizzoni's legs were unsecured by any restraints so I secured his left leg until Correctional Sergent J. Henley arrived on the scene. Sgt. Henley instructed Officer L. Grider and I to escort Inmate Mizzoni to Unit 8A for medical evaluation as his face was bleeding. Inmate Mizzoni was non-compliant with Officer Grider's and my verbal orders to stand up by dropping his body weight to the ground when we were attempting to assist him to his feet. I put Inmate Mizzoni's left wrist in a rear wrist lock while Officer Grider and I lifted him to his feet. Inmate Mizzoni was then escorted to Unit 8A for medical evaluation. Once Inmate Mizzoni was secured inside Unit 8A Sgt. Henley dismissed me back to my post in Unit 10A. END OF REPORT .... |

**SMITH, SCOTT** — Witness

**Comment:** responding officer

● **Reports**

| Report Type | Report Detail |
|---|---|
| INC028 | I C/O Scott smith was in Unit 4 when I responded to Unit 5. When I got there Officer C. Smith |

---

MIZZONI 006 — DEF EXH 6 - 006



# State of Nevada
# Department of Corrections
## Investigation Detail Report
### For: AG Office

---

**Investigation**

Investigator:

Assigned Date:

Report Due Date:

Disposition Date:

IR Number:  IR-2015-NNCC-000575

Occurrence Date: 03/28/2015

IA Number:  IA-

Institution: NNCC

---

**Staff Involvment**

● **Reports**

**Report Type**   **Report Detail**

had inmate Mizzoni 68549 on the ground hand cuffed. I helped secure the unit.

Witness

DARNELL, ROBERT

Comment:  Responding officer

● **Reports**

**Report Type**   **Report Detail**

INC028    On 3/28/15 at approximately 2045 hrs, C/O Darnell responded to a call for back up in unit 5.
Upon arrival I began to secure the unit by getting all inmates back into their wings and locking
down the unit. When Inmate Mizzoni (68549) was removed from the unit, I was then reassigned
to unit 5 by SGT. Henley, relieving C/O Smith. As instructed by SGT. Sherman, I secured, and
inventoried Inmate Mizzoni's property, which was sent to Unit 7.

Witness

ALLISON, JOSEPH

Comment:  report writer

● **Reports**

**Report Type**   **Report Detail**

INC028    On Saturday April 28, 2015 I, Correctional Officer J. Allison, was assigned to search and escort at
Northern Nevada Correctional Center. At approximately 7:30 P.M. Correctional Officer,s
Ardinger, S. Smith and I assisted unit 5 with cell searches. When we searched B wing cell 29
which houses Inmate Mizzoni (68549) and Inmate Deyerle (1010262) we found nothing but inmate
Deyerle had an attitude while we were conducting the cell search. At approximately 8:30 P.M. the
cell searches were complete and all of the additional officers left the unit. At approximately 8:40
P.M. I heard unit 5 call for assistance over the radio and I responded with Correctional Officer
Ardinger. When Officer Ardinger and I got into unit 5 Correctional Officer C. Smith and Inmate
Mizzoni were on the ground struggling. Officer C. Smith was on top of Mizzoni trying to control
him while Mizzoni was attempting to punch Officer C. Smith. I assisted Officer C. Smith by
placing my left hand on Mizzoni,s head so he was unable to bite or spit on the officers. I also
assisted by placing my right knee against Mizzoni,s left shoulder and my right hand on his right
shoulder because Mizzoni continued to struggle and resist staff. I was giving verbal commands to
Mizzoni to quit resisting and to stop fighting. After the unit was locked down and the inmate was
in wrist restraints, I assisted Inmate Mizzoni get to his feet and he continued to resist by dropping
his weight down refusing to stand up straight. Correctional Officer Hightower and Correctional
Officer Grider escorted Mizzoni to unit 8 for medical evaluation. I collected all of the evidence and
placed it in the evidence locker end of report.

USEOF    On Saturday April 28, 2015 I, Correctional Officer J. Allison, was assigned to search and escort at
Northern Nevada Correctional Center. At approximately 8:40 P.M. I heard unit 5 call for

---

Page 7 of 10

MIZZONI 133: DEF EXH 8 -



# State of Nevada
# Department of Corrections

*Investigation Detail Report*
*For: AG Office*

## Investigation

**Investigator:**
**Assigned Date:**
**Report Due Date:**
**Disposition Date:**

**IR Number:**  IR-2015-NNCC-000575
**Occurrence Date:**  03/28/2015
**IA Number:**  IA-
**Institution:**  NNCC

## Staff Involvement

● **Reports**

| Report Type | Report Detail |
|---|---|
|  | assistance over the radio and I responded with Correctional Officer Ardinger. When Officer Ardinger and I got into unit 5 Correctional Officer C. Smith and Inmate Mizzoni were on the ground struggling. I assisted Officer C. Smith by placing my left hand on Mizzoni¿s head so he was unable to bite or spit on the officers. I also assisted by placing my right knee against Mizzoni¿s left shoulder and my right hand on his right shoulder because Mizzoni continued to struggle and resist staff. I gave verbal commands to Mizzoni to quit resisting and to stop fighting. I assisted Inmate Mizzoni get to his feet and he was escorted to unit 8 A for medical treatment. End of Report. |

**SMITH, CHRIS**                                                                  Victim

**Comment:**  officer struck by inmate

● **Reports**

| Report Type | Report Detail |
|---|---|
| INC028 | On March 28th, 2015 I Correctional Officer C. Smith was assigned to housing unit 5 of the Northern Nevada Correctional Center as the only Officer in the unit. At approximately 6:45pm I was approached by Inmate Hermanson (#84668) stating that he placed a kite in my mailbox with important information. I then checked my mailbox during the 7:00pm count and retrieved the kite. The kite stated that there was tattoo equipment in the wall of Unit 5 A wing cell 2. I then called search and escort officers Allison, Ardinger, and S. Smith to assist me with cell searches to make it appear as random searches. I searched Unit 5A cell 2 and had negative results. I then randomly searched B wing cell 29 housing inmates Mizzoni (#68549) and Deyerle (#1010262) and had negative results. Search and Escort Officers then departed Unit 5 at approximately 8:30pm. Approximately 10 minutes later at 8:40pm inmate Mizzoni (#68549) approached my office in an aggressive manner. He smacked my door and said " C.O. Shove it up your ass" so I told Inmate Mizzoni To place his hands on the wall and that he was being placed in restraints. I ordered the rest of the unit to lock down as I attempted to make a call for assistance on the radio and was unsuccessful due to inmate Mizzoni turning off the wall towards me with his elbow raised in an attempt to strike me. I then assisted Inmate Mizzoni to the ground in an attempt to restrain him. Throughout the entire altercation I was verbally instructing Inmate Mizzoni to "stop resisting". As I struggled with inmate Mizzoni on the ground he struck me with a closed fist to the right temple. I struggled to position him on the ground where he could not strike me again. I then ordered several inmates to "get back" because my rotunda was full of other inmates. It was at this time that I was able to gain control of inmate Mizzoni and call for backup on the radio. Search and Escort Officer Ardinger was the first to arrive in the unit. At this time I was able to get wrist restraints onto Inmate Mizzoni. As soon as other Officers were able to take over restraining inmate Mizzoni I walked out of the unit to catch my breath. I remained at the front of my unit after responding officers had already removed inmate Mizzoni from my unit. I was then relieved by Search and Escort officers to go to medical for an evaluation and fill out a C-1 form. END OF REPORT. |
| USEOF | On March 28th, 2015 I Correctional Officer C. Smith was assigned to housing unit 5 of the Northern Nevada Correctional Center as the only Officer in the unit. At approximately 6:45pm I was approached by Inmate Hermanson (#84668) stating that he placed a kite in my mailbox with |

MIZZONI       EXH      - 008



# State of Nevada
# Department of Corrections

*Investigation Detail Report*
*For: AG Office*

| **Investigation** | | |
|---|---|---|
| Investigator: | IR Number: | IR-2015-NNCC-000575 |
| Assigned Date: | Occurrence Date: | 03/28/2015 |
| Report Due Date: | IA Number: | IA- |
| Disposition Date: | Institution: | NNCC |

## Staff Involvement

● **Reports**
  **Report Type**    **Report Detail**

important information. I then checked my mailbox during the 7:00pm count and retrieved the kite. The kite stated that there was tattoo equipment in the wall of Unit 5 A wing cell 2. I then called search and escort officers Allison, Ardinger, and S. Smith to assist me with cell searches to make it appear as random searches. I searched Unit 5A cell 2 and had negative results. I then randomly searched B wing cell 29 housing inmates Mizzoni (#68549) and Deyerle (#1010282) and had negative results. Search and Escort Officers then departed Unit 5 at approximately 8:30pm. Approximately 10 minutes later at 8:40pm inmate Mizzoni (#68549) approached my office in an aggressive manner. He smacked my door and said " C.O. Shove it up your ass" so I told inmate Mizzoni To place his hands on the wall and that he was being placed in restraints. I ordered the rest of the unit to lock down as I attempted to make a call for assistance on the radio and was unsuccessful due to inmate Mizzoni turning off the wall towards me with his elbow raised in an attempt to strike me. I then assisted inmate Mizzoni to the ground in an attempt to restrain him. Throughout the entire altercation I was verbally instructing inmate Mizzoni to "stop resisting". As I struggled with inmate Mizzoni on the ground he struck me with a closed fist to the right temple. I struggled to position him on the ground where he could not strike me again. I then ordered several inmates to "get back" because my rotunda was full of other inmates. It was at this time that I was ~~able to regain control of inmate Mizzoni and call for backup on the radio. Search and Escort Officer Ardinger was the first to arrive in the unit. At this time I was able to together restrain onto inmate Mizzoni. As soon as other officers were able to take over restraining inmate Mizzoni I~~ walked out of the unit to catch my breath. I remained at the front of my unit after responding officers had already removed inmate Mizzoni from my unit. I was then relieved by Search and Escort officers to go to medical for an evaluation and fill out a C-1 form. END OF REPORT.

| **Staff Name** | | **Disposition** |
|---|---|---|
| DIERHKA, HEIDI | | Witness |
| Comment:  responding officer | | |

● **Reports**
  **Report Type**    **Report Detail**
  INC028

I Officer Dierhka was posted to 8A on 3/28/15 when at approximately 8:40pm, radio traffic of "S&E I need assistance in unit 5¿ came over the radio. It was less than a minute later that it was followed by ¿I need back up in unit 5¿. Upon reaching the unit I noticed inmate Mizzoni # 68549 was restrained by the immediate responding officers. I noticed two inmates sitting on the floor and restrained them. The rest of the unit was locked down. The shift supervisors entered the unit and the inmate was walked over to 8A for a physical evaluation.

END OF REPORT

| **Staff Name** | | **Disposition** |
|---|---|---|
| GARNICA, NATHAN | | Witness |
| Comment:  responding officer. | | |

Page 9 of 10

MIZZONI 355: DEF EXH B - 1





# State of Nevada
## Department of Corrections
### Investigation Detail Report
### For: AG Office

## Investigation

| | |
|---|---|
| **Investigator:** | |
| **Assigned Date:** | |
| **Report Due Date:** | |
| **Disposition Date:** | |

**IR Number:** IR-2015-NNCC-000575
**Occurrence Date:** 03/28/2015
**IA Number:** IA-
**Institution:** NNCC

## Staff Involvment

• **Reports**

**Report Type**   INC028

**Report Detail**

On March 28th 2015 at approximately 2030 I, Correctional Officer Garnica responded to a back up call on the radio to Unit 5. Upon getting there Inmate Mizzoni #68548 was on the ground in restraints. I assisted in securing the unit and escorting the inmate to unit 8A. Upon getting to unit 8A the medical staff determined that the inmate was ok to move to unit 7A for housing. I, along with C/O Samsel and C/O Wyke escorted the inmate over to unit 7A and after securing the inmate in his cell left the unit. End of report.

...[NGARNICA, 04/05/2015 21:41:03] On March 28th 2015 at approximately 2030 I, Correctional Officer Garnica responded to a back up call on the radio to Unit 5. Upon arriving at Unit 5. Inmate Mizzoni #68549 was on the ground in restraints. I assisted securing the unit and escorting the inmate Mizzoni to unit 8A for a medical evaluation. The medical staff determined that the inmate was ok and could be moved to Secure housing Unit 7 A. Along with C/O Samsel and C/O Wyke, I escorted the inmate over to unit 7A and secured the inmate in cell 7A38 . End of report.

| | |
|---|---|
| **ARDINGER, ROBERT** | Witness |
| **Comment:** Report Writer | |

| | |
|---|---|
| **HIGHLINE, MICHAEL** | Witness |
| **Comment:** responding officer | |

| | |
|---|---|
| **SAMSEL, PAUL** | Witness |
| **Comment:** Responding Officer | |

MIZZONI ___: ___ EXH E - 010

# EXHIBET-F

93

Declarations of #1 Joseph Albin #2 Robert Hatager
and Christopher Smith §1746 Parity of Perjury

# EXHIBET-F

( EXHIBIT-F )

go to Clo Rejects Ex exhibit

# DECLARATION OF
# JOSEPH ALLISON

## DECLARATION OF CORRECTIONAL OFFICER JOSEPH ALLISON

1.    I, Correctional Officer Joseph Allison, am over the age of 18 and am otherwise fully competent to testify to the facts contained in this declaration.

2.    The statements contained in this declaration, except where otherwise indicated to be upon information and belief, are based on my personal knowledge.

3.    I am currently employed by the Nevada Department of Corrections (NDOC) as a Correctional Officer at Northern Nevada Correctional Center (NNCC) and have been so employed at all times relevant to this matter.

4.    In connection with case *Mizzoni v Allison, et al* case number 3:15-cv-00313-MMD-VPC, currently pending in the United States District Court, District of Nevada. The Nevada Office of the Attorney General requested that I provide truthful and accurate information relevant to legal briefs that the defendants intend to file with the Court in the Mizzoni Litigation and for other proper purposes.

5.    On Saturday, March 28, 2015, I was assigned to Search and Escort at NNCC.

6.    At approximately 7:30 pm, Officers Ardinger, S. Smith and I were assisting with cell searches in Unit 5. Cell 29, B wing was part of the search, which was the cell belonging to inmate Mizzoni and inmate Deyerle.

7.    At approximately 8:30 pm the cell searches were complete and all additional officers left the unit.

8.    At approximately 8:40 pm, a call for assistance from Unit 5 came over the radio. I responded with Officer Ardinger.

9.    Upon arrival to Unit 5, Officer C. Smith and inmate Mizzoni were on the ground struggling. Officer C. Smith was on top of inmate Mizzoni attempting to control him while inmate Mizzoni was attempting to punch Officer C. Smith.

10.    I assisted Officer C. Smith by placing my left hand on inmate Mizzoni's head so he was unable to bite or spit on the officers. I then placed my right knee against Mizzoni's left shoulder and my right hand on his right shoulder because inmate Mizzoni continued to struggle and resist staff. I gave the verbal command to inmate Mizzoni to stop resisting and fighting.



11.   After the unit was locked down and inmate Mizzoni was in restraints, I assisted inmate Mizzoni get to his feet and he continued to resist by dropping his weight down and refusing to stand up. Officer Hightower and Officer Grider escorted inmate Mizzoni to Unit 8 for medical evaluation.

12.   I then collected all of the evidence and placed it in the evidence locker.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed On:  October 24, 2016.

Correctional Officer Joseph Allison

41

## DECLARATION OF ROBERT ARDINGER

1.   I, Robert Ardinger, am over the age of 18 and am otherwise fully competent to testify to the facts contained in this declaration.

2.   The statements contained in this declaration, except where otherwise indicated to be upon information and belief, are based on my personal knowledge.

3.   I am currently employed by the Nevada Department of Corrections (NDOC) as a Correctional Officer at Northern Nevada Correctional Center (NNCC) and have been so employed at all times relevant to this matter.

4.   In connection with case *Mizzoni v Allison, et al* case number 3:15-cv-00313-MMD-VPC, currently pending in the United States District Court, District of Nevada. The Nevada Office of the Attorney General requested that I provide truthful and accurate information relevant to legal briefs that the defendants intend to file with the Court in the Mizzoni Litigation and for other proper purposes.

5.   On March 28, 2015 I was assigned to search and escort at Northern Nevada Correctional Center ("NNCC").

6.   At approximately 2034 hours I heard a call on the radio from Unit 5 that was unclear what the situation was. Therefore, I proceeded in route to Unit 5 to determine if back up was needed.

7.   Upon arriving to Unit 5 I observed what appeared to be a fight in the Unit 5 Rotunda. I called for backup for second officers on my portable radio.

8.   As I entered Unit 5, I saw Correctional Officer Smith on the ground with an unrestrained inmate later identified as Joseph Mizzoni (#68549).

9.   I observed Mr. Mizzoni refusing Officer Smith's verbal commands. Therefore, I assisted Officers Smith and Allison in placing Mr. Mizzoni in wrist restraints.

10.   Even after Mr. Mizzoni was in restraints he continued to verbally abuse staff. He also continued to struggle after being placed in restraints therefore staff secured Mizzoni's legs to gain compliance and prevent any further incident.

///

///

///

Office of the
Attorney General
100 N. Carson St.
Carson City, NV
89701-4717

1

R&F ECF

MIZZONI 499: ~~Defendant Exh. B~~ - 001

98

11.     Mr. Mizzoni was then escorted to the Regional Medical Facility for evaluation.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed On:  October 24, 2016.

ROBERT ARDINGER

2

MIZZONI 499: Def. Nic...B - 002

# EXHIBIT F

## Declaration of Christopher Smith

# EXHIBIT F

## DECLARATION OF CHRISTOPHER SMITH PURSUANT TO 28 U.S.C. § 1746

I, Christopher Smith, state:

1.   I was employed as a Correctional Officer for the Nevada Department of Corrections ("NDOC") at Northern Nevada Correctional Center ("NNCC") in Carson City, Nevada during the subject Complaint.  If I am called to testify, I would verify the truthfulness of the statements made below.

2.   On March 28, 2015, I was working for the NDOC at NNCC in housing unit 5.  I was involved in an incident where an inmate named Joseph L. Mizzoni ("Inmate Mizzoni") assaulted me. When the backup correctional officers arrived on the scene and the situation was under control, I departed the housing unit.  Soon after the situation was under control, pictures were taken of Inmate Mizzoni and me.  The pictures accurately depicted the injuries sustained by both Inmate Mizzoni and me during Inmate Mizzoni's assault on my person.

3.   I have not had any contact with Inmate Mizzoni since March 28, 2015.

4.   After the incident, I wrote a detailed, accurate, and truthful incident report detailing the assault by Inmate Mizzoni.  This incident report was used in the disciplinary process at the disciplinary hearing.

5.   Other than writing the incident report regarding Inmate Mizzoni's assault, I have not been involved in Inmate Mizzoni's disciplinary process.

6.   I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my knowledge and belief.

EXECUTED this __13__ day of June, 2017.

CHRISTOPHER SMITH

Office of the
Attorney General
100 N. Carson St.
Carson City, NV
89701-4717

1

EX-F

MIZZONI 499: Def. _____ - 001

EXHIBIT - #G

(NDOC) ADMISTRATION REGULATION - 405
USE OF FORCE   Pg 6 of 18 to 7 of 18

EXHIBIT - #G

( EXHIBIT-G )

# ADMINISTRATIVE REGULATION
# 405

## USE OF FORCE

**Supersedes:** AR 405 (Temporary 6/23/11) AR 405 (Temporary, 03/03/16)
AR 405 (Temporary 5/25/16) AR 405 8/16/16,
AR 405 (Temporary 11/3/16)

**Effective Date:** 11/16/16

**AUTHORITY:** NRS 209.131, 209.161, 212.090 and 212.190

## RESPONSIBILITY

1. The Warden/Division Head is responsible for the overall execution of this regulation. Direct supervision of this regulation is the responsibility of the Shift Supervisor (institutions/facilities) and/or the Transportation Lieutenant/Sergeant in regards to Central Transportation Division. The Inspector General in regards to the Inspector General's Office.

2. The Warden at each institution, Central Transportation Lieutenant, the Inspector General; shall ensure that all assigned staff is trained and have signed an acknowledgement statement that they have read, know and understand this regulation. A copy of their acknowledgement shall be maintained in each staff member's training file.

3. It is the responsibility of all employees who may be required to use force as part of their duties to understand and comply with the Use of Force Policy, related procedures, use of equipment and attend and understand relevant use of force training.

## DEFINITIONS

**Authorized Personnel** – A person who has received the prescribed NDOC training in the application of Use of Force equipment or tactics, and whose qualifications are up-to-date. Any person who volunteers, is contracted by or is employed by the NDOC is authorized to defend themselves or others from attack. A Correctional Officer Trainee or Correctional Officer who has not completed the Basic Academy and has not passed the Peace Officer Standards and Training (POST) certification exam are authorized to defend themselves and others from attack. Only certified Peace Officers who are current on their qualifications shall be authorized to utilize force tactics, tools, devices, weapons or other methods authorized by the Department Director.

**Lethal Force** –

Any force which carries a substantial risk that it will proximately result in death or serious or great bodily injury.

* **Excessive Force** – The use of more force than an objective trained and competent correctional peace officer faced with similar facts and circumstances would use to subdue an attacker, overcome resistance, arrest custody or gain compliance with a lawful order.

* **Force** – Any violence, compulsion, or constraint physically exerted by any means upon or against a person.

**Less Lethal Force** – any force that is neither intended nor likely to cause death or serious or great bodily injury (NRS 9.060).

**Passive Compliance Measures (De-escalation)** – Techniques/strategies used by staff to gain compliance/control of an inmate without forcible physical contact.

**Planned Use of Force** – The Use of Force when time and circumstances allow the

**Physical Force** – The use of hands, other parts of the body, objects, instruments, chemical devices, firearms, or other physical methods for the purpose of overcoming resistance to lawful authority.

* **Spontaneous Use of Force** – Force used in an immediate situation or in response to a threat or emergency situation to dissuade or quell a course of action by an inmate(s).

* **Use of Force** – The application of progressive levels of force to gain control of an inmate

* **Serious Bodily Injury** – Serious bodily injury means but is not limited to a condition ... suffering or a disfigurement.

* **Great Bodily Injury** - Great bodily injury is any bodily injury that creates a substantial risk of death, such as but not limited to, stab wounds that cause substantial bleeding strike vital organs, repeated blows to the head with kicks or with a blunt instrument.

## 405.01 USE OF FORCE GENERAL PROVISIONS

The NDOC shall operate under this use of force policy that defines staff responsibilities and limitations concerning the use of force while still allowing discretion in the appropriate application of force. The policy provides staff with the appropriate guidance on the permissible Use of Force. It ensures discipline is imposed for violations of the Use of Force policy, procedures or training.

It is the policy of the NDOC to authorize the use of physical force when and only to the extent that is reasonably believed to be necessary as specified in these rules. Staff is authorized to use that amount of force that is objectively reasonable to overcome a threat thereby minimizing the risk of injury to the officer, the threat and the public.

* At no time are staff permitted to use force for punishment, retaliation, or discipline. *

Force shall be used only when reasonably necessary to subdue an attacker, overcome resistance, effect custody or to gain compliance with a lawful order. It is the policy of the NDOC to accomplish the educational treatment and supervision functions with minimal reliance on the use of force. Staff may use reasonable force as required in the performance of their duties (but unnecessary or excessive force shall not be used.) If staff, at any point, determines the situation can be resolved without any further use of force, staff shall terminate the use of force.

All the facility Operational Procedures must conform to the provisions in this Administrative Regulation.

## 405.02 STAFF TRAINING INVOLVING USE OF FORCE

1. All personnel shall receive training and be qualified prior to being assigned to a position involving possible Use of Force and being authorized to use any force related equipment such as physical restraints, firearms, projectile launchers, chemical agents (CS/OC), taser or similar technology or batons. A staff member employed in positions that are authorized to use force-related equipment shall receive annual refresher and semi-annual firearms qualification training in the correct use of all equipment to maintain their established proficiency levels.

2. The application of force when using any authorized equipment must be consistent with training. (For example: intentional strikes to the head or neck are not consistent with training for the side-handle baton.) Shots to the head with 40 mm launcher are not consistent with training (The use of carotid or choke holds is not authorized.)

3. Training shall include:



A. Techniques that may involve no Passive Compliance Measures (Psychological) used by staff to gain compliance/control of an inmate without forceful physical contact such as: communications, videotaping of inmate(s), show of force.

*Video Tape Inmate*
*Force to*
*Use as (Punishment)*
*2 Forces*
*3 Close*

B. Staff is expected to know the Continuum of Force and be able to apply the proper level and type of force needed to control a situation. Restraints are paramount failure to staff the guilty data enabled in any goal) but the pursuit value are to be to gain compliance control and security measures from time or control of the situation and that is necessary for control the situation (force shall not be used to punish, harass, or abuse inmates)

405.03 WHEN FORCE MAY BE USED

1. A staff member may use force to protect himself or any other individual from physical harm by an inmate. Alternative methods i.e. permissive such as communications, videotaping of inmate(s) and/or show of force shall be utilized prior to utilizing force whenever feasible.

*Video Tape Inmate*

2. Force shall be proportionate to the threat or resistance the inmate uses. Individual shall...

*Report Excessive Force?*

4. ...escape if no alternative method of persuasion is effective...

5. To prevent destruction of state property.

A. Staff may use force to prevent state property from substantial damage by an inmate if no alternative method of persuasion is effective.

B. "Nevada Revised Statute (NRS) 212.190 states that damaging prison property is a class E prison felony/misdemeanor...

6. To compel the inmate's compliance with orders force may be used if no alternative method of persuasion is effective or where the circumstances require it; is/are...

7. To prevent or quell a disturbance, dispute or uprising of inmate(s) which conduct is creating a risk of death or serious physical injury to others.

8. To stop inmate self-injurious behavior where this does not pertain to the arrival of a supervisor or the assembly of a planned use of force team and sufficient back-up is available.

9. Use of Force Options in the Use of Force Continuum:

- Physical Force – includes the use of physical strength and holds (strikes i.e. hand, elbow, knee and locks i.e. wrist lock), takedowns, choke holds and other types of physical holds that prevent the person from breathing (swallowing or cutting off blood supply to the brain are not authorized).
- Chemical Agents – use of departmentally authorized chemical agents.
- Hand-held Batons – departmentally approved batons.
- Less-lethal weapons – departmentally approved projectile launchers that are not likely to cause death.
- Lethal weapons – firearms capable of firing lethal rounds/projectiles.

§10. Levels of Force

A. Planned use of force can be used at any level in the use of force continuum.

- Planned use of force incidents must be videotaped as outlined in this AR.

- Healthcare staff shall be consulted to determine if there are any contra-indicating factors such as but not limited to the use of O/C for asthmatics or tasers on inmates with other health problems or heart problems prior to the planned use of force and documented. Staff involved in these incidents shall utilize protective equipment. An example of planned use of force is a cell extraction. Staff are to be reminded to use universal precautions equipment such as latex gloves in addition to their other equipment.

  a. In a planned use of force, the Incident Commander in charge shall assign a staff member to be in charge of recording the entire planned use of force. If time permits and a second camera is available, one staff member shall video-record the inmate at the cell front during staff's attempts to gain the inmate's compliance through verbal persuasion efforts and the other video-recording is taping the planned use of force team introductions and plan by the incident commander.

  b. The staff member assigned to recording shall ensure, prior to the start of the use of force, that the recording equipment has sufficient batteries and sufficient blank recording space, such that technical issues with recording shall be minimized once recording begins. The recorder shall begin all video recording stating his/her name, date, time, location and inmate name.

  - The incident commander shall describe the nature of the incident that requires the planned use of force and the attempts to resolve the issue without the use of force.
  - Prior to the use of force, healthcare staff shall be contacted to determine if there are is medical or mental health condition that would preclude the use of any chemical agent or taser. Record on video the comments by healthcare staff, stating his/her name. If unavailable for video, Incident Commander shall identify name of healthcare staff and the comment made by the healthcare staff member on the recording.

AR 405

Page 5 of 18

- Each staff member shall identify themselves by name, rank and state their responsibility such as the shield person, right side, left side or what type of equipment they shall employ such as handcuffs or leg restraints.

*Handwritten margin note: Confined Cell Extraction / Convey Video / USE OF FORCE*

c. The staff member assigned to recording shall not be expected to participate in the use of force and shall not do any such act that may distract their full attention to recording. The recording staff member shall refrain from engaging in verbal comments during the recording, as staff comments may obscure the sounds being recorded.

d. The recording staff member must record in such a manner that the inmate is in focus as much as possible, and adjust their positions should a staff member's body position be obscuring a visual of the inmate. Prior to the planned use of force the recording staff member must state the sufficiency of the inmate's ████████████████████████████████████████

e. For any breaks in recording the recording staff member must sign back on with ████████ name, the date, time and reason for the image is recording.

f. All recordings of a planned use of force shall be kept in a manner and location that is easily retrievable in the event review is needed. The records must be maintained for no less than three years from the date force was used.

████████████████████████████████████████████████████████████████████████████████████████████████████████████ Immediate use of force shall be employed in a manner that meets the least risk to staff and other inmates.

*Handwritten margin notes: Video Required / Planned CASE / And USE of Force 3-23-15 / Supervisor / Video*

a. Where force was used spontaneously, regardless of injuries alleged, contemporaneous with the event, the area supervisor/incident commander shall immediately review, if available, any unit video surveillance that may have captured the use of force.

b. If the use of force was captured on video from any angle by any camera, the area supervisor/incident commander shall be responsible for processing that recording in a manner and location that is easily retrievable in the event review is needed. The video must be maintained for no less than three years from the date force was used.

c. If no cameras were operational in that unit or no cameras captured the use of force, the area supervisor/incident commander shall make a notice of same in the Use of Force Incident Report. *Handwritten: Only in UNIT 5 Rotunda. The rest of ████ there are there are no other cams there are no other out. on UNIT 8 out on UNIT 2*

d. In addition to and apart from any surveillance footage from stationary cameras that may exist, video footage shall also be recorded via a hand-held camera, as follows:

* As soon as the shift supervisor becomes aware that force is being used or has been used, a staff member shall be directed to immediately obtain a handheld video camera and shall be ordered to the scene where force has been used.

* Immediately upon arrival to the scene, the staff video recorder shall begin recording, noting the time and date the recording begins and identify himself/herself as video recorder. The staff video recorder shall continue to take footage until the area supervisor/incident commander decides the incident is over and instructs the staff video recorder to cease recording.

* For any breaks in recording, the recording staff member must sign back on with the date, time and reason for the break in recording.

* If the Use of Force is still occurring when the staff video recorder arrives, the incidents shall be recorded to capture the unfolding events while waiting for a response team, even if through windows, fences, bars, or even if far away, etc. Staff shall not place themselves in any danger to capture the events.

C. The Warden/Division head shall ensure that Use of Force Operational Procedures are specific on the process for the recording of Use of Force incidents and storage of the video recordings.

## 405.04 AUTHORIZATION FOR THE USE OF LESS LETHAL FORCE

"Less lethal force" may be used in the following situations:

1. Self-defense;

2. Defense of others;

3. Prevention of self-injurious behavior;

4. Maintaining order and control in a facility, including prevention of damage to state property;

5. Prevention of escape from any security level;

6. Prevention of the commission of a felony by an inmate;

## 405.05   LESS LETHAL FORCE

**1.** The use of less lethal force projectile launchers may be used but not limited to stopping or preventing serious or great bodily injury to staff, inmates or the public which includes visitors. This is also listed under the use of lethal force.

Where situations allow a loud and clear verbal warning and instructions shall be given before the use of less lethal force is used and before additional less lethal force is discharged. Verbal warnings and instructions shall continue to be given throughout the use of less lethal force. The following approved less lethal tools are authorized for use in Nevada Department of Corrections facilities/institutions:

**A.** Physical Force (Hands On) – Physical force may be used to subdue or control combative inmates, to protect the inmate, officer, staff, and in defense of self or others, to prevent escape and or to gain compliance and or when fails to comply with lawful orders. Includes certain self defense maneuvers, come-along techniques or strikes to areas of the body unlikely to result in serious physical injury.

**B.** Chemical Agents ... agents may be deployed only by trained and qualified Authorized Personnel. Chemical agents items such as listed below are designed to incapacitate, immobilize, or incapacitate the inmate through exposure, temporarily causing ... irritated ...

- **CS** - Ortho-chlorobenzalmalononitrile - commonly known as tear gas or

- **OC** - Oleoresin Capsicum - commonly known as pepper spray.

**C.** Electronic Control Weapon (ECW) to include its use such as a Taser, Remote Activate Custody Control (RACC) Belt or Vest, or (NOVA) electronic shield, and designed to temporarily incapacitate or immobilize an inmate by ... delivering a non-lethal electronic charge. An ECW may only be deployed by trained and qualified Authorized Personnel. ECW is not authorized in women's facilities.

**D.** Specialty Impact Devices (SID) Expendable Baton (ASP) or similar equipment designed to temporarily incapacitate an inmate by striking or applying a controlled take down of the inmate. These SID's may only be used by trained and qualified Authorized Personnel.

**E.** Less Lethal Specialty Launchers (40mm) ... then authorized for required compliance from noncompliant inmates. Less-lethal launchers shall also be stored in the "operations" area of each institution so that should a response to an area where no coverage is available (housing units without coverage, chapel, education, gymnasium) these launchers are available for quick deployment.

F.  Pepperball or FN 303 less lethal launcher using compressed air to launch direct impact or chemical agents to temporarily incapacitate a threat. These Launchers may only be deployed by trained and qualified Authorized Personnel.

Decontamination - If chemical agents are utilized in a planned use of force or spontaneous use of force, the inmate shall be decontaminated as soon as the inmate is in restraints and the decontamination can be conducted in a safe manner. Inmate(s) affected shall also be seen by medical personnel as soon as practicable upon containment of incident. The decontamination and medical evaluation shall be documented in the Incident Report by Supervisor handling the planned use of force.

**Choke Holds** — Choke or carotid holds is not authorized use of force techniques. A head lock is not considered a choke or carotid hold.

3.  Wardens shall ensure through Operational Procedures where and how these tools shall be utilized, throughout the institution.

A loud and clear verbal warning or order shall be given. Verbal warnings shall be issued before and repeated while less lethal munitions or chemical agents are being deployed.

If the verbal warnings or orders fail to stop the prohibited activity, the Officer may then deploy less lethal force tools to prevent further harm of another person or property. Verbal warnings shall be repeated continuously while less lethal munitions or chemical agents are being deployed. Force shall cease immediately upon gaining compliance.

The use of less than lethal force are never to be used to stop verbal abuse or other non-threatening behavior

**405.06   AUTHORIZATION FOR USE OF LETHAL FORCE**

Staff has the obligation and responsibility to exercise discipline, caution, restraint and good judgment when using potentially lethal force. Lethal force may be used upon the reasonable belief that staff life or safety, or the life or safety of another, is in imminent jeopardy of death or substantial bodily harm, given the totality of the circumstances known to the officer at the time of his/her actions. Staff must keep in mind that the use of potentially lethal force presents a danger to the subject and to innocent parties. Only trained and qualified staff are authorized to use lethal force, and only as a last resort. Officers shall consider other reasonable means of control before resorting to the use of deadly force as time and circumstances safely permit.

Lethal force is any force which carries a substantial risk that it may result in death or serious or great bodily injury. Lethal force may be used only when imminent jeopardy exists regarding the following situations:

1. To prevent serious or imminent physical injury to self or other staff, inmates, or other persons who are threatened;

2. To prevent the taking of hostages;

3. To prevent the escape of any inmate who is likely attempting to flee lawfully from a lawful imprisonment, who is securely confined or is in custody including while being transported to or being treated in the community;

4. To prevent destruction or damage to property or seizure, a major disorder during a disturbance within a correctional institution, if it is reasonably believed that the damage may cause death or serious physical injury to any person;

5. To prevent inmates from unlocking other inmates (seizure of keys or door controls).

6. If lethal force is to be used, shall be used in accordance with the following guideline - Thus permitting a clear, verbal warning order, "Stop or I will shoot," shall be given before such shot is taken; or

7. When the use of lethal force is warranted, if time and circumstances permit, a warning shot shall be discharged.

   A. Before a warning shot is fired the officer shall determine that the warning shot will not injure a person in any manner, realizing that the pathway of the warning shot cannot be fully controlled and may travel in unforeseen directions;

   B. Every effort shall be made to direct the round into the aggressor and not the victim;

   C. If doubt exists in the officer's mind as to whether he/she should discharge the firearm under the circumstances that have been outlined above, the officer shall conclude that he/she SHALL NOT discharge the firearm.

### 405.01 – LETHAL FORCE:

1. Mini-14 .223 caliber rifle loaded with 55 grain soft point rounds. May only be used by trained and qualified Authorized Personnel.

2. .40 caliber Glock semi-automatic hand gun loaded with hollow point 165 to 180 grain rounds – approved through VSS preservice specifications. May only be used by trained and qualified Authorized Personnel.

3. Specialized weapons may be authorized for emergency situations with approval from the Warden/designee – May only be used by trained and qualified Authorized Personnel.



## 405.08  EMERGENCY RESPONSE

The Nevada Department of Correction shall utilize a "plain English" notification system. This statewide universal approach shall initiate first responders, followed by secondary responders, based on initial reports. Some examples for each level are as following:

1. Level 1, mutual combat between two inmates, isolated and contained physical plant failure or compromise, or a single disruptive inmate.

2. Level 2, multiple inmate fight, weapons present, staff assault, evidence of escape, or large scale physical plant failure or compromise.

3. Level 3, Escape, homicide, officer involved lethal force, or complete physical plant failure or compromise.

The Warden at each institution shall ensure the development of an Operational Procedure that shall identify responders/positions, the systematic lockdown, and equipment deployed for each level. This Operational Procedure shall also include response to work camps and Transitional Housing facilities.

## 405.09  ESCAPE FROM SECURED PERIMETER

1. If possible, prior to using firearms, an alert to the institution shall be broadcast by radio; attempts shall be made to apprehend or physically restrain an escapee or an attempted escapee.

2. If an officer observes an inmate located within the "No Mans Land," an immediate alarm shall be sounded to initiate a response then the following command in a loud and firm voice, shall be given, "Stop! I will shoot." A second alert to the institution shall be broadcast by radio, time permitting to alert responding staff of the possible discharge of the weapon. If the inmate fails to stop and no other means of stopping the inmate is available, then the officer may fire a warning shot as outlined in this procedure.

3. If the inmate continues toward the inner perimeter fence, after verbal warnings and a warning shot has been discharged, additional warning shots may be discharged near the escaping inmate in an effort to gain compliance. The officer must exercise care to prevent a possible ricochet of the warning shots. (Wardens shall designate in operational procedures where warning shots will be discharged.)

4. Once an inmate has begun going over, under, or through the inner perimeter fence, (that is, feet have left the ground or crawling under or through), the following shall be done:

A. The officer, after firing a warning shot, shall shoot to stop the [illegible]

B. The officer shall choose to use [illegible] distance based on the distances and conditions surrounding the incident. The perimeter towers have a 223 Mini-14 rifles assigned for greater distance and accuracy.

- Effective range:
  - 223 rifle round – up to 1000 yards.

C. In the event the institution does not have perimeter towers, or perimeter towers are [illegible] additional staff [illegible] distance required. (More armed perimeter officers may be placed at larger institutions or as needed for security) This position shall be armed with both lethal and less lethal (tools such as [illegible] perimeter position shall be assigned a perimeter vehicle to assist with patrolling the perimeter and responding to threats.

[several illegible lines]
inmate could clear the outer perimeter fence. If there is not enough time for a warning shot after the inmate has cleared the inner fence, then shots may be [illegible]

E. [illegible] the inmate/[illegible] [illegible] and warning shots and shall submit a Memo to the [illegible] the incident.

## 405.10 USE OF FORCE IN THE COMMUNITY

1. [several illegible lines] exercising extreme caution and for making careful judgments. The level of force utilized in any particular situation MUST be based largely on, the threat, physical [illegible]

2. The physical surroundings and the likely outcome MUST be weighed closely when to inmate [illegible] transport in the community [illegible] [illegible] lesser [illegible] necessary to prevent the inmate from escaping. If, in the best judgement of the transporting officer(s), it is deemed necessary to fire shots at the inmate escaping into the community, all [illegible]

area, such as within a building, it would be inappropriate to use warning shots. Verbal commands shall be substituted.

3. Transportation Officers shall be armed with both lethal and less lethal tools; in the event of the physical surroundings and the proximity of civilians would prevent the use of lethal tools.

4. Officers are required to cooperate with local law enforcement officials in any unusual or emergency situation involving inmates under the custody of the Department of Corrections.

## 405.11   MEDICAL CARE AFTER USE OF FORCE

1. Medical care which includes medical treatment and examinations shall be conducted by institutional medical staff when a Use of Force incident has occurred. When order has been restored, the inmate(s) who has been subjected to any Use of Force shall be examined by medical staff and provided medical care appropriate to the individual's injuries sustained. This examination shall be documented utilizing the Unusual Occurrence Report form DOC 2514. Inmates cannot refuse to be assessed, but can refuse treatment of any injuries sustained. All refusals of medical treatment shall be documented and included in the Use of Force incident files utilizing the Refusal of Medical Treatment form DOC 2523. Decontamination from chemical agents shall also be completed as soon as practical after the use of force. Refusal for decontamination shall be documented on DOC form 2523 Refusal of Medical Treatment. Photographs of the Inmate shall be completed on all Inmates who had force used upon them regardless of injuries. Copies of these photos shall be uploaded into NOTIS and placed in the Use of Force Incident File.

2. Any staff member involved in the Use of Force sustaining injuries shall be examined by NDOC medical staff and shall provide emergency medical care proportionate to the individual's injuries prior to transport to an appropriate healthcare facility. This examination shall be documented utilizing the Unusual Occurrence Report form DOC 2514.

## 405.12   REPORTING OF USE OF FORCE

In all cases the reporting of Uses of Force MUST be accomplished as soon as practical after the incident and before leaving the institution or going off duty. Any Use of Force shall be reported to the shift supervisors who shall ensure, once order has been restored and the involved inmate(s) are placed in secure housing, that written reports from all staff involved are completed. This includes custody officers, institutional staff, medical staff, volunteers or any persons that witnessed the Use of Force.

1. These reports shall be entered into the Nevada Offender Tracking Information System (NOTIS) for review by the appropriate supervisors.



A. All relevant and supporting documentation and information associated with the Use of Force shall be contained within the NOTIS Incident Report (IR).

B. All additional incident documentation, images, and associated information, with staff involvement, inquiries shall be documented within NOTIS.

2. Verbal notification of the Use of Force shall be made via the chain of command to the Warden. The Warden shall notify the Deputy Director of Operations (DDO).

3. An email shall be generated by the shift supervisor, notifying institutional facility administration, the Deputy Director of Operations, and the Inspector General of the IR number and Use of Force information. Such notification shall include but is not limited to the following uses of force that must be reported):

A. Discharge of a firearm for any reason other than training.

B. Any Use of Force that results in injury to an offender or inmate.

C. Any Use of Force that results in an offender or inmate/offender claiming an injury.

4.

Use of Force

1. Any Use of Force suspected to be excessive or unnecessary shall be immediately referred to the institutional Use of Force Review Panel for complete review.

2. An institutional review shall result in a Use of Force Review panel convening within ten (10) days from the Use of Force. To ensure a fair and impartial review, the review panel shall be comprised of staff not directly involved in the incident to ensure a fair and impartial review.

3. At a minimum the review panel shall consist of:

A. An Associate Warden from the institution involved.

B. An institutional Command Staff, at the level of authority of a Correctional Lieutenant or above, from the institution involved.

4. The review panel shall review all information, reports, all video footage and any other pertinent information or documents that is or shall become available.

5. The review panel shall review the actions of all staff members and inmate(s) involved in this Use of Force incident, including those actions leading up to the Use of Force, taking into account any NOTIS incident reports including the time/frame of the Use of Force, especially involving the staff member that used the force and the inmate that had the force used upon their person.

6. The review panel shall conduct in person, recorded interviews of all staff and inmate(s) involved in the Use of Force. Should the panel, as part of their review, desire to question/interview an employee involved in the use of force, the panel shall conduct all interviews in accordance with department procedures, as well as relevant provisions of NRS chapter 284 with 289. The panel does not have the authority to recommend discipline.

7. The review panel shall evaluate the Use of Force incident and prepare a written report on its evaluation and determination to the Warden, the Deputy Director of Operations and Inspector General within ten (10) days from commencement of the Use of Force review, to include:

    A. Was the Use of Force justified;

    B. Was the Use of Force within policy, procedures and training of the Department;

    C. Could the Use of Force have been prevented;

    D. Could this type of Use of Force be prevented in the future;

    E. Any referral for investigation for possible disciplinary action for staff member(s) involved in the Use of Force;

    F. Any recommended corrective action for staff member(s) involved in the use of force;

    G. Any recommendation for any staff member that acted with distinction in the Use of Force; and

    H. Any recommended changes or enhancements to policy, procedure, or training related to this Use of Force.

    I. Any recommended changes or enhancements to the physical structure of the area related to this use of force

405.13 SERIOUS USE OF FORCE INCIDENT REVIEWS

1. Any Use of Force suspected to be excessive or unnecessary shall be immediately referred to and assigned to the Inspector General for investigation. In these circumstances the Use of Force Incident Review will not be completed.

2. Any use of deadly force or less lethal force causing serious physical injury shall result in convening a review panel within fifteen (15) days from the Use of Force. The panel shall be convened in such a time frame that is the incident to occur in a fair and impartial review.

3. At a minimum the review panel shall consist of:

   A. A Warden and/or an Associate Warden from the institution where the Use of Force did not occur;

   B. An Investigator or Supervisory Investigation from the Inspector General's Office;

   C. An institutional Command Staff at a level of authority of a Correctional Lieutenant or above at an institution where the Use of Force did not occur.

4. The review panel shall review all information regarding all Uses of Force and any other pertinent information or document that is or shall become available.

5. The review panel shall review the actions of all staff members and inmate(s) involved in the Use of Force incident, to include those actions leading up to the use of force, any available information related to staff and inmate(s) issues surrounding the time frame of the Use of Force, especially involving the staff member that used the force and the inmate that had the force used upon their person.

6. The review panel shall conduct an interview of any staff member or inmate and inmates involved in the Use of Force, as appropriate. The panel may use information regarding the Use of Force, the participation of employees or of NDS in accordance with department procedures, as well as following provisions of NDS chapter 284 and 289. The panel does not have the authority to recommend discipline.

   A. The written notice shall provide the names of the assigned staff members to the review panel;

   B. The written notice shall identify the NOTIS Incident Number for the Use of Force incident;

   C. The written notice shall identify the date, time and location of the interview;

   D. The review panel shall ask questions and gather information relative to the specific Use of Force, the inmate(s) involvement and any historical information related to the interaction between the involved staff member and the inmate(s);

   E. The written notice shall provide the Notice of Confidentiality applied to the Use of Force Review.

7. The review panel shall evaluate the Use of Force incident and prepare a written report on its evaluation and determination to the Director and the Deputy Director of Operations within thirty (30) days from commencement of the Use of Force review, to include:

    A. Was the Use of Force justified;

    B. Was the Use of Force within policy, procedures and training of the Department;

    C. Could the Use of Force have been prevented;

    D. Could this type of Use of Force be prevented in the future;

    E. Any referral for investigation for possible disciplinary action for staff member(s) involved in the Use of Force.

    F. Any referral for investigation for possible corrective action for staff member(s) involved in the Use of Force.

    G. Any recommendation for any staff member that acted with distinction in the Use of Force; and

    H. Any recommended changes or enhancements to policy, procedures, or training related to this Use of Force.

    I. Any recommended changes or enhancements to the physical structure of the area related to this use of force.

8. Any recommended corrective action being applied to a staff member shall be reported to the appointing authority via a memorandum that outlines the reason for the corrective action. A corrective action is not deemed a discipline.

9. Any findings that recommend disciplinary action be taken against a staff member shall be referred to the Inspector General and Director for their review and appropriate response; response may include, but not be limited to official assignment for Administrative Investigation.

10. Any findings that recommend a change or enhancement to a policy, procedure, or training shall be sent to the Director and Deputy Director of Operations.

11. Any findings that identifies that a staff member acted with distinction in the Use of Force shall be sent to the Director and Deputy Director of Operations.

12. The review panel report and its contents are confidential and not subject to dissemination except by order of the Director, Inspector General, or lawful court order.



19. The Inspector General's Office shall track all Use of Force reviews to insure timely completeness. The Inspector General's Office shall prepare and submit to the Director's executive team, an annual report that details the number of Uses of Force that were reviewed and the total of the outcomes for each of the categories reviewed

## 405.14   OFFICER INVOLVED SHOOTING INVESTIGATIONS

1. All uses of force that involve the discharge of a firearm, excluding blank rounds, shall result in an Officer Involved Shooting (OIS) investigation being done by an investigator(s) of the Inspector General's Office (IG) unless:

   A. A death occurs as the result of the discharged round, at which time an outside law enforcement investigating body shall be called in for response and investigation;

   B. Director or Inspector General determines that the matter is or may be a conflict of interest to the Department.

2. The processes, procedures and format used in conjunction with an OIS investigation and the subsequent report are contained within the confidential I.O. manual.

3. All OIS investigations are confidential and not subject to dissemination without the authorization of the Director, Inspector General, the Board of Prison Commissioner's or by a lawfully issued court order.

4. The OIS report shall be e-mailed to the Director, Deputy Director of Operations and the Inspector General. At the discretion of those approving this report, it will be made available to the Use of Force Review Panels.

## APPLICABILITY

1. An Operational Procedure is required within thirty (30) days of this regulation's effective date.

2. This AR requires an audit.

## REFERENCES

ACA Standards: 4-4206, 4-4204, 4-4203, 4-4202, 4-4201, and 4-4191.

Date  11/16/16

James Enreada, Director

EXHIBIT—H

Declaration of Ronald Schreckengost

EXHIBIT—H



# Declaration of Ronald Schreckengost

CASE # 3:15-~~cv~~ ~~MMD~~ ~~WGC~~ CV-00499-MMD-WGC

Plaintiff not allowed to counter a response
To this Declaration. See:(Pg 4 Line 23-28) TO
(Pg 5 Line 1-15)







/22

## DECLARATION OF RONALD SCHRECKENGOST

I, RONALD SCHRECKENGOST, being first duly sworn, under penalty of perjury under the laws of the United States deposes and says:

1.    I am an Associate Warden at Northern Nevada Correctional Center ("NNCC") a correctional facility within the statewide prison system operated by the Nevada Department of Corrections ("NDOC"), having my place of employment at location;

2.    In my capacity as an Associate Warden at NNCC, I have knowledge of the processes by which inmate institutional grievances and institutional files are received, indexed, stored, maintained, archived, and subsequently searched and retrieved within the NDOC and Northern Nevada Correctional Center, whether in electronic form or paper form, in the ordinary course of the operations of prison administration;

3.    In my capacity as Associate Warden at NNCC, I have access to the "hard copy," paper files in which the original, hand-written copies of inmate institutional Grievances and files which are maintained in the ordinary course of the operations of prison administration;

4.    Pursuant to NRS 209.131, the powers vested in and appointments made by the Director of the NDOC, and Administrative Regulation ("AR") 569, my duties as the Associate Warden of NNCC include being responsible for the supervision of the institutional files for inmates incarcerated at NNCC;

5.    In connection with the filing of this declaration, I was contacted by the Nevada Attorney General's Office, who, on information and belief, represents the Defendants ("Defendants") in the matter, entitled *Mizzoni v Allison, et al.,* now proceeding in the United States District Court, District of Nevada as Case Number 3:15-cv-00313-MMD-VPC. It was requested that I provide truthful and accurate information concerning my personal knowledge and involvement in this matter;

6.    Pursuant to this request, I reviewed the incident involving Joseph Mizzoni (#68549) from March 28, 2015 at Northern Nevada Correctional Center in the rotunda of Unit 5;

///

Office of the
Attorney General
100 N. Carson St.
Carson City, NV
89701-4717

1

123

7.    As the incident occurred in the rotunda, there is no video coverage and therefore there is not any video footage of the incident of March 28, 2015.

8.    To my knowledge, and in my investigation of the incident of March 28, 2015 involving Joseph Mizzoni, there is also no video footage from elsewhere in the institution capturing any portion of the subject incident.

FURTHER, I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

EXECUTED this _5th_ day of December, 2016.

RONALD SCHRECKENGOST

Office of the
Attorney General
100 N. Carson St.
Carson City, NV
89701-4717

2

MIZZONI 313: DEF EXH L - 002

124

EXHIBIT- I

Inmate Request Form  MS. Walsh  "For Video" 3-28-15
"Affidavits and Witnesses of Inmates"

EXHIBIT- I

125

**INMATE REQUEST FORM**

| 1.) INMATE NAME | DOC # | 2.) HOUSING UNIT | 3.) DATE |
|---|---|---|---|
| Joseph Mizzou | 68549 | 7-B-62 | 4-5-15 |

**4.) REQUEST FORM TO: (CHECK BOX)**

___ CASEWORKER    ___ MEDICAL    ___ MENTAL HEALTH    ___ CANTEEN

___ EDUCATION    ___ VISITING    ___ LAW LIBRARY    ___ DENTAL

___ LAUNDRY    ___ PROPERTY ROOM    ___ SHIFT COMMAND

_X_ OTHER _WARDEN_ MS. WALSH FOR MY lawyer and Court

**5.) NAME OF INDIVIDUAL TO CONTACT:** MS WALSH (Please Retain all video/still pictures)

**6.) REQUEST: (PRINT BELOW)** MA'M, I am in 7-B-62 I went to a Hearing on 4-4-15 and Received my Notice of charges, and was Read everything in CPO Smiths Voring Unit 5 on 3-30-15 he said he order Tomblen to look it up, and they did, then he said he ordered several "Tomales" to get back _____ because his rotunda was full of other inmates. At the Hearing I requested those inmates in the rutunda and around myself and Marshall Names on Affidavits to or any other Tomales version of events to be at my disiplany. Also please request all video/still pictures from inside Unit 5 to 7-B-38 on 3-25-15 inorder to Confront witness and Continue with Charges against Me. MA'M. Thank you.

**7.) INMATE SIGNATURE** Joseph Mizz---    DOC # 68549

**8.) RECEIVING STAFF SIGNATURE** _____    DATE

**9.) RESPONSE TO INMATE**

Adhere to the process

**10.) RESPONDING STAFF SIGNATURE** _Riv_    DATE 4/17

DOC – 3012 (REV. 7/01)

# EXHIBIT-DJ

(NDOC) Grevance #2006-29-98671 Levels; Informal, 1st
and Second. "For Video Evidence" and "Inmate Witnesses"

# EXHIBIT-DJ

Case 3:15-cv-00499-MMD-WGC Document 12 Filed 12/03/15 Page 135 of 157

JK GRIEVANCE BOX
Please

EXHIBIT-I

Log Number 200602998671

## NEVADA DEPARTMENT OF CORRECTIONS
### INFORMAL GRIEVANCE

NAME: Joseph Mizzoni          I.D. NUMBER: 68549

INSTITUTION: NNCC PRISON          UNIT: 7-B-62

GRIEVANT'S STATEMENT: I am Grieving still all for All: Video Camera Showing inside and out Unit 5, Unit 8, and Unit 4 outside B-C wing and from Unit 8 to Unit 7-B-38 and all HAND HELD CAMERAS AND VIDEO AND PICTURES AND THOSE ABOVE AREAS ON THE NIGHT OF 3-28-15 from 8PM TO 9:30PM involving C/O SMITH,

**SWORN DECLARATION UNDER PENALTY OF PERJURY**

INMATE SIGNATURE: _[signature]_          DATE: 4-15-15 TIME: 8PM

GRIEVANCE COORDINATOR SIGNATURE: D. Clark          DATE: 4/16/15 TIME: 11:55am

GRIEVANCE RESPONSE:

CASEWORKER SIGNATURE: _[signature]_          DATE: 6/4/15

___ GRIEVANCE UPHELD  ___ GRIEVANCE DENIED  ___ ISSUE NOT GRIEVABLE PER AR 740

GRIEVANCE COORDINATOR APPROVAL: _[signature]_          DATE: 5/27/15

___ INMATE AGREES  ✓ INMATE DISAGREES

INMATE SIGNATURE: _[signature]_          DATE: 6-5-15

**FAILURE TO SIGN CONSTITUTES ABANDONMENT OF THE CLAIM. A FIRST LEVEL GRIEVANCE MAY BE PURSUED IN THE EVENT THE INMATE DISAGREES.**

RECEIVED OCT 13 2015

Original:      To inmate when complete, or attached to formal grievance
Canary:       To Grievance Coordinator
Pink:         Inmate's receipt upon formal grievance filed
Gold:         Inmate's initial receipt

RECEIVED RECEIVED RECEIVED

NOV 25 2015
NDOC
DEPUTY DIRECTORS OFFICE

JUN 08 2015
AWP - NNCC

APR 16 2015
AWP - NNCC

DOC 3091 (12/01)

## NEVADA DEPARTMENT OF CORRECTIONS
## GRIEVANT'S STATEMENT CONTINUATION FORM

**NAME:** Joseph L. Mizzon                **I.D. NUMBER:** 68549

**INSTITUTION:** NNCC Prison              **UNIT #:** 7-B-62

**GRIEVANCE #:** _____          **GRIEVANCE LEVEL:** Informal

**GRIEVANT'S STATEMENT CONTINUATION:** PG. __2__ OF __3__

All Cast Search and Escort OFFICES, NURSES, AND ALL
INMATES THAT SAW MYSELF AND MR SMITH
Around us and IN RUTUNDA on 3-28-15 between
8pm + 930pm. I would Request all NAMES of
Search and Escort Officers and any other Officers involved
with the whole incident of handing me from Shirt
to Transh and was present there. I have Ms Robertson (Sorg)
Officer, I have Smith (C/O), There Search and Escort Officer Ardinger.
I would request all of there Full NAMES As Employees of
Nevada Dept. Of Corrections here at Northern Nevada Correctional Center.
and Inmate Witnesses in Rutunda on Video that C/O Smith
Said was around us and in Rutunda only as witness to
have my lawyer to request as witnesses. or at a minimum have
all these NDoc Perphs and Inmates to be present for trial
Criminal and Civil as well as all Video /Pictures. I don't appreciate
hearing your C/O's playing and this Administration Saying they are going

Original:      Attached to Grievance
Pink:          Inmate's Copy

RECEIVED OCT 1 3 2015

RECEIVED
NOV 2 5 2015
NDOC
DEPUTY DIRECTORS OFFICE

RECEIVED
OCT 2 3 2015
AWP - NNCC

RECEIVED
JUN 0 8 2015
AWP - NNCC

RECEIVED
APR 1 6 2015
DOC - 3097 (01/02)
AWP - NNCC

# NEVADA DEPARTMENT OF CORRECTIONS
## GRIEVANT'S STATEMENT CONTINUATION FORM

NAME: Joseph Mizioni   I.D. NUMBER: 68549

INSTITUTION: NNCC Prison   UNIT #: 7-062

GRIEVANCE #: _____   GRIEVANCE LEVEL: Informal

GRIEVANT'S STATEMENT CONTINUATION:   PG. 3 OF 3

to Dosh the Video and say they were going to make it look like I hit CO Smith. I Didnt hit him and this is Illigal obstruction of Justice and CO Smith doesnt use on his Original Notice of Charges that he has Victim or witnesses on the avidence part of that Notice of Charges. I dont need to be Intorgated by your games and all other ways of minibolation. Your CO Plot escorted me to the Unit 7B-38 Sarge what read my miranda Rights so if you want to interrogat or question me do it infont of my lawyer now. I will Go to my Disciplenary and Want Video and witnesses that saw any thing in that Rotunda. Wolf v. McDowell. There is No Video Cameras Behind the Unit 5 Buble Areas for any undercover CIO?
(I Greived All Other Issues: What Happen 3-28-15 and NO Medical treatment still to this day 4-15-15.)

---

Original:        Attached to Grievance
Pink:           Inmate's Copy

RECEIVED OCT 13 2015

RECEIVED
NOV 25 2015
NDOC
DEPUTY DIRECTORS OFFICE

RECEIVED
OCT 23 2015
AWP - NNCC

RECEIVED
JUN 08 2015
AWP - NNCC

RECEIVED
APR 16 2015
DOC - 3097 (01/02)
AWP - NNCC



# State of Nevada
## Department of Corrections

### INMATE GRIEVANCE REPORT



**ISSUE ID#**  20062998671                    **ISSUE DATE:**  04/17/2015

| MIZZONI, JOSEPH L | 68549 | RTRN_INF | JREXWINKEL | |
|---|---|---|---|---|
| IF | 05/18/2015 | 4 | Denied | JREXWINKEL | A |

Grievance denied. All materials and disciplinary evidence is retained and kept in the property of the Nevada Department of Corrections.

GRIEVANCE RESPONDER   *JH  5/18/15*

RECEIVED OCT 13 2015

Report Name: NVRIGR
Reference Name: NOTIS-RRT-OR-0217.2
Run Date:  MAY-18-15 03:47 PM

RECEIVED NOV 25 2015
NDOC
DEPUTY DIRECTORS OFFICE

RECEIVED OCT 23 201
AWP - NDOC

RECEIVED JUN 08 2015
AWP - NDOC

Page 1 of 2

*(Video / still pictures Names of NDOC people involved)*

Log Number **2006-29-98621**

131

## NEVADA DEPARTMENT OF CORRECTIONS
## FIRST LEVEL GRIEVANCE

NAME: **Joseph Mizioni**          I.D. NUMBER: **68519**

INSTITUTION: **NNCC Prison**          UNIT: **7-B-62**

I REQUEST THE REVIEW OF THE GRIEVANCE, LOG NUMBER **2006-29-98621** , IN A FORMAL MANNER. THE ORIGINAL COPY OF MY GRIEVANCE AND ALL SUPPORTING DOCUMENTATION IS ATTACHED FOR REVIEW.

SWORN DECLARATION UNDER PENALTY OF PERJURY

INMATE SIGNATURE: *[signature]*          DATE: **6-5-15**

WHY DISAGREE: *Because I was not Allowed Any of this Evidence or Witnesses for my Disciplinary on 5-1-15 which was of Expunged IT and Dismissed Charges and by law I should be allowed to view all video to marshal my defense and I do have a right to it for a civil court case and Criminal case. I ask to preserve it all I was further punished because I could not use as evidence. I needed for discovery to support ...*

GRIEVANCE COORDINATOR SIGNATURE: **D Cook**          DATE: **6/8/15**

FIRST LEVEL RESPONSE: *See Attached*

_____ GRIEVANCE UPHELD _____ GRIEVANCE DENIED _____ ISSUE NOT GRIEVABLE PER AR 740

WARDEN'S SIGNATURE: *[signature]*          TITLE: **A.W.O.I.**          DATE: **9/06/15**

GRIEVANCE COORDINATOR SIGNATURE: *[signature]*          DATE: **9/7/15**

_____ INMATE AGREES   ✓   _____ INMATE DISAGREES

INMATE SIGNATURE: *[signature]*          DATE: **10/06/15**

FAILURE TO SIGN CONSTITUTES ABANDONMENT OF THE CLAIM. A SECOND LEVEL GRIEVANCE MAY BE PURSUED IN THE EVENT THE INMATE DISAGREES.

| Original: | To inmate when complete, or attached to formal grievance |
| Canary: | To Grievance Coordinator |
| Pink: | Inmate's receipt when formal grievance filed |
| Gold: | Inmate's initial receipt |

RECEIVED          RECEIVED

RECEIVED   NOV 25 2015   NDOC DEPUTY DIRECTORS OFFICE

OCT 23 2015   AWP - NNCC

JUN 08 2015   AWP - NNCC

RECEIVED OCT 13 2015

DOC 3093 (12/01)



# State of Nevada
# Department of Corrections

## *INMATE GRIEVANCE REPORT*



/32

**ISSUE ID#** 20062998671        **ISSUE DATE:** 04/17/2015

| | | | | | |
|---|---|---|---|---|---|
| MIZZONI, JOSEPH L | 68549 | | RTRN_L1 | | IBACA |
| 1 | 07/07/2015 | | Denied | SIRVIN | A |

You will not be provided any evidence. Grievance denied.

GRIEVANCE RESPONDER

Report Name: NVRIGR
Reference Name: NOTIS-RPT-OR-021.2
Run Date: AUG-04-15 03:24 PM

RECEIVED
NOV 2 5 2015
NDOC
DEPUTY DIRECTORS OFFICE

RECEIVED OCT 2 3 2015

RECEIVED OCT 1 3 2015

Page 1 of 4

LOG NUMBER: 2006-29-98671

# NEVADA DEPARTMENT OF CORRECTIONS
## SECOND LEVEL GRIEVANCE

NAME: Joseph Mizani                    I.D. NUMBER: 68549

INSTITUTION: ELY STATE PRISON          UNIT: 4-B-19

I REQUEST THE REVIEW OF THE GRIEVANCE, LOG NUMBER 2006-29-98671 , ON THE SECOND LEVEL. THE ORIGINAL COPY OF MY GRIEVANCE AND ALL SUPPORTING DOCUMENTATION IS ATTACHED FOR REVIEW.

SWORN DECLARATION UNDER PENALTY OF PERJURY

INMATE SIGNATURE: Joseph M.                     DATE: 10-6-15

WHY DISAGREE: Believe under the Due process Rights of 14th Amendments and AR 707 Disciplinary Hardbook, Wolff v. McDowell that inmates have a right to all Relevant evidence to a Disciplinary Hearing and preserved for Court Purposes. I Request all Video on 3-28-15 as seen in my Informal/First levels to be preserved for a § 1983 Civil Rights Case on the due process and cruel And Unusual Punishment.

GRIEVANCE COORDINATOR SIGNATURE: _____ DATE: 10-12-15
D. Clark                                10/23/15

SECOND LEVEL RESPONSE: _____

See Attached

_____ GRIEVANCE UPHELD  ✓ GRIEVANCE DENIED_____ ISSUE NOT GRIEVABLE PER AR 740

SIGNATURE: _____ TITLE: DW  DATE: 12-24-15

GRIEVANCE COORDINATOR SIGNATURE: _____ DATE: 1.12.16

INMATE SIGNATURE: Joseph M.                     DATE: 3-1-16

## THIS ENDS THE FORMAL GRIEVANCE PROCESS

RECEIVED

Original:   To inmate when complete, or attached to formal grievance
Canary:     To Grievance Coordinator
Pink:       Inmate's receipt when formal grievance filed
Gold:       Inmate's initial receipt

FEB 05 2016

RECEIVED NOV 25 2015
NDOC
DEPUTY DIRECTORS OFFICE

RECEIVED OCT 13 2015

DOC 3094 (12/01)



# State of Nevada
## Department of Corrections

### INMATE GRIEVANCE REPORT

HDSP
4B/7A



134

**ISSUE ID#** 20062998671        **ISSUE DATE:** 04/17/2015

| | | | |
|---|---|---|---|
| MIZZONI, JOSEPH L | 68549 | RTRN_L2 | SLFOSTER |

| 2 | 12/31/2015 | | Denied | LHINE | A |
|---|---|---|---|---|---|

For security reasons, you will not be given access to the videos you are requesting. Grievance denied.

FEB 05 2016



GRIEVANCE RESPONDER

EXHIBIT-K

(Document 112) Report & Recommendation of U.S. Magistrate Judge   Re: ECF No. 100 Pages 10-11.

EXHIBIT- K

135

(EXHIBIT-K)

1
2
3
4
5
6                    **UNITED STATES DISTRICT COURT**
7                         **DISTRICT OF NEVADA**
8
JOSEPH L. MIZZONI,                    )        3:15-cv-00499-MMD-WGC
9                                      )
             Plaintiff,                )        **REPORT & RECOMMENDATION**
10                                     )        **OF U.S. MAGISTRATE JUDGE**
        vs.                            )
11                                     )        Re:  ECF No. 100
STATE OF NEVADA, *et al.*,             )
12                                     )
             Defendants.               )
13    _____)

14
15         This Report and Recommendation is made to the Honorable Miranda M. Du, United States

16   District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. §

     636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.
17
18         Before the court is Plaintiff's Motion Seeking Permission to File a Spoliation/Destruction of

     Video Tape Evidence against Defendants. (ECF No. 100.) Defendants filed a response (ECF No. 106),
19
20   and Plaintiff filed a reply (ECF No. 111). The court held a hearing on the motion on September 21, 2017,

     and issues this Report and Recommendation that the motion be granted in part and denied in part.
21
22                              **I. BACKGROUND**

23         Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC),

     proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Pl.'s Am. Compl., ECF No. 7.) The
24
25   events giving rise to this action took place while Plaintiff was housed at Northern Nevada Correctional

     Center (NNCC). (*Id.*) Defendants are Ira Brannon and Christopher Smith.
26
27         ///

28         ///

1     In the Amended Complaint, Plaintiff alleges that he was involved in an incident on March 28,

2   2015, with Correctional Officer C. Smith that resulted in disciplinary charges. (ECF No. 7 at 3-4.) That

3   incident, which allegedly involved the use of excessive force, is the subject of another lawsuit, *Mizzoni*

4   *v. State of Nevada*, 3:15-cv-00313-MMD-VPC. In this action, Plaintiff avers that C. Smith wrote a false

5   disciplinary report stating Plaintiff hit him in the temple, and a hearing was held on May 1, 2015. (*Id.*

6   at 3, 7.) Lieutenant Brannon was the hearing officer. (*Id.*) Plaintiff pleaded not guilty and stated he did

7   not hit Smith on March 28, 2015. (*Id.* at 3-4.) Plaintiff requested to present all witnesses to the incident,

8   as well as any video of the incident. (*Id.*) Brannon denied his request for witnesses, with the exception

9   of allowing Plaintiff's cellmate at the time of the incident to appear as a witness. (*Id.*) With respect to

10   the request to present video evidence, Brannon told Plaintiff there was no video of the incident, and then

11   that any video was for official use only. (*Id.*)

12     Particularly important for purposes of this motion is Plaintiff's allegation that there were inmates

13   all around at the time of the incident, and that there is a video camera in the unit that would have

14   captured the incident, as well as video from a hand-held video camera used by Sergeant Roberson. (*Id.*)

15   Plaintiff avers that prior to the disciplinary hearing, he wrote to Warden Walsh and asked for all video

16   evidence. (*Id.* at 4.)

17     Brannon found Plaintiff guilty of battery. (*Id.*) Plaintiff alleges that Brannon stated he was

18   punishing Plaintiff for prior incidents as far back as eight years ago, for which Plaintiff had already been

19   punished. (*Id.*) Plaintiff was sentenced to two years of disciplinary segregation. (*Id.* at 5.)

20     On screening, the court found Plaintiff stated colorable due process claims against both Brannon

21   and Smith. (ECF No. 10 at 6.) The claim against Brannon is based on the allegations that Plaintiff was

22   denied evidence and witnesses during his disciplinary hearing on May 1, 2015, and that Brannon

23   punished him for prior acts for which he had already received punishment. (*Id.*) The claim against Smith

24   is based on the allegation that Smith made a false disciplinary report, which is actionable if the inmate

25   is not afforded procedural due process in connection with the resulting disciplinary proceedings. (*Id.*)

26     ///

27     ///

28

138

1    Plaintiff previously filed a motion for a court order for production of video evidence from the

2    night of March 28, 2015. (ECF No. 50.) The court held a hearing on this motion on July 24, 2017, where

3    Defendants maintained there was no video footage of the incident of March 28, 2015. Therefore, the

4    court denied the motion. (See ECF No. 95 at 2.) At the hearing, Plaintiff accused Defendants of

5    destroying the evidence. (*Id.*) The court advised Plaintiff that it could not address that topic at that time

6    because there was no spoliation motion before the court. (*Id.*) Plaintiff has now filed his spoliation

7    motion.

8                                   **II. LEGAL STANDARD**

9    "Spoliation is 'the destruction or significant alteration of evidence, or the failure to preserve

10   property for another's use as evidence[,] in pending or reasonably foreseeable litigation.'" *Reinsdorf v.*

11   *Skechers U.S.A. Inc.*, 296 F.R.D. 604, 626 (C.D. Cal. July 19, 2013) (alteration original) (quoting

12   *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003)). Thus, a party must preserve

13   evidence it knows or should know is relevant to a claim or defense of any party. *See Reinsdorf,* 296

14   F.R.D. at 626-27 (citations omitted); *In re Napster, Inc. Copyright Litigation*, 462 F.Supp.2d 1060, 1067

15   (N.D. Cal. 2006) (citations omitted).  This duty arises not only during litigation, but extends to that

16   "period before litigation when a party should reasonably know that evidence may be relevant to

17   anticipated litigation." *Surowiec v. Capital Title Agency, Inc.*, 790 F.Supp.2d 997, 1005 (D. Ariz. 2011)

18   (citation and quotation marks omitted). Once the duty to preserve takes effect, a party must "suspend any

19   existing policies related to deleting or destroying files and preserve all relevant documents related to the

20   litigation." *In re Napster*, 462 F.Supp.2d at 1070 (citations omitted).

21   There are two sources of authority under which a district court can sanction a party who has

22   engaged in spoliation of evidence: the inherent power of the court to levy sanctions in response to

23   abusive litigation tactics, and Federal Rule of Civil Procedure 37's provision for sanctions against a party

24   who fails to obey an order to provide discovery. *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 958 (9th Cir.

25   2006) (citation omitted). Here, there is not a particular discovery order being violated; therefore, the

26   court's analysis is based on the inherent power to sanction. Specifically, the court "'has the inherent

27   discretionary power to make appropriate evidentiary rulings in response to the destruction or spoliation

28   of relevant evidence.'" *Medical Laboratory Mgmt. Consultants v. American Broadcasting Companies,*

1  *Inc.*, 306 F.3d 806, 824 (9th Cir. 2002) (quoting *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir.

2  1993)).

3      Courts may sanction parties responsible for spoliation of evidence in three ways. First,
4  a court can instruct the jury that it may draw an inference adverse to the party or witness
   responsible for destroying the evidence. Second, a court can exclude witness testimony
5  proffered by the party responsible for destroying the evidence and based on the destroyed
   evidence. Finally, a court may dismiss the claim of the party responsible for destroying
6  the evidence.

7  *In re Napster*, 462 F.Supp.2d at 1066 (internal citations omitted). "A party's destruction of evidence

8  need not be in 'bad faith' to warrant a court's imposition of sanctions." *Id.* (citations omitted). "District

9  courts may impose sanctions against a party that merely had notice that the destroyed evidence was

10 potentially relevant to litigation." *Id.* (citations omitted). The "motive or degree of fault in destroying

11 evidence is relevant to what sanction, if any, is imposed." *Id.* at 1066-67 (citations omitted).

12     The applicable standard of proof for spoliation appears to be a preponderance of the evidence.

13 *Krause v. Nevada Mut. Ins. Co.*, No. 2:12-cv-00342-JCM-CWH, 2014 WL 496936, at * 7 (D. Nev. Feb.

14 6, 2014). The party seeking spoliation sanctions has the burden of establishing the elements. *Reinsdorf,*

15 296 F.R.D. at 626.

16     It is not entirely clear what sanction Plaintiff seeks as he makes reference to "all relief" as well

17 as to a jury instruction. As the court will discuss further below, there is no specific evidence of bad faith

18 or the "outrageous" conduct that justifies dismissal; therefore, the court does not find any type of

19 directed verdict, dismissal or terminating sanction appropriate. *See e.g. Pettit v. Smith*, 45 F.Supp.3d

20 1099, 1113 (D. Ariz. 2014) (finding that case-terminating sanctions require conduct akin to bad faith);

21 *In re Napster*, 462 F.Supp.2d at 1066 (noting that dismissal is a severe sanction warranted by

22 "outrageous" conduct). Accordingly, the court will construe Plaintiff's motion as seeking an adverse

23 inference instruction.

24     The Ninth Circuit has not set forth a standard for an adverse inference instruction, but most

25 district courts have adopted the Second Circuit's three-part test for determining whether an adverse

26 inference sanction is appropriate for spoliation. *See e.g., Reinsdorf,* 296 F.R.D. at 626 (citations

27 omitted); *In re Napster,* 462 F.Supp.2d at 1078. In such case, the moving party must establish:

       (1) that the party having control over the evidence had an obligation to preserve it at the
28     time it was destroyed; (2) the records were destroyed 'with a culpable state of mind'; and

                                              4

1    (3) that the evidence was 'relevant' to the party's claim or defense such that a reasonable

2    trier of fact could find that it would support that claim or defense.

3    *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002).

## III. DISCUSSION

4

5    To reiterate, this action includes a claim that Brannon violated Plaintiff's due process rights when

6    Brannon denied Plaintiff the right to present video evidence and to call witnesses at a hearing on

7    disciplinary charges asserting that Plaintiff hit Smith when Plaintiff and Smith were involved in an

8    altercation on March 28, 2015. Specifically, Plaintiff requested to call all inmates who witnessed the

9    incident, and to present any video of the incident. Brannon denied the request for witnesses, except that

10   Brannon let Plaintiff's cell mate serve as a witness. With respect to the request to present video of the

11   incident, Plaintiff alleges that Brannon told him there was no video of the incident, and then that any

12   video was for official use only. Plaintiff was found guilty of battery, and sanctioned to disciplinary

13   segregation.

**A. Pertinent Video Evidence**

14   The court will first discuss which video evidence is subject to Plaintiff's spoliation argument.

15   Plaintiff's motion references video evidence from Units 5-8 from 8:00 p.m. to 9:30 p.m. on

16   March 28, 2015. Plaintiff's allegations in this action, insofar as they relate to this motion, are that

17   Brannon denied him the opportunity to present evidence or witnesses in a disciplinary hearing

18   concerning a charge that he assaulted Correctional Officer Smith. This alleged assault took place in Unit

19   5; therefore, footage from the other units, which go to other allegations of excessive force set forth in

20   Plaintiff's lawsuit in 3:15-cv-0033-MMD-VPC, are not relevant. As such, the court's relevancy inquiry

21   will focus on video footage from Unit 5. *V.2 is relevant source I was physical before*

22   *this D.S. Hearing and the Video shows it*

22   Insofar as video evidence from Unit 5 is concerned, Plaintiff's motion also references video from

23   Unit 5, as well as footage from any hand-held camera depicting the incident or witnesses to the incident.

24   Plaintiff acknowledges Defendants' representation the altercation between Plaintiff and Smith on

25   March 28, 2015 was not captured by any mounted cameras because the altercation occurred in the

26   rotunda of Unit 5, which does not have video camera coverage. Plaintiff's request for video evidence

27   also included video footage from elsewhere in Unit 5 which might have captured potential witnesses to

28   the altercation between Plaintiff and Smith, whom he could have called as witnesses at his disciplinary

1  hearing.

2       Finally, Plaintiff makes reference to a handheld camera operated by Sergeant Roberson, however,

3  it was clarified at the hearing that this was a still-picture camera, and not a video camera.

4       In sum, the court's analysis of Plaintiff's spoliation motion will focus on the purported

5  destruction or failure to preserve video evidence from Unit 5 that may have depicted witnesses to the

6  altercation between Plaintiff and Smith on March 28, 2015.

7  **B. Obligation to Preserve the Video Evidence**

8       "As soon as a potential claim is identified, a litigant is under a duty to preserve the evidence

9  which it knows or reasonably should know is relevant to the action." *In re Napster*, 462 F.Supp.2d at

10  1067 (citations omitted); *see also Surowiec v. Capital Title Agency, Inc.,* 790 F.Supp.2d 997, 1005 (D.

11  Ariz. 2011). The Ninth Circuit has held, however, that a party does not engage in spoliation of evidence

12  when, *without* notice of the evidence's potential relevance, it destroys the evidence according to its

13  policy or in the normal course of its business. *United States v. $40,955.00 in U.S. Currency*, 554 F.3d

14  752 758 (9th Cir. 2009).

15       In his declaration Associate Warden at NNCC, Ronald Shreckengost, states that he did review

16  video from March 28, 2015 for housing units 4-8 at NNCC, and that it did not depict the incident

17  involving Plaintiff. (ECF No. 106-1 ¶ 9.) At the hearing, the court asked defense counsel *when* Mr.

18  Shreckengost reviewed the video footage from March 28, 2015, and counsel represented that he did so

19  either on the date of the incident, March 28, 2015, or the following day. Insofar as the video taken may

20  have identified potential witnesses to the altercation, the declaration states that the video is on a

21  recording loop, which records over it every ten to fourteen days unless there is an incident, in which case

22  NDOC makes a copy of the recording and keeps it. (*Id.*) He says that there was no significant incident

23  recorded that required NNCC to make a copy of the video footage from the units, and the video footage

24  was recorded over pursuant to NDOC policy, so there is no videotape footage of potential witnesses.

25  (ECF No. 106-1 ¶¶ 10-12.)

26       While it may not have depicted the incident between Plaintiff and Smith, other evidence in the

27  record suggests that the video footage taken from Unit 5 did depict inmates who may have witnessed

28  the altercation between Plaintiff and Smith. (See ECF No. 100 at 26.) Specifically, Frank Sherman stated

6

142

in his report that he began checking institutional cameras on the date of the incident—March 28, 2015—for Unit 5 and did not see the incident on camera. (ECF No. 100 at 26.) He did state that when he checked the playback of the unit for any possible information nothing was seen except for inmates "mingling in the wings." (*Id.*) The court finds there is some question as to whether Mr. Shreckengost would have known that footage depicting only inmates "mingling in the wings" would have been relevant to a claim at that point.

Plaintiff cleared this up, however, when he sent a kite to Warden Walsh on April 5, 2015, specifically asking for this video footage, noting that the rotunda was full of inmates, and that he sought the video to confront the witnesses and charges against him. (ECF No. 100 at 14.) At this point, the video footage would not yet have been recorded over pursuant to the policy described by Shreckengost; yet, the video was still not retained. To be clear, the duty to preserve evidence applies to the period before litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation. *See Surowiec*, 790 F.Supp.2d at 1005 (citations omitted). Walsh would have known that the video footage from Unit 5 depicting inmates who may have witnessed the altercation between Plaintiff and Smith was relevant to Plaintiff's claim when Plaintiff sent his request on April 5, 2015. At that point, the routine video retention policy should have been suspended, and the video should have been preserved.

**C. State of Mind and Relevance**

"'Courts have not been uniform in defining the level of culpability—be it negligence, gross negligence, willfulness, or bad faith—that is required before sanctions are appropriate for evidence destruction.'" *Reinsdorf*, 296 F.R.D. at 627 (citation and quotation marks omitted). In the Ninth Circuit, "a party's destruction of evidence need not be in 'bad faith' to warrant a court's imposition of sanctions." *In re Napster*, 462 F.Supp.2d at 1066 (citing *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir 1993)). The state of mind, however, is "relevant to what sanction, if any, is imposed." *In re Napster*, 462 F.Supp.2d at 1066-67. As indicated above, "[o]nly 'wilfulness, bad faith, and fault' justify terminating sanctions." *Connecticut General Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007) (quoting *Jorgensen v. Cassiday*, 320 F.3d 906, 912 (9th Cir. 2003). Courts have held that the "culpable state of mind" for an adverse inference instruction includes "simple notice of 'potential

7

relevance to the litigation,'" gross negligence and even negligence. *Reinsdorf*, 296 F.R.D. at 627-28 (citations omitted). "[W]hen the spoliating party was merely negligent, the innocent party must prove both relevance and prejudice in order to justify the imposition of a severe sanction." *Id.* (citation and quotation marks omitted).

There is no specific evidence before the court indicating that the video evidence was destroyed in bad faith, but there is at least evidence that NDOC officials allowed the evidence to be recorded over despite being put on notice that it was relevant to Plaintiff's claim as of April 5, 2015.

This finding requires a return to the discussion of relevance and prejudice in terms of determining what type of sanction, if any, is appropriate for the failure to preserve the video evidence here.

"'[R]elevance' for spoliation purposes is a two-pronged finding of relevance and prejudice because for the court to issue sanctions, the absence of the evidence must be prejudicial to the party alleging spoliation of evidence." *Reinsdorf*, 296 F.R.D. at 627 (citations and quotation marks omitted). "The prejudice inquiry looks to whether the [spoiling party's] actions impaired [the non-spoiling party's] ability to go to trial or threatened to interfere with the rightful decision of the case." *Leon*, 464 F.3d at 959 (internal citation and quotation marks omitted) (alteration original).

The video footage showing potential witnesses to the altercation is certainly relevant to Plaintiff's claim that his due process rights were violated at his disciplinary hearing when he was denied the right to present other witnesses and was denied the right to view video footage that might identify witnesses to the incident where he was accused of hitting Smith. The absence of the video evidence is prejudicial to Plaintiff in the sense that having that evidence would have helped him prove his claim that there were other witnesses that he was precluded from calling at the hearing. The prejudice is limited, however, because Plaintiff is in possession of a report where Frank Sherman affirmatively stated that he reviewed video footage from Unit 5 and it showed other inmates mingling in the wings of the Unit 5 rotunda. He can present this as evidence that there was video footage depicting other inmates who may have witnessed the incident, and he was denied review of the video for the purpose of identifying and calling other witnesses. Under these circumstances the court does not find it appropriate to recommend an adverse inference instruction. *See Apple Inc v. Samsung Electronics Co., Ltd. (Apple II)*, 888 F.Supp.2d 976, 993 (N.D. Cal. 2012) (citations omitted) (even where three-part spoliation test is satisfied, a court

8

1    may deny request for adverse inference where degree of fault and level of prejudice were insufficient

2    to justify the imposition of the sanction).

3    **D. Appropriate Sanction**

4            While the court does not find that an adverse inference instruction is appropriate, it concludes

5    that Plaintiff is entitled to some sort of relief for the failure to preserve the video evidence from the date

6    of the incident, which can at least be characterized as negligent. *See Apple II*, 888 F.Supp.2d at 993

7    (citing *Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994) (courts should choose "the

8    least onerous sanction corresponding to the willfulness of the destructive act and the prejudice suffered

9    by the victim")).

10           Here, the court finds a more appropriate sanction under the court's inherent power would be to

11   allow Plaintiff to present evidence and argument to the jury that he asked for this video footage; that the

12   prison had a duty to preserve the footage once he asked for it; that other employees of the prison (and

13   not the Defendants) failed to preserve the video footage; and that the video would have shown there were

14   other inmates present in the wings of the Unit 5 rotunda that may have witnessed the incident between

15   Plaintiff and Smith.

16   **E. Imputation**

17           Finally, the court must address the fact that there is no evidence that the parties to this

18   action—Brannon and Smith—had any responsibility for the failure to preserve the video evidence.

19   Instead, it was the responsibility of NDOC. Therefore, the court must decide whether NDOC's failure

20   to preserve the evidence should be imputed to the Defendants.

21           District courts within this circuit have held that spoliation by a prison may be imputed to named

22   defendants in circumstances similar to these. The seminal case on this topic appears to be *Pettit v. Smith*,

23   45 F.Supp.3d 1099 (D. Ariz. 2014). That case involved an Eighth Amendment excessive force claim,

24   and the plaintiff argued, *inter alia,* that the incident was recorded by a defendant, who turned it in to his

25   supervisor, and the supervisor ordered the video erased several days after the incident. *Pettit*,

26   45 F.Supp3d at 1103. There, as is the case here, there was no evidence that the defendants named in the

27   case were responsible for destruction of the video, and the defendants argued that they therefore had no

28   duty to preserve the evidence. *Id.* at 1106. The court disagreed, finding that the prison was "not a

9

1  disinterested third party," but was responsible for Defendants' training and conduct, and had control over

2  the evidence and over the inmate's ability to access the evidence, as well as the defendants' ability to

3  preserve it. *Id.* It also pointed out that the State of Arizona, of which the department of corrections was

4  an agency, indemnified employees for damages for which an employee became legally responsible

5  within the course and scope of employment. *Id.* The state also funded the defense of their employees in

6  such lawsuits. *Id.* As a result, the court determined that the prison "had a duty to preserve evidence

7  relevant to th[e] case once it knew that litigation was reasonably likely." *Id.* (citation omitted). The court

8  concluded that "there [was] strong reason to impute the spoliation of [the prison] to [the] Defendants

9  to ensure that fairness is done at trial." *Id.* at 1110. As a remedy, the court did not award the case

10  dispositive sanctions requested by the plaintiff, but instead ordered that the loss of evidence be explained

11  to the jury, and allowed the jury to infer that the lost evidence would have favored the plaintiff's

12  position. *Id.* at 1110-11. The court pointed out that there would be "no suggestion …to the jury that

13  Defendants themselves [were] in any way responsible for the loss of evidence." *Id.* at 1111.

14       Here, the court likewise finds that NDOC is not just a "disinterested third party." The prison is

15  responsible for the training and conduct of its employees, and according to the declaration of

16  Mr. Shreckengost, appears to have had control over the video evidence. As in *Pettit,* the State of Nevada,

17  of which NDOC is a department, indemnifies employees for damages for which they become legally

18  responsible within the course and scope of employment, and funds the defense of employees in such

19  lawsuits when requested. *See* Nevada Revised Statutes (NRS) 41.0339, 41.0349. Therefore, the court

20  finds that the prison had a duty to preserve the video evidence once Ms. Walsh was put on notice that

21  it was potentially relevant to Plaintiff's claim, and the prison failed to preserve the evidence. Under these

22  circumstances, there are grounds for imputing the spoliation to the Defendants.

23                              **IV. RECOMMENDATION**

24       **IT IS HEREBY RECOMMENDED** that the District Judge enter an order **GRANTING IN**

25  **PART AND DENYING IN PART** Plaintiff's motion (ECF No. 100). Plaintiff's requests for some sort

26  of dismissal sanction or per se adverse inference instruction should be denied. It is recommended,

27  however, that the spoliation of the video evidence be imputed to the named defendants and that as a

28  sanction Plaintiff should be allowed to present evidence and argument to the jury that he asked for this

146

video footage; that the prison had a duty to preserve the footage once he asked for it; that other employees of the prison (and not the Defendants) failed to preserve the video footage; and that the video would have shown there were other inmates present in the wings of the Unit 5 rotunda that may have witnessed the incident between Plaintiff and Smith.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

DATED: September 27, 2017.

_William G. Cobb_
WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE

147

# EXHIBIT-ML

Parole Hearing Results of September 14, 2016  page 2.
Denied

EXHIBIT-ML



Case 3:19-cv-00490-MMD-WGC Document 121 Filed 03/03/17 Page 156 of 157

# STATE OF NEVADA
# CERTIFICATION OF
# BOARD OF PAROLE COMMISSIONERS ACTION

Did [3] years timed
(Court Dr. on or about
10/22/2003
2t Should of been (1½) years
not (3 years)

148

## PAROLE RISK ASSESSMENT & GUIDELINE

| INMATE NAME | N.JOC# | BOOKING# | LOCATION | DATE |
|---|---|---|---|---|
| MIZZONI, JOSEPH L | 685499 | 068549 | HDSP-U7-B-39-A | 09/14/2016 |

Parole Risk Assessment

| Questions | Responses / Scores |
|---|---|
| 1. Age at 1st Arrest | 19 years or younger (2): 2 |
| 2. Prior Revocations | (2) One or more: 2 |
| 3. Employment History | (2) Unsatisfactory Employment/Unemployed/Unemployable: 2 |
| 4. Property Conviction | (2) Auto Theft, Burglary, Forgery, Robbery, Property Crime: 2 |
| 5. Drug/Alcohol Use/Abuse | (2) Frequent abuse, serious disruption of functioning: 2 |
| 6. Gender | (1) Male: 1 |
| Static Risk Score | 11 |
| 7. Current Age | (-1) 41 and above: -1 |
| 8. Gang Membership | (0) No or Suspect: 0 |
| 9. Programming (current term) | (0) No: 0 |
| 10. Disciplinary Conduct | (0) 1 disciplinary: 0 |
| 11. Approved Custody Level | (0) Medium: 0 |
| Dynamic Risk Score | -1 |
| Total Score (Static-Dynamic) | 10 |

| Offense (used to determine crime severity for risk assessment) | Offense Category | Offense Severity |
|---|---|---|
| ROBBERY | CAT B | High |

| Total Risk Score | Guideline Risk | Guideline Recommendation |
|---|---|---|
| 10 | Mod Risk | Consider Factors |

**The Board determined the following Aggravating Factors are applicable in your case:**
Housed in disciplinary segregation within 24 months: Inmate was released from disciplinary segregation on 06/02/2016.
Commission of a crime while incarcerated, on bail, eluding, on escape status, or while under parole or probation supervision: The instant offense was committed while incarcerated for a previous felony conviction.
Significant prior criminal history: Inmate has multiple prior felony convictions.
Prior violent convictions: Inmate has multiple violent offenses in his history.
Repetitive Similar Criminal Conduct: Inmate has multiple prior property-related convictions.
Prior Prison term did not deter future criminal activity: Inmate has served prior terms in prison.

**The Board determined the following Mitigating Factors are applicable in your case:**
Community and or family support: Inmate has indicated family support in New York.
Participation in programs specific to addressing the behavior that led to their incarceration: Inmate has taken part in classes and/or programs.

*This document was prepared by DBARNARD at 9/22/2016 6:8:59 AM*

z_ord_dny rev 9-8-2010

(EXD)

Did (3)years. Started
Count IV on or about
10/23/2013
It should of been (1½) years
Not (3) years

149

# STATE OF NEVADA
# CERTIFICATION OF
# BOARD OF PAROLE COMMISSIONERS ACTION

## ORDER DENYING PAROLE

| MIZZONI, JOSEPH L | 1/23/09 68549 | 068549 | HDSP-U7-B-39-A | 09/14/2016 |
|---|---|---|---|---|
| Inmate Name | NDOC Number | Booking # | Location | Date |

It is the Order of the Board that further consideration of parole is denied until 06/01/2018.

## THIS ACTION APPLIES TO THE FOLLOWING SENTENCE(S):

*Controlling sentence denoted by *: Case #: Count: Offense Description:*
CR4829, 3; GRAND LARCENY OF MOTOR VEHICLE
*CR4829, 4; ROBBERY

### Reason(s) for action:
Denial Reason: Disruptive institutional behavior, or poor disciplinary record.
Denial Reason: Prior prison term did not deter future criminal activity.
Denial Reason: Significant prior criminal history.
Specific Recommendation: Do not engage in disciplinary misconduct during denial period.
Specific Recommendation: Participate or continue to participate in programs that address the behaviors that led to your incarceration.

### Recommendation of the panel who conducted the hearing: Deny Parole.
Hearing Representative David Smith; Deny Parole
Commissioner Lucille Monterde; Deny Parole

### The final action was ratified by the following Members of the Board of Parole Commissioners:
Commissioner Lucille Monterde; Deny Parole
Commissioner Ed Gray; Deny Parole
Commissioner Michael Keeler; Deny Parole
Commissioner Susan Jackson; Deny Parole

FOR THE NEVADA BOARD OF PAROLE COMMISSIONERS

This document was prepared by DBARNARD at 8/22/2016 8:59 AM

Z_ord_dny rev 9-8-2010