UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| JOSEPH L. MIZZONI, | Case No. 3:15-cv-00499-MMD-WGC |
| Plaintiff, | **REPORT & RECOMMENDATION OF U.S. MAGISTRATE JUDGE** |
| v. | |
| STATE OF NEVADA, *et al.*, | Re: ECF No. 118 |
| Defendants. | |

This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Defendants' Motion for Summary Judgment. (ECF Nos. 118, 118-1 to 118-13, 120-1, 120-2.) Plaintiff filed a response. (ECF No. 123.) Defendants filed a reply. (ECF No. 124.) After a thorough review, the court recommends granting Defendants' motion.

Defendants also filed a motion to strike Exhibits B, C and G in support of Plaintiff's response, arguing they are immaterial to Plaintiff's claims. (ECF No. 125, errata at ECF Nos. 126, 126-1, 126-2, 126-3, 126-4, 126-5.) The court has issued a separate order denying that motion as moot.

## I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Am. Compl., ECF No. 7.) The events giving rise to this action took place while Plaintiff was housed at Northern Nevada Correctional Center (NNCC), though at the time he filed his response he was housed at High Desert State Prison (HDSP). (*Id*.) Defendants are Ira Brannon and Christopher Smith.

///

1   In the Amended Complaint, Plaintiff alleges he was involved in an incident on March 28,

2   2015, with Correctional Office C. Smith, that resulted in disciplinary charges. (ECF No. 7 at 3-4.)

3   That incident, which Plaintiff alleges involved the use of excessive force by C. Smith, is the subject

4   of another lawsuit, *Mizzoni v. State of Nevada,* 3:15-cv-00313-MMD-VPC. In this action, Plaintiff

5   challenges the report C. Smith wrote which led to a disciplinary hearing, where Plaintiff claims he

6   was not afforded the proper procedural protections. He was convicted of the disciplinary violation

7   and sentenced to time in disciplinary segregation. Specifically, Plaintiff avers that C. Smith wrote

8   a false disciplinary report stating Plaintiff hit C. Smith in the temple, and a hearing was held on

9   May 1, 2015. (*Id*. at 3, 7.) Lieutenant Brannon was the hearing officer. (*Id*.) Plaintiff pleaded not

10   guilty and stated he did not hit Smith on March 28, 2015. (*Id*. at 3-4.) Plaintiff requested to present

11   all witnesses to the incident, as well as any video of the incident. (*Id*.) Brannon denied his request

12   for witnesses, with the exception of allowing Plaintiff's cellmate at the time of the incident to

13   appear as a witness. (*Id*.) With respect to the request to present video evidence, Brannon told

14   Plaintiff there was no video of the incident, and then that any video was for official use only. (*Id*.)

15   Plaintiff asserted that there were inmates all around at the time of the incident, and that

16   there was a video camera in the unit that would have captured the incident. Brannon found Plaintiff

17   guilty of battery. (*Id*. at 4.) Plaintiff alleges that Brannon told him that he was being punished for

18   incidents as far back as eight years prior, for which Plaintiff had already been punished. (*Id*.) He

19   was sentenced to two years of disciplinary segregation. (*Id*. at 5.)

20   On screening, the court found Plaintiff stated colorable due process claims against both

21   Brannon and Smith. (ECF No. 10 at 6.) The claim against Brannon is based on the allegations that

22   Plaintiff was denied the opportunity to present evidence and witnesses during his disciplinary

23   hearing on May 1, 2015, and that Brannon punished him for prior acts for which he had already

24   received punishment. (*Id*.) The claim against C. Smith is based on the allegation that C. Smith

25   made a false disciplinary report, which is actionable if the inmate is not afforded procedural due

26   process in connection with the resulting disciplinary proceedings. (*Id*.)

27   Defendants now move for summary judgment, arguing: (1) Brannon did not violate

28   Plaintiff's due process rights because Plaintiff had no liberty interest such that he was entitled to

due process protections, and in any event, Brannon's conclusion was supported by "some evidence," and he allowed Plaintiff to present testimony from the named witness (his cellmate), and denied the request for video evidence because there was none; and (2) C. Smith did not retaliate against Mizzoni by writing a false disciplinary report, but included his version of events that Plaintiff struck him, attempted to strike him and resisted being restrained.

It should be noted that Plaintiff previously filed a spoliation motion, asserting that Defendants destroyed the video evidence of the incident. The court construed the motion as seeking an adverse inference instruction, and focused on the alleged destruction of video footage from the unit where the altercation between Plaintiff and C. Smith took place: Unit 5. (*See* Report and Recommendation, ECF No. 112 at 4-5.) Ultimately, the undersigned recommended that Plaintiff be allowed to present evidence and argument to the jury that he asked for the video footage; the prison had a duty to preserve it once he asked for it; that other employees of the prison (not defendants) failed to preserve the footage; and, that the video would have shown there were other inmates present in the wings of the Unit 5 rotunda that may have witnessed the incident between Plaintiff and C. Smith. Finally, it was recommended that the failure to preserve the evidence should be imputed to the Defendants. District Judge Du adopted and accepted the report and recommendation in full. (ECF No. 135.)

After reviewing the briefing, and as will be explained *infra*, the court concludes that Plaintiff was not subject to an atypical and significant hardship as a result of the disciplinary conviction and sanction such that he had no protected liberty interest in avoiding disciplinary segregation under these circumstances. Therefore, he did not have a right to the procedural due process measures he claims in his action, and the order on the spoliation motion becomes immaterial.

## II. LEGAL STANDARD

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citation omitted). In considering a motion for summary judgment, all reasonable inferences are drawn in favor of the non-moving party. *In re Slatkin*, 525 F.3d 805, 810

(9th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On the other hand, where reasonable minds could differ on the material facts at issue, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250.

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A), (B).

If a party relies on an affidavit or declaration to support or oppose a motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

In evaluating whether or not summary judgment is appropriate, three steps are necessary: (1) determining whether a fact is material; (2) determining whether there is a genuine dispute as to a material fact; and (3) considering the evidence in light of the appropriate standard of proof. *See Anderson*, 477 U.S. at 248-250. As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment; factual disputes which are irrelevant or unnecessary will not be considered. *Id.* at 248.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'...In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element

of the nonmoving party's case; or (2) by demonstrating the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). To establish the existence of a genuine dispute of material fact, the opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Id*. Instead, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing competent evidence that shows a genuine dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

> That being said,
> [i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).

At summary judgment, the court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine dispute of material fact for trial. *See Anderson*, 477 U.S. at 249. While the evidence of the nonmovant is "to be believed, and all justifiable inferences are to be drawn in its favor," if the evidence of the nonmoving party is merely colorable or is not significantly probative, summary judgment may be granted. *Id*. at 249-50 (citations omitted).

///

1

## III. DISCUSSION

2       Defendants do not dispute that there was an altercation between C. Smith and Plaintiff on

3   March 28, 2015. The parties' versions of what occurred during that incident differ, i.e., whether

4   Plaintiff hit C. Smith or whether C. Smith used excessive force against Plaintiff (this is also the

5   subject of another lawsuit). It is undisputed that C. Smith drafted an incident report for disciplinary

6   charges to be brought against Plaintiff stemming from that incident, and Plaintiff claims this was

7   false. (ECF No. 118 at 4, ECF No. F.) A disciplinary hearing was held on March 28, 2015.

8   (ECF No. 118 at 4, Ex G.) Plaintiff was allowed to have his cellmate, Christopher Deyerle, testify

9   as a witness. (ECF No. 118 at 4, Ex. G; ECF No. 123 at 26.) Plaintiff asked for video of the

10  incident. (ECF No. 118 at 4.) In the motion for summary judgment, Defendants contend that the

11  video was not presented because it was destroyed in the ordinary course of business before NDOC

12  officials received notice of Plaintiff's request to retain the footage. (ECF No. 118 at 4-5, citing

13  ECF No. 114-2 at 2.) In their reply, Defendants state that Plaintiff's request for video evidence

14  was denied for safety and security reasons.

15      Defendant Brannon found Plaintiff guilty of battery, and he was sanctioned to twenty-four

16  months in disciplinary segregation. (ECF No. 118 at 5, Ex. G; ECF No. 123 at 25-28.) He served

17  eighteen months of his disciplinary segregation sentence.

18  **A. Due Process Standard**

19      The Fourteenth Amendment provides: "No state shall … deprive any person of life, liberty,

20  or property, without due process of law." U.S. Const. amend XIV, § 1. A plaintiff asserting a

21  Fourteenth Amendment due process claim related to disciplinary action that leads to his

22  confinement in disciplinary segregation must first establish that he has been deprived of a protected

23  liberty interest in order to invoke the Due Process Clause's protections. *Wilkinson v. Austin*,

24  545 U.S. 209, 221 (2005); *Chappell v. Mandeville*, 706 F.3d 1052, 1062 (9th Cir. 2013). Once the

25  plaintiff has established that one of these interests is at stake, the court's analysis turns to whether

26  the inmate suffered a denial of adequate procedural protections. *See Biggs v. Terhune*, 334 F.3d

27  910, 913 (9th Cir. 2003) (citations omitted).

28  ///

- 6 -

1  "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit

2  in the word 'liberty,' … or it may arise from an expectation or interest created by state laws or

3  policies[.]" *Wilkinson*, 545 U.S. at 221 (citing *Vitek v. Jones*, 445 U.S. 480, 493-94 (1980) (finding

4  a liberty interest in avoiding involuntary psychiatric treatment and transfer to mental institution

5  under the Due Process Clause itself) and *Wolff v. McDonnell*, 418 U.S. 539, 556-58 (1974) (finding

6  a liberty interest in avoiding withdrawal of state-created system of good-time credits)).

7  First, under the Constitution itself, a liberty interest is implicated when the conditions of

8  confinement exceed "the sentence in such an unexpected manner as to give rise to protection by

9  the Due Process Clause of its own force." *Mitchell v. Dupnik*, 75 F.3d 517, 523 (9th Cir. 1996)

10  (internal quotation marks and citation omitted). The Ninth Circuit has recognized that "only the

11  most extreme changes in the conditions of confinement" such as "involuntary commitment to a

12  mental institution" and "forced administration of psychotropic drugs" have been found to "directly

13  invoke the protections of the Due Process Clause." *Chappell*, 706 F.3d at 1063 (citing *Vitek*, 445

14  U.S. at 493-94; *Washington v. Harper*, 494 U.S. 210, 221-22 (1990)). Other circumstances where

15  a liberty interest has been found as arising from the Due Process Clause itself include: revocation

16  of probation, *Gagnon v. Scarpelli*, 411 U.S. 778 (1973); revocation of parole status (not just mere

17  denial of parole), *Morrissey v. Brewer*, 408 U.S. 471 (1972); and labeling an inmate as a sex

18  offender, *Neal v. Shimoda*, 131 F.3d 818 (9th Cir. 1997).

19  Plaintiff does not include allegations that courts have recognized as directly invoking the

20  protections of the Due Process Clause; therefore, the court will turn to state-created liberty

21  interests. *See Wilkinson*, 545 U.S. at 221-22 (citing *Meachum v. Fano*, 427 U.S. at 225) ("the

22  Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse

23  conditions of confinement."); *Chappell*, 706 F.3d at 1063 (quoting *Montayne v. Haymes*, 427 U.S.

24  236, 242 (1976)) ("'As long as the conditions or degree of confinement to which the prisoner is

25  subjected is within the sentence imposed upon him and is not otherwise violative of the

26  Constitution, the Due Process Clause does not in itself subject an inmate's treatment by prison

27  authorities to judicial oversight.'").

28  ///

- 7 -

1    "A state may create a liberty interest through statutes, prison regulations, and policies."

2    *Chappell*, 706 F.3d at 1063 (citing *Wilkinson*, 545 U.S. at 222 and *Neal*, 131 F.3d at 827). This,

3    however, is "subject to the important limitations set forth in *Sandin v. Conner*[.]" *Wilkinson*, 545

4    U.S. at 222 (citation and quotation marks omitted). *Sandin* rejected the previously employed

5    approach for evaluating whether there was a state-created liberty interest which looked at the

6    mandatory language of prison regulations. *See id.* (citing *Sandin v. Conner,* 515 U.S. 472, 481

7    (1995)). Instead, *Sandin* directed that it was more important to look at the "nature of the

8    deprivation." *Id.* (citing *Sandin*, 515 U.S. at 481).

9    "Discipline by prison officials in response to a wide range of misconduct falls within the

10   expected perimeters of the sentence imposed by a court of law." *Sandin*, 515 U.S. at 485. Thus, a

11   change in the conditions of confinement, such as Plaintiff's confinement to disciplinary

12   segregation, only rises to the level of a protected liberty interest if it amounts to "freedom from

13   restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to

14   the protection by the Due Process Clause of its own force …, nonetheless imposes atypical and

15   significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484.

16   Placement in punitive segregation alone does not make the conditions of confinement an

17   "atypical and significant hardship." *Sandin*, 515 U.S. at 485; *Chappell*, 706 F.3d at 1063 (quoting

18   *Meachum*, 427 U.S. at 224).

19   The Supreme Court has declined to establish a "baseline from which to measure what is

20   atypical and significant in any particular prison system." *Wilkinson*, 545 U.S. at 223 (noting

21   inconsistent conclusions among the circuits, but concluding that assignment to Ohio's "Supermax"

22   facility satisfied this standard "under any plausible baseline"). The Ninth Circuit has stated that in

23   order to determine whether a particular form of restraint imposes "atypical and significant

24   hardship," a court considers a condition or combination of conditions or factors on a case by case

25   basis, rather than invoking a single standard." *Chappell*, 706 F.3d at 1064 (citing *Keenan v. Hall*,

26   83 F.3d 1083, 1089 (9th Cir. 1996) (confirming that the inquiry is "context-dependent" and

27   requires "fact by fact consideration").

28   ///

At least three factors have been used to guide this inquiry: (1) "whether the conditions of confinement mirrored those imposed upon inmates in analogous *discretionary* confinement settings;" (2) "the duration and intensity of the conditions of confinement;" and (3) "[w]hether the change in confinement would inevitably affect the duration of the [prisoner's] sentence." *Chappell*, 706 F.3d at 1064-65 (italics original, internal quotation marks and citation omitted). As such, "*Sandin* requires a factual comparison between conditions in general population or administrative segregation (whichever is applicable) and disciplinary segregation, examining the hardship caused by the prisoner's challenged action in relation to the basic conditions of life as a prisoner." *Jackson v. Carey*, 353 F.3d 750, 755 (9th Cir. 2003).

In *Sandin*, the inmate was sentenced to thirty days in punitive segregation for allegedly interfering with prison officials during a strip search, and brought suit because prison officials refused to allow him to call witnesses at his disciplinary hearing. The Supreme Court concluded his case did "not present a dramatic departure from the basic conditions of [his] indeterminate sentence." *Sandin*, 515 U.S. at 485. The conditions in disciplinary segregation mirrored those in administrative segregation and protective custody. *Id*. at 486. There, the plaintiff was in lockdown twenty-three hours a day while the other inmates were confined to their cells twelve to sixteen hours a day. The Court found his placement in disciplinary segregation for thirty days "did not work a major disruption in his environment." *Id*. Nor was there evidence his placement in disciplinary segregation would affect the duration of his sentence. *Id*. at 487. The Court noted that the parole board was not required to deny parole because of a disciplinary record. *Id*.

In *Wilkinson*, the Supreme Court considered a challenge to Ohio's placement of prisoners in its "Supermax" facility, a "maximum-security prison with highly restrictive conditions." *Wilkinson*, 545 U.S. at 213. Inmates were required to stay in their seven by fourteen foot cells twenty-three hours a day, with constant illumination; they could not communicate with other inmates and were deprived of almost all human contact; they were limited to one hour of exercise a day in a small, indoor room; their placement in the facility was indefinite; and after an initial thirty-day review, their placement was reviewed only once a year; and, an inmate moved to the facility who was otherwise eligible for parole would become ineligible. *Id*. at 214, 215, 224. The

1    Supreme Court found that while the conditions at the facility considered individually may not

2    create a liberty interest, "taken together they impose an atypical and significant hardship within

3    the correctional context" so as to create a "liberty interest in avoiding assignment" to the facility.

4    *Id*. at 224 (citation omitted). Having found a liberty interest existed, the court then concluded that

5    the procedural protections afforded were sufficient. *Id*. at 225.

6        In *Brown v. Oregon Department of Corrections*, 751 F.3d 983 (9th Cir. 2014), the Ninth

7    Circuit addressed a situation where a prisoner was placed in Oregon's Intensive Management Unit

8    (IMU) for twenty-seven months. Inmates in the IMU were in solitary confinement for twenty-three

9    hours a day. *Id*. at 985. They got out of their cells for forty minutes a day, thirty of which could be

10   spent in recreation. *Id*. Half of that time (fifteen minutes) could be spent in an "outside" facility

11   within a fifteen by forty-foot room with high, concrete walls covered by a metal grate. *Id*. This

12   was compared to general population inmates who got twenty-five to thirty-five hours a week for

13   recreation and social interaction, including two to five hours a day of outdoor recreation. *Id*.

14   Inmates in the IMU got two non-contact visits per month, and a maximum of two visitors in a six-

15   month period. *Id*. General population inmates got between eleven and twenty-two contact visits

16   per month, and an unlimited number of approved visitors. *Id*. IMU inmates were denied access to

17   the prison and law libraries, group religious worship, educational and vocational opportunities,

18   telephone usage except in emergencies, access to televisions, and personal property. *Id*. Brown's

19   status was reviewed four times between July 2008 and June 2009, with all four occurring in the

20   first three months, and then he was reviewed every month and was kept at the same level pending

21   successful completion of assigned packets.

22       In *Brown*, the Ninth Circuit held that "under any plausible baseline, Brown's twenty-seven-

23   month confinement in the IMU without meaningful review 'impose[d] atypical and significant

24   hardships on [him] in relation to the ordinary incidents of prison life.'" *Id*. at 988 (quoting *Sandin*,

25   515 U.S. at 484). The Ninth Circuit pointed out that while the "baseline for determining 'atypical

26   and significant hardship' is not entirely clear[,]… *Sandin* seems to suggest that a *major* difference

27   between the conditions for the general prison population and the segregated population triggers a

28   right to a hearing[.]" *Id*. (quoting *Keenan*, 83 F.3d at 1089) (emphasis added). The court also noted

1    that the Supreme Court has not clearly held that "conditions in the general population, as opposed

2    to those in other forms of administrative segregation or protective custody, form the appropriate

3    baseline comparator." *Id*. The Ninth Circuit, like the Supreme Court, declined to identify the

4    baseline, but instead concluded that Brown's confinement to the IMU imposed an atypical and

5    significant hardship under any baseline, focusing on the facts that Brown was in solitary

6    confinement for almost twenty-three hours a day with almost no interpersonal contact, and was

7    denied most privileges given to general population inmates. *Id*. at 988. The Ninth Circuit stated

8    that "these conditions alone might apply to most solitary-confinement facilities," but the "crucial

9    factor distinguishing confinement in the IMU" was the duration of Brown's confinement: "a fixed

10   and irreducible period of confinement in the IMU for twenty-seven months, in contrast to the

11   limited period of confinement with periodic review afforded inmates in ODOC's other segregated

12   housing units." *Id*.

13   **B. Analysis**

14          The parties dispute whether Plaintiff's disciplinary proceeding which led to his being

15   confined in disciplinary segregation for eighteen months invoked a state-created liberty interest

16   protected under the Due Process Clause. Again, there must be a recognized liberty interest before

17   the court moves on to analyze whether the procedural protections afforded, if any, were sufficient.

18          Plaintiff argues that he did face an atypical and significant hardship implicating a liberty

19   interest when he served eighteen months in disciplinary segregation as a result of the charges

20   stemming from the incident with C. Smith. He cites many conditions that were different in

21   disciplinary segregation (DS) when compared to general population (GP), including: inmates in

22   GP get clothing and food packages, while DS inmates do not; GP inmates have access to the coffee

23   shop, while DS inmates do not; GP inmates get yard and gym time all day with access to weights

24   and the recreation yard, while DS inmates get one hour a day; GP inmates have access to the church

25   and choir and DS inmates do not; GP inmates have visiting room privileges with contact visits,

26   and the opportunity to get food from family members, while DS inmates have visits behind glass

27   with no contact, must wear their orange jumpsuits and are shackled with belly chains and leg

28   shackles the entire time; GP inmates get to wear regular prison clothes and have property

privileges, while DS inmates have to wear orange jumpsuits and have limited property access; GP inmates can shower every day at any time, while DS inmates can shower every three days when the officer says they can do so; GP inmates have tier time, while DS inmates have none; GP inmates can walk to the culinary or work, while DS inmates may not; GP inmates are free of restraints, and DS inmates have their legs and hands cuffed wherever they go; GP inmates have phone privileges any time, but DS inmates can only use the phone once a week; GP inmates have access to hobby craft, and DS inmates do not; GP inmates have access to food and appliances in the prison store, but DS inmates have much more limited access.

He also claims that the disciplinary conviction stopped him from getting parole on September 14, 2016, because the conviction was for institutional violence, and that he was denied good time credits because he could not work while in segregation. (*Id*. at 17.)

In another case filed by Plaintiff in 2011, *Mizzoni v. State of Nevada,* 3:11-cv-00186-LRH-WGC, Plaintiff also raised a Fourteenth Amendment due process claim. In that case, Plaintiff alleged he was not provided with due process in connection with a disciplinary proceeding. In assessing whether he was subject to an atypical and significant hardship, the court looked at the verified allegations of his complaint that alleged in disciplinary segregation he was: unable to get a job; he was denied personal property and clothing and certain appliances general population inmates had; he was denied clothing and food packages general population inmates were able to access; he was only allowed to shower every three days instead of every two days like general population inmates; he was denied a change to have more yard exercise; he was denied hobby craft; he was denied the ability to have his handcuffs and leg shackles removed like other general population inmates; he was denied access to eat in the culinary like general population inmates; and he was denied access to religious and church activities like general population inmates. (*See* 3:11-cv-00186-LRH-WGC, ECF No. 78 at 10-11.) The court concluded that these conditions were not excessive compared to those faced by inmates in general population, and did not present a dramatic departure from the basic conditions of his sentence.

In 3:11-cv-00186-LRH-WGC, Plaintiff's stay in disciplinary segregation was 365 days, which the court considered significant, but because the conditions he alleged were not excessive

1    compared to those in general population, the court concluded that his disciplinary sanction did not

2    give rise to a protected liberty interest. As a result, the undersigned recommended that the

3    defendants' motion for summary judgment be granted as to the due process claim. (3:11-cv-00186-

4    LRH-WGC, ECF No. 78.) District Judge Larry R. Hicks adopted the report and recommendation.

5    (3:11-cv-00186-LRH-WGC, ECF No. 85.) Plaintiff appealed, and the Ninth Circuit affirmed the

6    grant of summary judgment. (ECF No. 95.)

7        Here, the conditions Plaintiff describes relative to his stay in disciplinary segregation are

8    substantially similar to those asserted in 3:11-cv-00186-LRH-WGC. As he did in that case, here

9    Plaintiff has generally pointed out differences between the two categories of housing, but does not

10   describe any condition with specificity or show how it exceeded the conditions in general

11   population so as to raise a genuine dispute of material fact as to whether the conditions he faced

12   were "atypical and significant." As such, this factor weighs against finding a liberty interest was

13   implicated.

14       Next, the court will address the duration of Plaintiff's confinement in disciplinary

15   segregation. In this case, Plaintiff spent eighteen months in disciplinary segregation. This is more

16   time than he spent in disciplinary segregation at Ely State Prison in 3:11-cv-00186-LRH. As

17   indicated above, courts have not established a baseline regarding how much time spent in

18   disciplinary confinement will rise to the level of an atypical and significant hardship. Eighteen

19   months is a significant amount of time to be placed in punitive segregation. This factor weighs in

20   favor of finding a liberty interest was implicated.

21       Finally, the court considers whether the sanction affected the duration of his sentence.

22   While Plaintiff claims that he was denied parole because of the disciplinary conviction, there is no

23   evidence in the record that the parole board had to deny him parole only because he had a violent

24   offense as a disciplinary violation. Instead, the evidence submitted by Plaintiff concerning his

25   parole denial, and the statutes governing parole in Nevada, indicate that the board took into account

26   many factors in denying him parole, and his disciplinary conviction and sanction was just one of

27   those factors. (*See* ECF No. 123 at 156-157; Nevada Revised Statute (NRS) 213.1099.) *Sandin*

28   recognized that a prisoner's confinement in disciplinary segregation would not "inevitably" affect

1    the duration of his sentence since the decision to release a prisoner on parole "rests on a myriad of

2    considerations." *Sandin,* 515 U.S. at 487.

3            Plaintiff also argues that the duration of his sentence was affected because he was unable

4    to work and earn good time credits while in disciplinary segregation. Following *Sandin,* a number

5    of courts have held that while there is a liberty interest in good time credit already earned, there is

6    no liberty interest, and no due process protection, in the mere opportunity to earn good time credits.

7    *See Abed v. Armstrong,* 209 F.3d 63, 66-67 (2nd Cir. 2000) (although inmates have a liberty

8    interest in good time credit they have already earned, no such interest has been recognized in the

9    opportunity to earn good time credit where prison officials have discretion to determine whether

10   an inmate is eligible to earn good time credit); *Antonelli v. Sheahan*, 81 F.3d 1422, 1431 (7th Cir.

11   1996); *Luken v. Scott,* 71 F.3d 192, 193 (5th Cir. 1995); *Ellington v. Clark*, No. 1:09-cv-0054-

12   DLB, 2009 WL 1295781, at * 6 (E.D. Cal. May 8, 2009) (no liberty interest in earning good time

13   credits through work programs) (citing *Toussaint v. McCarthy*, 801 F.3d 1080 (9th Cir. 1986),

14   *overruled on other grounds* by *Sandin* (but, holding that statutory scheme providing for possibility

15   of early release due to good time credits accrued through prison work programs did not create a

16   constitutionally protected liberty interest in the good time work credits)). The court similarly finds

17   that Plaintiff had no liberty interest in the ability to earn good time credits by holding a

18   discretionary prison job.

19           On balance, the factors discussed above weigh against finding that Plaintiff faced an

20   atypical and significant hardship in disciplinary segregation. While Plaintiff was in disciplinary

21   segregation for a significant amount of time, he has not demonstrated that the conditions he faced

22   there were unusually harsh or a major departure from the conditions of his sentence, and there is

23   no evidence it affected the duration of his sentence. As a result, Plaintiff does not implicate a

24   protected liberty interest. With this finding, he cannot succeed on his due process claims, and the

25   court need not reach the issue of whether the procedural protections given were sufficient.

26   ///

27   ///

28   ///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## IV. RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the District Judge enter an order **GRANTING** Defendants' motion (ECF No. 118) and enter judgment in Defendants' favor.

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of receipt. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

DATED: March 12, 2018.

William G. Cobb
WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE